UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DONNA W. SHERWOOD, et al.,           )
                                     )
            Plaintiffs,              )
                                     )
v.                                   )      No.:  3:12-CV-156
                                     )            (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY,           )
                                     )
            Defendant.               )


## <u>MEMORANDUM OPINION AND ORDER</u>

This civil action is before the Court on plaintiffs' Motion for Preliminary Injunction

[Doc. 10]. Plaintiffs request that the Court enter a preliminary injunction requiring defendant

Tennessee Valley Authority ("defendant" or "TVA") to suspend its allegedly new vegetation

management policy of removing trees that have a mature height of fifteen feet or taller until

it has submitted an environmental impact statement pursuant to the National Environmental

Policy Act ("NEPA") and the Court has approved such statement as being in compliance

with NEPA [*Id.*].[1] Defendant filed a response in opposition [Doc. 18], and plaintiffs replied

[Doc. 26]. The Court heard oral argument on the matter on May 17, 2012, and upon TVA's

request [Doc. 30], the Court allowed TVA to file affidavits in support of its position [*See*

Docs. 48, 49, 50]. After oral argument, plaintiffs also filed several documents in support of

---

[1]Plaintiffs later amended this request, asking for an injunction directing TVA, pending
further order of the Court, to stop cutting down trees unless they pose a present or imminent danger
to power lines [*See* Doc. 56].

their position [*See* Docs. 33, 34, 35, 36, 37, 38, 39, 40, 42, 43, 44, 45, 46, 47].[2]  In addition,

plaintiffs filed a supplemental brief in support of their position [Doc. 56], and TVA

responded [Doc. 57].[3]  The Court has thoroughly considered the arguments of the parties,

advanced both in their briefs and orally, as well as the plethora of materials related to the

pending motion.  For the reasons stated herein, plaintiffs' motion will be denied.

## I.     Background

Plaintiffs commenced this action as a result of TVA's allegedly new vegetation

management policy, which plaintiffs submit requires the removal of all trees, by cutting or

using herbicide, that have a mature height of fifteen feet or taller within its 15,900 mile

transmission line right-of-way [Doc. 1].  They assert various claims: an injunction based

upon common law (easements, trespass, conversion of property, and taking of property

without compensation); declaratory and injunctive relief based upon defendant's failure to

make the environmental impact statement required by NEPA prior to implementing the new

policy; declaratory and injunctive relief under the Administrative Procedure Act ("APA")

for defendant's failure to engage in notice and comment rulemaking; and declaratory and

---

[2]Plaintiffs filed such in contravention of Local Rule 7.1; however, because TVA has not contested the post-hearing filings, the Court will consider them.

[3]Plaintiffs filed a motion for leave to file a supplemental brief in excess of the five-page limit established by this Court's Local Rules [Doc. 51].  While plaintiffs requested leave to file a proposed brief thirty-three pages in length, the Court allowed plaintiffs to file an eighteen-page brief on or before 5:00 p.m. Tuesday, May 29, 2012 [Doc. 54], and plaintiffs did so.  Pursuant to the Local Rules, TVA had seven days after service of the supplemental brief to file a response.  *See* E.D. Tenn. L.R. 7.1(d).  A response was filed within this time frame.

injunctive relief under the APA for arbitrary and capricious action [*Id*.]. Plaintiffs also seek to certify their claims as a class action [*Id*.].

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiffs move the Court for a preliminary injunction to suspend TVA's allegedly new vegetation management policy until it has submitted an environmental impact statement pursuant to NEPA and the Court has approved such statement as being in compliance with NEPA [*Id*.].[4] They state they do not seek an injunction pursuant to any of their other claims (i.e., common law and APA claims), and they ask the Court not to require a bond [*Id*.].[5]

## II.    Preliminary Injunction Standard

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief if he believes he will suffer irreparable harm or injury during the pendency of the action. Fed.

---

[4]Again, plaintiffs later amended this request, asking for an injunction directing TVA, pending further order of the Court, to stop cutting down trees unless they pose a present or imminent danger to power lines [*See* Doc. 56].

[5]The Court recognizes that plaintiffs have filed another motion for injunctive relief [Doc. 58]. That motion, however, seeks relief on the basis of plaintiffs' APA and breach of easement claims, whereas the present motion seeks relief on the basis of plaintiffs' NEPA claim only, and therefore does not impact the Court's analysis herein.

The Court also recognizes that, in that motion, plaintiffs move the Court for an injunction enjoining TVA from cutting or removing any trees on plaintiffs' property, including the common areas in the Westminster Place subdivision in Knox County, Tennessee, because TVA had committed to provide sufficient notice before taking action against plaintiffs' trees, but later "retracted" that commitment, stating it would only "endeavor" to provide two weeks' notice before cutting trees on plaintiffs' properties [*See* Doc. 59]. TVA has filed a response, asserting the motion should be denied as moot without prejudice because TVA has agreed to provide plaintiffs with two weeks' notice of schedule cutting of trees on their properties should the Court deny plaintiffs' previously filed request for injunctive relief, unless there is an emergency situation or TVA determines a tree poses an imminent risk to TVA providing continued electrical service [Doc. 64].

3

R. Civ. P. 65. A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). In determining whether to grant a plaintiff's request for injunctive relief, the Court must consider four factors: (1) whether the movant would suffer irreparable harm without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the public interest would be served by the issuance of the injunction; and (4) whether the movant has demonstrated a strong likelihood of success on the merits. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (citation omitted). The factors are to be balanced and are "not prerequisites that must be met." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted). A stronger showing of likelihood of success on the merits is required if the other factors militate against granting relief, but a lesser showing of likelihood of success on the merits is required when the other factors support granting relief. *Performance Unlimited, Inc. v. Questar Publ'rs, Inc.*, 52 F.3d 1373, 1385–86 (6th Cir. 1995) (citations omitted).

## III.    Analysis

### A.    Strong Likelihood of Success on the Merits

#### 1.    Standard of Review for Plaintiffs' NEPA Claim

NEPA is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), and is designed to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent

4

or eliminate damage to the environment and biosphere and stimulate the health and welfare of man," 42 U.S.C. § 4321. To that end, NEPA requires federal agencies to take a "hard look" at the environmental consequences of their projects before taking action. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989); 42 U.S.C. § 4332(2)(C). NEPA also requires that federal agencies follow the necessary process in assessing the environmental effects of projects; it does not, however, mandate a specific result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980). In other words, NEPA's mandate is essentially procedural. *Id.*

A primary provision of NEPA is the requirement that all federal agencies prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1508.18; *Sw. Williamson Cnty. Assn., Inc. v. Slater*, 243 F.3d 270, 274 n.3 (6th Cir. 2001). "Major" has no meaning independent of "significantly," and "actions" "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18. An EIS is the most detailed and comprehensive level of review under NEPA regulations. *See* 40 C.F.R. § 1508.11; *see also* 40 C.F.R. Part 1502.

Prior to preparing an EIS, the agency may, however, prepare an environmental assessment ("EA") as a preliminary step in determining whether the environmental impact

of the proposed action is sufficiently significant to warrant an EIS. *See* 40 C.F.R. §

1508.9(a)(1). "The EA is to be a 'concise public document' that '[b]riefly provide[s]

sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of*

*Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (alterations in original) (quoting 40 C.F.R.

§ 1508.9(a)). "If, pursuant to [an] EA, an agency determines that an EIS is not required

under applicable [regulations issued by the Council on Environmental Quality ("CEQ")], it

must issue a 'finding of no significant impact' ('FONSI'), which briefly presents the reasons

why the proposed agency action will not have a significant impact on the human

environment."[6] *Id.* at 757–58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

In some cases, however, the agency need not go through this process. An agency need

not prepare and EIS or an EA if the agency determines that the proposed action falls within

an established categorical exclusion ("CE"). *Wilderness Watch v. Iwamoto*, No. C10-1797-

JCC, 2012 WL 1072064, at *14 (W.D. Wash. Mar. 27, 2012). A "categorical exclusion" is

defined as:

> a category of actions which do not individually or cumulatively have
> a significant effect on the human environment and which have been
> found to have no such effect in procedures adopted by a Federal agency
> in implementation of these regulations (§ 1507.3) and for which,
> therefore, neither an environmental assessment nor an environmental
> impact statement is required.

---

[6]NEPA crated the CEQ, which is charged with assessing federal programs and activities in light of the policy goals of NEPA. 42 U.S.C. §§ 4342, 4344. The CEQ has promulgated regulations to assist federal agencies in complying with NEPA. *See* 40 C.F.R. Part 1500.

40 C.F.R. § 1508.4. A CE ensures that agencies comply with NEPA in a manner that does not divert agency resources away from matters of real environmental concern or unnecessarily delay federal activities. *See* 40 C.F.R. §§ 1500.4(p), 1500.5(k). A CE may not be used, however, where "extraordinary circumstances [exist] in which the normally excluded action may have a significant environmental effect." *See* 40 C.F.R. § 1508.4.

TVA proposed and, after public review and comment and with CEQ's approval, promulgated twenty-eight CEs, which are set forth in TVA's Procedures for Compliance with the National Environmental Policy Act [*See* Doc. 49]. *See Tennessee Valley Authority Implementation of Procedures on the National Environmental Policy Act*, 45 Fed. Reg. 54,511 (Aug. 15, 1980); *Tennessee Valley Authority Revisions to Procedures Implementing the National Environmental Policy Act*, 48 Fed. Reg. 19,264 (Apr. 28, 1983); Tennessee Valley Authority, Procedures for Compliance with the National Environmental Policy Act, *available at* http://www.tva.com/environment/reports/pdf/tvanepa_procedures.pdf (last visited June 14, 2012) ("TVA NEPA Compliance Procedures"). Among them is a CE that covers "[r]outine operation, maintenance, and minor upgrading of existing TVA facilities." TVA NEPA Compliance Procedures at 5.2.1. For many years, TVA did not document its CE determinations because CEQ's regulations did not require TVA to do so, *see Council on Environmental Quality Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34,263, 34,265 (July 28, 1983); however, recently, TVA began documenting its CE determinations through use of a Categorical Exclusion Checklist ("CEC") [*See* Docs. 18, 49]. TVA also has established, consistent with regulations, two possible extraordinary circumstances that would

trigger a heightened environmental assessment and preclude the use of a CE: "(1) the proposed action could have a potentially significant impact on a threatened or endangered species, wetland or floodplain, cultural or historical resource, important farmland, or other environmentally significant resource;" and "(2) substantial controversy over the significance of the environmental impacts associated with the proposed action has developed or is likely to develop." TVA NEPA Compliance Procedures at 5.2.

Although plaintiffs claim they are seeking injunctive relief based only upon their NEPA claim—that is, that defendant was required to prepare an EIS before implementing its allegedly new vegetation management policy but failed to do so—NEPA itself does not provide a private right of action to review an agency's decision. *Sierra Club v. Slater*, 120 F.3d 623, 630–31 (6th Cir. 1997). Rather, federal courts have jurisdiction to review NEPA claims only pursuant to the APA, 5 U.S.C. § 704. *Id*. The Court thus reviews plaintiffs' request for relief pursuant to the APA.

It is well settled that a reviewing court grants substantial deference to an agency's determination under NEPA, including decisions regarding what level of environmental review is needed. Such a determination will be upheld so long as the determination was not arbitrary, capricious, or an abuse of discretion. *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 412 (1976); *Marsh*, 490 U.S. at 376 (1989); *Sierra Club v. Slater*, 120 F.3d at 632 (also indicating that an agency's determination may be set aside it if is "otherwise not in accordance with the law"); *Tenn. Clean Water Network v. Kempthorne*, No. 3:05-CV-214, 2007 WL 2220414, at *4 (E.D.

Tenn. July 27, 2007). In other words, an agency's decision must be "reasonable under the circumstances" when viewed "in the light of the mandatary requirements and the standard set by NEPA." *Kelley*, 42 F.3d at 1519. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted).

In engaging in its review, a court cannot "'substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue.'" *Kelley*, 42 F.3d at 1518 (citation omitted). A court must, however, "determine whether the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Id.* (citation and internal quotation marks omitted). At bottom, the review is "a narrow one." *Marsh*, 490 U.S. at 378.

## 2. Discussion

The Court finds it appropriate to first address whether there is a new vegetation management policy at issue, as the matter is one the parties dispute. Plaintiffs assert TVA has implemented a new policy that requires the cutting down of "virtually all" of the trees in the transmission line rights-of-way that are fifteen feet tall or taller, or have the potential of growing fifteen feet or taller.

TVA, on the other hand, has denied that it has a new vegetation management policy, claiming its current reclearing policy is consistent with its "Right-Of-Way (ROW) Maintenance Reclearing Guidelines" set forth in TVA's Line Maintenance Manual, which went into effect in December 2008 and provides the minimum right-of-way widths to be

9

recleared for certain types of transmission lines (the "2008 Manual") [Doc. 18-1]. For example, pursuant to the 2008 Manual, for 500-kV lines, 150 feet are to be recleared, leaving a 25-foot buffer zone on each side if the right-of-way is 200 feet wide and a 12.5-foot buffer zone on each side if the right-of-way is 175 feet wide. The 2008 Manual also provides guidelines for trees growing on right-of-way buffer zones; generally, unless "hazardous or detrimental to maintenance," the policy allows "low-growing" vegetation, although "low-growing" is not expressly defined.[7]

The Court has reviewed all the evidence submitted in this case and finds that, while TVA may not be clearing trees pursuant to a new policy, TVA has likely become more strict in the manner in which it implements its current vegetation management policy, as set forth in the 2008 Manual. Indeed, counsel for TVA conceded as much during the hearing on this matter, noting TVA is more strictly implementing its right-of-way maintenance guidelines in light of recent regulatory changes and fund availability [*See*, *e.g.*, Doc. 41 at 5; *see also* Doc. 35]. In making this determination, the Court notes TVA employees have made comments in the press indicating there is new policy, program, or initiative [*see* Doc. 22], and even discussed with plaintiffs what TVA representatives termed a new policy [*see* Doc. 24]. The Court also notes documents published on TVA's own website, which refer to a change in the way TVA manages vegetation [Docs. 29-5, 29-6], and a letter sent to landowners that states TVA is "now exercising [its] right to clear virtually all trees located

---

[7]TVA submits that these guidelines and policies are identical to those set forth in the 1997 Line Maintenance Manual [*See* Doc. 18-2].

10

on TVA easements" [Doc. 23-8]. Further, the affidavit of TVA's Manager of Line Applied Services in the Energy Delivery organization, Jason Regg, indicates that TVA "now has an objective standard" for tree height that it did not previously have and is now "more closely adhering to its reclearing guidelines and not allowing exceptions as it had in the past" [Doc. 50].

Nevertheless, such determination is not dispositive of the issue before the Court; that is, whether plaintiffs have shown a strong likelihood that TVA's decision that implementation of its vegetation management, or reclearing, policy for the Knoxville Sector[8] for 2012 (hereinafter the "2012 reclearing project") falls within a CE was arbitrary or capricious. *See Ctr. for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687, 701 (D. Ariz. 2011) (noting that "'[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the [APA]'s arbitrary and capricious standard'" (alteration in original and citation omitted)); *Reed v. Salazar*, 744 F. Supp. 2d 98, 115 (D.D.C. 2010) (same).[9]

TVA claims it decided, pursuant to a CEC, that the implementation of its 2012 reclearing project falls within the categorical exclusion that covers "[r]outine operation,

_____

[8]TVA's transmission system is divided into multiple sectors, one of which is called the Knoxville Sector [Doc. 50].

[9]The entirety of the CEC for the 2012 reclearing project for the Knoxville Sector was provided to the Court by TVA [Docs. 48-1, 48-2, 48-3]. Neither plaintiffs nor TVA provided the Court with a CEC for any other sector. Accordingly, the Court can determine only whether TVA's determination that implementation of its 2012 reclearing project for the Knoxville Sector falls within a CE was arbitrary and capricious.

maintenance, and minor upgrading of existing TVA facilities." *See* TVA NEPA Compliance Procedures at 5.2.1. Plaintiffs assert the CEC, however, is not only arbitrary and capacious, but fraudulent. In particular, they claim the easement technician who prepared the CEC, John Hardyman, stated the new policy is not major in scope, when in fact it is major in scope; stated the 2012 reclearing project is not part of a project involving other actions of TVA when it is part of a multi-state project covering TVA's entire 15,900 mile right-of-way; stated the new policy would not involve more than a minor amount of land when it involves all 15,900 miles of TVA's right-of-way that is 150 to 200 feet wide, which is about half the size of the Great Smoky Mountains National Park; and stated the 2012 reclearing project would not cause soil erosion when it will cause massive soil erosion.

At this time, and based on the record currently before it, the Court cannot find that there is a strong likelihood of success regarding plaintiffs' NEPA claim. In determining that the 2012 reclearing project falls within the CE for routine operation, maintenance, and minor upgrading of existing facilities, a TVA employee with extensive experience in preparing CECs, Mr. Hardyman, completed a CEC for the 2012 reclearing project [*See* Doc. 48]. The CEC includes five parts with multiple questions, each of which requires a yes or no answer [*Id.*]. Part one asks questions about the characteristics of the project, including whether it is major in scope, is part of a larger project, and involves more than a minor amount of land. Mr. Hardyman answered these questions in the negative [*Id.*]. Plaintiffs claim such responses were arbitrary and capricious, though, because TVA is cutting down virtually all the trees in the Knoxville Sector alone and the cost to do so is approximately $10,000 to

$12,000 per mile. Plaintiffs further assert the project is part of a larger multi-state project covering TVA's entire transmission line system. The CEC also asks, in the part addressing potential pollutant generation, whether the project will cause soil erosion, and Mr. Hardyman answered "no" and provided some supporting commentary for his determination [*Id.*]. Plaintiffs assert the supporting commentary demonstrates the negative answer was arbitrary and capricious because it states the project will not involve road construction. Finally, among other things, the CEC asks about social and economic effects, including whether the project will contrast with existing land use, produce visual discord, or interfere with recreational or educational uses, and Mr. Hardyman answered each in the negative [*Id.*]. Plaintiffs, however, assert the project will have such effects, rending the determination arbitrary and capricious.

The Court finds these negative responses were likely not arbitrary or capricious because Mr. Hardyman did not just "check the box" in answering the questions as plaintiffs suggest. Rather, it appears he conducted a hard look into the environmental impacts of the project, producing over 700 pages of materials in support of his determinations [Docs 48, 48-1, 48-2, 48-3, 48-4, 48-5]. More specifically, in making these determinations, Mr. Hardyman received a list of plots, which are diagrams used to identify transmission line segments and other information, for the proposed work area [Doc. 48]. He entered the plots into TVA's System Applied Maintenance ("SAM") database to identify specific segments and structures for which right-of-way maintenance was proposed and to obtain plan and profile drawings for those segments and structures [*Id.*]. Mr. Hardyman then cross-referenced the list of line

13

segments and structures with TVA's sensitive area review ("SAR") database[10] to identify areas of known environmental concern [*Id.*]. With this information, he prepared a spreadsheet, identifying known areas of environmental concern within and near the proposed work areas, and maps with overlays depicting lines, structures, and sensitive areas of environmental concern [*Id.*]. The spreadsheet also identifies, among other things, the environmental specialist responsible for issues relating to the identified areas of environmental concern and a brief description of limitations on work performed in or near the area of environmental concern for each line segment [*Id.*]. For example, for certain lines, it is noted that trees can be cut down only between certain dates because the area is known as a summer roosting habitat for the Indiana Bat [*See*, *e.g.*, Doc. 48-2].

Also, it appears that Mr. Hardyman's particular determinations that the project is not major in scope, does not involve more than a minor amount of land, and is not part of a larger project were based upon the consideration that maintenance of existing rights-of-way is recurring and routine, as such is conducted every year, limited to specific line segments and structures, and does not involve a changed use of the property. Indeed, TVA has submitted evidence to the Court indicating that a CEC is completed for right-of-way maintenance each year for each sector, and that TVA has always considered its right-of-way maintenance to fall within the CE for routine operation, maintenance, and minor upgrading of existing facilities because most of the trees in the rights-of-way were removed years ago and because

---

[10]The SAR database consists of more than 30,000 records of protected plants, animals, caves, heroines, eagle nests, and natural areas within the TVA power service area [Doc. 48].

each sector is different in terms of topography and flora and fauna, among other things [Docs. 18, 48, 49]. Also, it appears Mr. Hardyman's determinations were based on the fact that the land proposed to be cleared within the Knoxville Sector is relatively small compared to the total right-of-way area within the Knoxville Sector and the entire system [Doc. 48]. Regarding soil erosion, while Mr. Hardyman's comments mentioned there would be no road construction, a seemingly irrelevant consideration, he also found there would be no soil disturbance and referred to previous comments indicating that compliance with TVA's BMP Manual would eliminate the impact on wetlands, water flow, and stream channels [*See* Doc. 48-1]. Mr. Hardyman further provided comments about whether the 2012 reclearing project would contrast with existing land use [*Id.*].[11]

Moreover, the Court notes the CEC completed by Mr. Hardyman was reviewed by the Site Environmental Compliance Reviewer for the project, Kent Smithson, an Environmental Program Manager for TVA's Energy Delivery organization, as well as Jason Regg [Doc. 48]. Mr. Smithson and Mr. Regg concurred in Mr. Hardyman's determinations. Thus, while such review was internal in scope, it appears that TVA nonetheless took a hard look at the environmental consequences of the 2012 reclearing project and that its decision that such project falls within the CE for routine operation, maintenance, and minor upgrading of existing facilities was reasonable under the circumstances. *Cf. Center for Biological*

---

[11]Regarding plaintiffs assertion that Mr. Hardyman arbitrarily and capriciously answered questions about visual discord and recreational or educational uses, the Court notes plaintiffs did not elaborate on this assertion and TVA did not address it in its response.

15

*Diversity*, 791 F. Supp. 2d at 703 (finding "unexplained conclusion" that a permit would have no cumulatively significant environmental effects insufficient to support application of a CE).

Such determination, however, does not end the Court's inquiry. Plaintiffs also assert the decision that the 2012 reclearing project qualifies for the CE that covers routine operation, maintenance, and minor upgrading of existing TVA facilities was arbitrary and capricious because there is substantial controversy over the environmental impacts associated with the 2012 reclearing project; thus, TVA should have determined that the extraordinary circumstances exception for "substantial controversy over the significance of the environmental impacts associated with the proposed action" precluded use of the CE. TVA NEPA Compliance Procedures at 5.2. In support of plaintiffs' position, plaintiffs point to various news articles discussing the public's opposition to the 2012 reclearing project, a resolution enacted by the Chattanooga City Council in opposition against the 2012 reclearing project, TVA's newspaper advertisements "defending" the 2012 reclearing project, and statements of various public officials and entities indicating their opposition to the 2012 reclearing project. TVA claims plaintiffs' asserted controversy is not the type of controversy that triggers the extraordinary circumstances exception. Rather, TVA explains, "controversy" refers to a substantial dispute as to the size, nature, or effect of the action, not to the existence of public opposition to it.

"Judicial review of the applicability of an extraordinary circumstances exception is informed by the agency's guidelines." *United States v. Coal. for Buzzards Bay*, 644 F.3d 26,

16

35 (1st Cir. 2011) (citations omitted). TVA construes substantial controversy to mean "a substantial dispute over the analysis of the size, nature, or effect of the proposed action," and this interpretation is consistent with case law [Doc. 18]. *See Town of Cove Creek v. F.A.A.*, 325 F.3d 320, 331 (D.C. Cir. 2003) ("a substantial dispute . . . as to the size, nature, or *effect* of the major federal action rather than to the existence of opposition to a use" (internal quotation marks and citation omitted)); *see also Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004) ("Put another way, a proposal can be considered controversial if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor.'" (citation omitted)); *North Carolina v. F.A.A.*, 957 F.2d 1125, 1133–34 (4th Cir. 1992) (noting that if controversy were equated with opposition, the EIS "outcome would be governed by a 'heckler's veto'" (citation omitted)). Moreover, TVA states it considers three matters when determining whether there is substantial controversy regarding a certain action: (1) whether the controversy is about the significance of environmental impacts, not mere opposition; (2) whether the controversy is scientifically based; and (3) the context in which the controversy arises, including the number of people potentially affected by an action in relation to the number of people who object to the action [*See* Doc. 49]. Thus, and in light of TVA's interpretation of substantial controversy, the Court finds it was likely not arbitrary or capricious for TVA to conclude the extraordinary circumstances exception for substantial controversy did not apply here. And while plaintiffs also submit affidavits of Anthony Laurence King, a birder and forester, which arguably could be scientifically based opposition, the Court finds his assertions do not constitute the type of

17

scientifically based opposition TVA considers in assessing whether the extraordinary circumstances exception applies, that is, for example, objection from other governmental agencies or entities with environmental expertise [*See* Doc. 49].[12]

Plaintiffs claim "controversial" can nevertheless encompass public opposition, citing *United States v. Coalition for Buzzards Bay* in support. *Buzzards Bay* can be distinguished from this case, however, because one of promulgated extraordinary circumstance exceptions to utilizing a CE by the agency involved in that case was whether the proposed action would likely "be highly controversial in terms of scientific validity *or public opinion*." 644 F.3d at 35 (emphasis added). TVA's promulgated extraordinary circumstances exception for substantial controversy does not address public opinion, but only "substantial controversy over the significance of the environmental impacts associated with the proposed action." TVA NEPA Compliance Procedures at 5.2. Accordingly, *Buzzards Bay* is distinguishable from the present case.

In sum, after considering the present record under the "narrow" standard of review, the Court cannot find there is a strong likelihood of success on plaintiffs' claim that TVA's decision that implementation of the 2012 reclearing policy falls within the CE for routine

_____

[12]The Court further notes that the CEC was completed on September 29, 2011, and that the public opposition claimed by plaintiffs did not exist at that time. Thus, TVA's finding that the extraordinary circumstances exception for substantial controversy did not apply was not likely arbitrary and capricious. Moreover, even though the public opposition would have been apparent to TVA at the time the CEC was updated—February 15, 2012, and May 4, 2012—the public opposition claimed by plaintiffs, as the Court has found, is not the type of opposition that would have triggered the extraordinary circumstances exception.

18

operation, maintenance, and minor upgrading of existing TVA facilities was arbitrary and capricious.

### B. Irreparable Harm

Plaintiffs claim the irreparable injury is "obvious and immense" because, as a result of TVA's failure to comply with NEPA, TVA has several crews that are wrongfully cutting down trees every day that weather permits in Knoxville, Chattanooga, Johnson City, and Lenoir City, and perhaps in other states. They generally state that, every day, hundreds of trees are cut down, more and more birds' nests are destroyed, and more and more baby birds are killed, and none of such can be brought back to life. Plaintiffs also have submitted estimates that three million to fifteen million trees will be destroyed as a result of the 2012 reclearing project.

While the Court is cognizant of the environmental concerns identified by plaintiffs and does not doubt that there could be some irreparable harm to the environment in the absence of an injunction if plaintiffs ultimately succeed in this action, the Court is mindful of its determination that plaintiffs are not likely to succeed on the merits of their NEPA claim, and this factor lessens the likelihood of irreparable harm. Indeed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987), but the Court cannot find that there is a strong likelihood that NEPA has been violated here and the Supreme Court has made clear that violations of procedural environmental statutes do not mandate the issuance of an injunction, *Hirt v.*

19

*Richardson*, 127 F. Supp. 2d 833, 845 (W.D. Mich. 1999) (NEPA violations do not create a presumption of irreparable injury). Thus, even if the Court had found that plaintiffs demonstrated a strong likelihood of success on the merits of their NEPA claim, it would not be obligated to grant an injunction. Further, the Court notes TVA's assessment of the environmental impacts of its 2012 reclearing project indicates that the environmental impacts will not be significant because various measures will be taken to minimize any harm. For example, the CEC indicates, among other things, that herbicides should not be used in certain areas, such as the Daniel Boone National Forest, and that debris from the project should not be allowed to enter the Clinch River [*See* Docs. 48-1, 48-2, 48-3]. The Court additionally recognizes that, with respect to the 2012 reclearing project and out of almost 16,000 miles of right-of-way, TVA has scheduled and budgeted for only 2,668 miles of right-of-way for tree maintenance and only 4,962 miles of right-of-way for mowing and spraying, and for the Knoxville Sector in particular, TVA has scheduled less than 190 miles of right-of-way for tree maintenance [Doc. 50].

## C. Harm to Others

Plaintiffs claim the requested injunction would not pose any danger to the public because it would not interfere with TVA's right to cut down trees that pose a danger to TVA's transmission lines, and TVA could cut down trees pursuant to its pre-2012 policy. Plaintiffs' assertion is based upon the proposition that there is a new policy in effect; however, the Court does not find that there is a new policy for vegetation management or reclearing, just that TVA is more strictly implementing the policy that has been in place since

1997.  Thus, there would be some harm to TVA in the injunction were granted.  Moreover, TVA asserts that this strict implementation is necessary to protect the public and ensure energy delivery, with TVA noting by way of example the August 2003 electric power blackout in the United States and Canada, which affected approximately 50 million people and cost the economy an estimated $4 billion to $10 billion in the United States alone and was, in part, the result of failing to manage adequately tree growth in transmission line rights-of-way.

### D.    Public Interest

Plaintiffs assert the public interest would be served by an injunction because TVA would be required to undertake a more extensive environmental review, as required by NEPA, and because preservation of the environment is in the public interest.  The Court does not dispute that preservation of the environment is in the public interest, but as discussed, it is not likely that TVA was required to undertake any more environmental review than it did. Plaintiffs further assert the opposition from various public officials and entities indicates that the 2012 reclearing project is not in the public interest.  The Court also notes, however, that the public has an interest in maintaining electricity and not allowing TVA to implement its reclearing policy for 2012 could harm this interest.  Indeed, disturbances of the transmission of power affect the reliability of many devices relied upon by the general public, including, for example, security systems, production devices, medical devices, water purification and sewage treatment systems, fire and safety systems, and communication systems.

## IV.    Conclusion

In conclusion, and for the reasons stated above, the Court finds the factors a court must consider in determining whether to grant preliminary injunctive relief weigh against granting plaintiffs' motion.  The Court therefore **DENIES** plaintiffs' Motion for Preliminary Injunction [Doc. 10].

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE