UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DONNA W. SHERWOOD, et al.,        )
                                  )
            Plaintiffs,           )
                                  )
v.                                )     No.:  3:12-CV-156
                                  )           (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY,        )
                                  )
            Defendant.            )

## MEMORANDUM OPINION

This civil action is before the Court on defendant Tennessee Valley Authority's ("TVA") Motion for Summary Judgment on Count II (the NEPA Count) of the Second Amended Complaint [Doc. 129]. Plaintiffs filed a response [Doc. 139], and defendant replied [Doc. 147]. After careful consideration of the parties' arguments, the record in this case, and the relevant law, the Court finds the motion well taken and will dismiss the NEPA claim.

## I.    Background

Plaintiffs commenced this action on or about April 3, 2012, as a result of TVA's allegedly new vegetation management policy, which plaintiffs submit requires the removal of all trees, by cutting or using herbicide, that have a mature height of fifteen feet or taller within TVA's 15,900 mile transmission line right-of-way [Doc. 1].[1] Plaintiffs are

---

[1] Plaintiffs filed an amended complaint on May 2, 2012 [Doc. 8], and a second amended complaint on June 12, 2012 [Doc. 62]. As discussed herein, the Court afforded plaintiffs leave to file a third amended complaint on February 19, 2013 [*See* Docs. 162, 168, 170].

citizens and residents of Tennessee [Doc. 170 ¶ 1]. Defendant TVA "maintains high voltage electric transmission lines to conduct electricity from sites where the electricity is generated to sites where the electricity is consumed, throughout a seven state region[,] including Tennessee" [*Id.* ¶ 6].[2]

In their second amended complaint, plaintiffs brought four claims, designated as "counts": an injunction based upon common law (easements, trespass, conversion of property, and taking of property without compensation) ("Count I"); declaratory and injunctive relief based upon defendant's failure to make the environmental impact statement required by the National Environmental Policy Act ("NEPA") prior to implementing the new policy ("Count II"); declaratory and injunctive relief under the Administrative Procedure Act ("APA") for defendant's failure to engage in notice and comment rulemaking ("Count III"); and declaratory and injunctive relief under the APA for arbitrary and capricious action ("Count IV") [*Id.* ¶¶ 94–125]. In response, TVA filed a motion to dismiss Counts I, III, and IV, and a motion for summary judgment with respect to Count II [Docs. 65, 129]. Plaintiffs filed a motion to amend the complaint, which asked for leave to assert additional causes of action and to include additional plaintiffs [Doc. 83].

Considering the motion to dismiss and motion to amend together, the Court granted the motion to dismiss and granted in part and denied in part the motion to amend, finding plaintiff could include certain individuals as additional plaintiffs but could not assert

---

[2] The Court assumes familiarity with the record in this case and recites only the background necessary for purposes of this opinion.

2

additional causes of action against TVA [Doc. 162]. Plaintiffs thus filed a third amended complaint, which sets forth additional factual paragraphs and asserts noncompliance with NEPA [Doc. 170].

TVA has notified the Court that the filing of the third amended complaint should not moot the pending motion for summary judgment because the sole cause of action in the third amended complaint is for violation of NEPA and is substantially identical to the NEPA cause of action alleged in the second amended complaint [Doc. 173]. Because the Court agrees, and because plaintiffs did not object to TVA's characterization, the Court turns to the merits of the motion for summary judgment. *See Graham v. City of Oklahoma City*, 859 F.2d 142, 144–45 (10th Cir. 1988) (initial motion for summary judgment properly granted where original complaint and amended complaint were "substantially identical" and plaintiff had "adequate notice and sufficient opportunity to meet defendants' arguments contained in the initial motion for summary judgment" (footnote omitted)).

## II.     Standard of Review for Summary Judgment Motion

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be

3

viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

4

"Summary judgment . . . is a particularly useful method of reviewing federal agency decisions[, as here,] because 'the sole question at issue [is] a question of law,' and the underlying material facts are contained in the administrative record." *Lone Tree Council v. U.S. Army Corps of Eng'rs*, No. 06-12042-BC, 2007 WL 1520904, at *11 (E.D. Mich. May 24, 2007) (second alteration in original and citation omitted). "The Court's role is to determine whether judgment as a matter of law is appropriate for either party, in light of the standard of review prescribed by [NEPA] and interpretive case law of an agency's decision not to prepare an [environmental impact statement]." *Id.*

## III. Analysis

NEPA is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), and is designed to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man," 42 U.S.C. § 4321. To that end, NEPA requires federal agencies to take a "hard look" at the environmental consequences of their projects before taking action. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989); 42 U.S.C. § 4332(2)(C). NEPA also requires that federal agencies follow the necessary process in assessing the environmental effects of projects; it does not, however, mandate a specific result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980). In other words, NEPA's mandate is essentially procedural. *Id.*

5

A primary provision of NEPA is the requirement that all federal agencies prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1508.18; *Sw. Williamson Cnty. Assn., Inc. v. Slater*, 243 F.3d 270, 274 n.3 (6th Cir. 2001). "Major" has no meaning independent of "significantly," and "actions" "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18. An EIS is the most detailed and comprehensive level of review under NEPA regulations. *See* 40 C.F.R. § 1508.11; *see also* 40 C.F.R. Part 1502.

Prior to preparing an EIS, the agency may, however, prepare an environmental assessment ("EA") as a preliminary step in determining whether the environmental impact of the proposed action is sufficiently significant to warrant an EIS. *See* 40 C.F.R. § 1508.9(a)(1). "The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (alterations in original) (quoting 40 C.F.R. § 1508.9(a)). "If, pursuant to [an] EA, an agency determines that an EIS is not required under applicable [regulations issued by the Council on Environmental Quality ("CEQ")], it must issue a 'finding of no significant impact' ('FONSI'), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757–58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

6

In some cases, however, the agency need not go through this process. An agency need not prepare and EIS or an EA if the agency determines that the proposed action falls within an established categorical exclusion ("CE"). *Wilderness Watch v. Iwamoto*, No. C10-1797-JCC, 2012 WL 1072064, at *14 (W.D. Wash. Mar. 27, 2012). A "categorical exclusion" is defined as:

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 C.F.R. § 1508.4. A CE ensures that agencies comply with NEPA in a manner that does not divert agency resources away from matters of real environmental concern or unnecessarily delay federal activities. *See* 40 C.F.R. §§ 1500.4(p), 1500.5(k). A CE may not be used, however, where "extraordinary circumstances [exist] in which the normally excluded action may have a significant environmental effect." *See* 40 C.F.R. § 1508.4.

TVA proposed and, after public review and comment and with CEQ's approval, promulgated twenty-eight CEs, which are set forth in TVA's Procedures for Compliance with the National Environmental Policy Act [*See* Doc. 49]. *See Tennessee Valley Authority Implementation of Procedures on the National Environmental Policy Act*, 45 Fed. Reg. 54,511 (Aug. 15, 1980); *Tennessee Valley Authority Revisions to Procedures Implementing the National Environmental Policy Act*, 48 Fed. Reg. 19,264 (Apr. 28, 1983); Tennessee Valley Authority, Procedures for Compliance with the National Environmental Policy Act,

7

*available at* http://www.tva.com/environment/reports/pdf/tvanepa_procedures.pdf (last visited July 10, 2013) ("TVA NEPA Compliance Procedures"). Among them is a CE that covers "[r]outine operation, maintenance, and minor upgrading of existing TVA facilities." TVA NEPA Compliance Procedures at 5.2.1. For many years, TVA did not document its CE determinations because CEQ's regulations did not require TVA to do so, *see* Council on Environmental Quality Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,263, 34,265 (July 28, 1983); however, TVA recently began documenting its CE determinations through use of a Categorical Exclusion Checklist ("CEC") [*See* Docs. 18, 49]. TVA also has established, consistent with regulations, two possible extraordinary circumstances that would trigger a heightened environmental assessment and preclude the use of a CE: "(1) the proposed action could have a potentially significant impact on a threatened or endangered species, wetland or floodplain, cultural or historical resource, important farmland, or other environmentally significant resource;" and "(2) substantial controversy over the significance of the environmental impacts associated with the proposed action has developed or is likely to develop." TVA NEPA Compliance Procedures at 5.2.

Federal courts have jurisdiction to review NEPA claims only pursuant to the APA, 5 U.S.C. § 704. *Sierra Club v. Slater*, 120 F.3d 623, 630–31 (6th Cir. 1997). It is well settled that a reviewing court grants substantial deference to an agency's determination under NEPA, including decisions regarding what level of environmental review is needed. Such a determination will be upheld so long as the determination was not arbitrary, capricious, or an abuse of discretion. *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995);

8

*see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 412 (1976); *Marsh*, 490 U.S. at 376 (1989); *Sierra Club v. Slater*, 120 F.3d at 632 (also indicating that an agency's determination may be set aside it if is "otherwise not in accordance with the law"); *Tenn. Clean Water Network v. Kempthorne*, No. 3:05-CV-214, 2007 WL 2220414, at *4 (E.D. Tenn. July 27, 2007). In other words, an agency's decision must be "reasonable under the circumstances" when viewed "in the light of the mandatory requirements and the standard set by NEPA." *Kelley*, 42 F.3d at 1519. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted).

In engaging in its review, a court cannot "'substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue.'" *Kelley*, 42 F.3d at 1518 (citation omitted). A court must, however, "determine whether the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Id.* (citation and internal quotation marks omitted). At bottom, the review is "a narrow one." *Marsh*, 490 U.S. at 378.

A. **Plaintiffs' Request for Discovery**

Before turning to the merits of the summary judgment motion, the Court must address an issue that was raised in plaintiffs' response to the motion. Plaintiffs ask the Court to allow discovery prior to a ruling on the motion for summary judgment. They

9

specifically request to take the deposition of John Hardyman and to obtain documents that would demonstrate whether TVA cleared the right-of-ways when TVA initially installed the transmission lines.

The Court finds this request is moot because of previous orders of the Court. In addition to requesting discovery in their response to the motion for summary judgment, plaintiffs filed a motion to supplement the administrative record submitted by TVA [Doc. 142] and a motion to compel [Doc. 153]. In the motion to supplement, plaintiffs specifically asked the Court to supplement the administrative record with approximately thirty-six documents set forth in a submitted table of documents [Doc. 142-1] and to allow them to depose certain TVA officers. The motions were referred to Magistrate Judge H. Bruce Guyton, who determined that TVA had to produce any documents identified in the table that were in existence at the time of TVA's decision underlying this litigation and that plaintiffs should be afforded the opportunity to depose one official of TVA, John Hardyman. The magistrate judge denied any other discovery [Doc. 181].

Plaintiffs sought reconsideration of this order, which the Court denied [Doc. 189]. Plaintiffs deposed John Hardyman [*see* Docs. 190-1, 191], and the parties have submitted supplemental filings in support of their positions concerning TVA's motion for summary judgment [Docs. 190, 194, 197]. The Court considers these filings in reviewing TVA's request for summary judgment.

10

## B. Consideration of Materials Outside the Administrative Record

The scope of a NEPA review is narrow; it is limited to "a review of the administrative record and a determination, based on the administrative record, of whether that decision was arbitrary and capricious." *Tenn. Clean Water Network*, 2005 WL 2464675, at *8. "[T]he Court is to review the 'administrative record already in existence, not some new record made initially in the reviewing court.'" *Id.* at *6. It "consists of all the materials compiled by the agency that were before the agency at the time of the decision at issue." *Id.* Supplementation of the record is limited and may be appropriate when the plaintiff makes a strong showing of bad faith on the part of the agency, when the agency deliberately or negligently excludes documents, or when the Court needs certain background information to determine whether the agency considered all of the relevant factors. *Id.*; *see also River Fields, Inc. v. Peters*, No. 3:08-CV-264-S, 2009 WL 2222901, at *4 (W.D. Ky. July 23, 2009) (judicial review of agency determination that a CE applies is "limited to the administrative record"); *Hells Canyon Pres. Council v. Jacoby*, 9 F. Supp. 2d 1216, 1222 (D. Or. 1998) (holding that judicial review of an agency's determination that a CE applies "is limited to review of the administrative record before the agency at the time of the decision").

TVA has submitted the administrative record documenting its review of the 2012 vegetation maintenance project under its NEPA procedures [Docs. 114–26]. TVA asks the Court to supplement the administrative record with previously-filed declarations of three TVA employees: John Hardyman, Aaron Nix, and Jason Regg [Docs. 48, 49, 50].

11

TVA submits that these declarations explain TVA's NEPA procedures and TVA's right-of-way vegetation management program and are therefore appropriate background information. The Court has reviewed these declarations and finds that they contain appropriate background information for the Court to consider in determining whether TVA acted arbitrarily or capriciously.

The Court will also supplement the administrative record with those materials the magistrate judge determined should be part of the administrative record; that is, the deposition testimony of John Hardyman and those documents that fall within the magistrate judge's order on plaintiff's motion for supplementation of the administrative record. Plaintiffs have failed to persuade the Court that any other documents fall within the permissible categories of supplementation. Indeed, many of the materials filed by plaintiffs were not in existence at the time of TVA's NEPA analysis. *See Center for Biological Diversity*, 450 F.3d at 943–44 (not abuse of discretion to strike document dated one month after agency decision was completed).

### C.     Review of TVA's Vegetation Management Policy

#### 1.     TVA's Transmission Line Right-of-Way Vegetation Maintenance

TVA is an executive branch corporate agency and instrumentality of the United States, created by and existing pursuant to the TVA Act of 1933, as amended, 16 U.S.C. §§ 831-831ee. The TVA Act charges TVA with "advanc[ing] the national defense and the physical, social and economic development" of the Tennessee Valley region, *id.* at § 831n-4, "promot[ing] interstate commerce and the general welfare," *id.* at § 831dd, and

12

providing electric power to residents of the region "at the lowest possible rates," *id.* at § 831j. To this end, TVA "maintains and operates one of the nation's largest electric power systems as part of a program to fulfill its mission for the development of the Tennessee Valley region's resources and economy." *4-Cnty. Elec. Power Ass'n v. Tenn. Valley Auth.*, 930 F. Supp. 1132, 1135 (S.D. Miss. 1996).

The TVA power system includes 15,900 circuit-miles of transmission lines located on easements and right-of-ways owned by the United States and "entrusted to [TVA] as the agent of the United States to accomplish the purposes of [the TVA Act]." 16 U.S.C. § 831c(h). These transmission lines and right-of-ways are the subject of this litigation.

The right-of-ways entrusted to TVA require regular vegetation maintenance (e.g., cutting of trees and brush) in order to facilitate walking and helicopter inspections of the lines, vehicle access to support normal maintenance of structures and hardware, and vehicle access to support emergency maintenance and repair (such as after tornados and ice storms). TVA maintains that this regular vegetation maintenance is essential to provide for public safety and to provide transmission line reliability for dependable electric power service to institutions, businesses, and residences throughout the Tennessee Valley region. TVA further maintains that cutting of right-of-way trees before they actually pose a present danger to a line helps decrease maintenance expense because it is less expensive to cut a young tree than a mature tree, and it enables longer cycles between maintenance cuttings. TVA has been clearing trees and brush from its right-of-ways for more than seven decades [Doc. 50 ¶¶ 2–4].

13

For vegetation maintenance purposes, TVA divides its transmission system into sectors, and within each sector, such maintenance is performed on a rotating cycle [*Id.* ¶¶ 3, 8]. Annually, a vegetation-maintenance plan for portions of each sector is developed based on the results of periodic inspections, and the sector's terrain conditions, species mix, growth, and density [*Id.* ¶ 3]. Within each sector, specific transmission line segments are identified for maintenance and those segments are cross-referenced against TVA's sensitive area review ("SAR") database [Doc. 48 ¶ 6]. The SAR database allows TVA to identify any areas of known environmental concern, including protected animal and plant species, prime or unique farmland, Wild and Scenic Rivers, and ecologically critical areas [*Id.*]. TVA asserts that because each sector involves different lines, topography, flora and fauna, historical, archeological, recreational, social, and economic characteristics, the maintenance in each sector is a discrete action that is not part of a larger project or proposal [Doc. 50 ¶ 3].

Generally, the vegetation maintenance program provides for a five-year cycle for treecutting and a three-year cycle for mowing or spraying undergrowth [*Id.*]. For example, in 2012, only about 2,668 miles of right-of-ways were scheduled for tree maintenance across TVA's entire transmission line system [*Id.*]. In addition to making manageable the number of lines to be cleared in any given year, the sector and segment approach allows TVA to address the unique maintenance requirements of transmission line segments caused by significant topographic, demographic, and ecological differences across the system [*Id.*].

14

TVA's right-of-way vegetation maintenance activities are performed under TVA's 2008 guidelines for right-of-way re-clearing: TVA Power System Operations Line Maintenance Manual, TOM-LMM-6-ROW-001, Right Of Way Maintenance (the "2008 manual") [Doc. 50-1]. Generally, the 2008 manual provides for re-clearing the center of a right-of-way (the area directly under the lines or "wire zone"), and allowing a buffer or border zone of "low-growing" trees, shrubs, hedges, and the like on each side of the wire zone where the right-of-way width allows and unless such re-clearing would be "hazardous or detrimental to maintenance" [Doc. 50 ¶ 5; Doc. 50-1]. While the 2008 manual does not specifically define "low-growing" trees, TVA has previously informed landowners that no trees should be planted under the transmission lines, and that only low-growing trees should be planted in the buffer or border zones of the right-of-way [Doc. 50 ¶ 6; Doc. 50-2].

## 2. TVA's Environmental Reviews for 2012 Transmission Line Right-of-Way Vegetation Maintenance

TVA asserts that in order to more effectively manage the vegetation maintenance program for 2012, TVA provided objective guidance to its right-of-way maintenance specialists, which clarified that "low-growing" trees in the buffer zones are trees that will not exceed fifteen feet at mature height [Doc. 50 ¶¶ 10, 14]. Plaintiffs assert that this fifteen-foot rule is a new policy.

15

The Court disagrees that TVA instituted a new policy. As the Court found likely in ruling on plaintiffs' motion for a preliminary injunction, TVA has become stricter in the manner in which it implements its current vegetation management policy, as set forth in the 2008 manual. Moreover, pursuant to the 2008 manual, TVA's right-of-way maintenance specialists have the authority to make discretionary operating decisions and evaluate situations tract-by-tract and make decisions about the scope of maintenance on individual tracts [*See* Doc. 50; Doc. 191-1]. Hence, as TVA concedes, the exercise of a right-of-way specialist's discretion may in some cases result in a greater exercise of the right to clear all trees and brush from right-of-ways than in previous years. Nevertheless, it appears to the Court that TVA's right-of-way re-clearing for 2012 is consistent with TVA's right-of-way maintenance guidelines over the last fifteen years [*See* Doc. 50 ¶¶ 7–10; Doc. 50-3].[3]

As TVA has done in the past, TVA determined that the right-of-way re-clearing for 2012 fell within the CE for "[r]outine operation, maintenance, and minor upgrading of existing TVA facilities" [Doc. 49 ¶ 7–8; Doc. 49-1]. Generally, for each sector, TVA evaluates the potential impacts of the proposed vegetation maintenance to confirm that the proposed work qualifies for the CE. If it so qualifies, then TVA examines whether any

---

[3] Plaintiffs filed a motion to file a supplemental brief [Doc. 202], arguing that TVA admitted that it did not conduct an environmental review of the fifteen-foot rule. Because the Court determines that TVA did not institute a new fifteen-foot policy, the Court determines this motion is **MOOT** and **DENIES** it. Moreover, the issue is not whether TVA performed an environmental review of the fifteen-foot rule; rather, the issue is whether TVA's determination that the 2012 vegetation management project qualified for the CE for routine maintenance was arbitrary or capricious.

16

extraordinary circumstances would preclude it from being classified as a CE. The environmental review is conducted by an individual trained in NEPA compliance matters [Doc. 48 ¶ 3; Doc. 49 ¶ 11]. That environmental review assesses whether a proposed action has the potential for measurable, physical impacts on the environment. TVA documents the determination that the action falls within a CE and that it does not have extraordinary circumstances that would preclude such a classification [Doc. 48 ¶ 5].

The CE form that guides the NEPA review includes five parts, each with multiple questions [Doc. 48 ¶ 7; *See*, *e.g.*, Doc. 122 at PageID 19139–41]. Answering those questions involves an environmental review and often requires extensive documentation to support the answers. The environmental review starts with an analysis of the plots of the specific transmission line segments scheduled for maintenance, the plan and profile drawings of all the line segments and structures, and TVA's Geographic Information System, which includes multiple layers such as aerial photographs, maps, structures, topography, and water [Doc. 48 ¶¶ 6–7; *See*, *e.g.*, Doc. 122 at PageID 19137, 19386–19412, 19906–19963, 19972–20147]. The line segments are cross-referenced against TVA's SAR [Doc. 48 ¶ 6; *See*, *e.g.*, Doc. 122 at PageID 19171–19385, 19414–19905].

Each review assesses the impact of right-of-way maintenance on ecologically critical areas, federal, state, or local park lands, national or state forests, wilderness areas, scenic areas, wildlife management areas, recreational areas, greenways, and trails [*See*, *e.g.*, Doc. 122 at PageID 19139–19140, 19142–19146]. Each review also examines the effects of right-of-way maintenance on exotic or invasive species, migratory bird

17

populations, surface water, drinking water supply, groundwater, and any unique or important land or aquatic habitat [*Id.*]. The review further addresses whether maintenance, including tree clearing, in the particular sector will generate any significant air, water or land pollution or erosion or have a negative social or economic impact or create any other environmental compliance or reporting issues [*Id.*]. TVA employees with expertise in assessing and addressing impacts to sensitive resources are identified in the review and are available for consultation during the review and during the project to identify and assess impacts and to recommend measures to mitigate any such impacts [Doc. 48; *See, e.g.*, Doc. 122 at PageID 19171–385, 19414–905].

In addition to specific questions relating to environmental, archeological, historical, recreational, social, economic, and other factors, the NEPA review for a CE asks a number of more general questions. When the CE form is completed, it is reviewed by a qualified expert reviewer and the project initiator [Doc. 48; *See, e.g.*, Doc. 122 at PageID 19138]. The NEPA review is guided by TVA's Best Management Practices ("BMPs"), which details the maintenance techniques and procedures that are used to minimize environmental impacts [*See, e.g.*, Doc. 122 at PageID 20152–333].

For 2012, TVA's transmission system was divided into thirteen sectors for vegetation maintenance, and TVA conducted NEPA reviews of the maintenance plans in each sector.[4] After conducting those reviews, TVA concluded that the 2012 planned

---

[4] These reviews have been provided to the Court and are the administrative record in this case [*See* Docs. 114–26].

18

maintenance work for each sector qualified for the CE for routine maintenance. TVA further determined that no "extraordinary circumstances" existed in any of the sectors that would preclude application of its routine maintenance CE. Accordingly, TVA concluded that the planned 2012 vegetation maintenance project would not have a significant impact on the environment [*See*, *e.g.*, Doc. 122 at PageID 19141].

### 3. TVA's 2012 Vegetation Maintenance Project was not Arbitrary or Capricious

The Court finds that TVA's determination that the 2012 vegetation maintenance project qualified as a CE for routine maintenance was not arbitrary or capricious because the project was to occur on existing right-of-ways that had already been cleared for the erection of transmission lines and that for years had been periodically re-cleared of vegetation to facilitate access, inspections, maintenance work, and reliability [*See* Doc. 48 at ¶ 7]. Indeed, TVA's determination is similar to decisions of other agencies that have found actions that involve upgrading, modernization, or more extensive use of facilities to similarly qualify for a CE. *See West Houston Air Comm. v. F.A.A.*, 784 F.2d 702, 705–06 (5th Cir. 1986) (finding FAA's determination that granting a certificate authorizing an airport to serve larger capacity airplanes qualified as a CE where the airport was not required to physically expand); *River Fields, Inc. v. Peters*, No. 3:08-CV-264-S, 2009 WL 2222901 (W.D. Ky. July 23, 2009) (agency determination that bridge widening and rebuilding road qualified for CE was not arbitrary or capricious); *Ware v. FHWA*, No. H-04-2294, 2006 WL 696551, at *8 (S.D. Tex. Mar. 15, 2006) (holding FHWA's CE

19

classification of the reconstruction and elevation of lanes and connectors to Interstate Highway 610 in Houston, Texas, was not arbitrary or capricious where the "record reveals that the area next to plaintiffs' neighborhood already hosted a major freeway and the concomitant visual and noise impacts"); *Hells Canyon*, 9 F. Supp. 2d at 1238–39, 1241 (holding the FHWA's CE classification of a road through the Hells Canyon National Recreation Area that included realignments and changes to the road grade was not arbitrary and capricious because the agency had taken a "'hard look'" in concluding that the project would not have significant environmental impacts); *Pub. Interest Research Grp. of N.J. v. FHWA*, 884 F. Supp. 876, 891 (D.N.J. 1995) (finding that the FHWA's determination that a highway widening project to add two high-occupancy vehicle lanes on an interstate in New Jersey fell within the CE classification for modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes was not arbitrary or capricious because "all widening would occur within the median, on the existing right-of-way . . . because all construction on the Project is to occur within the existing median, which has already been disturbed by highway construction . . . [because] [a]ll environmental regulations are to be complied with during construction . . . [because] [w]etlands impact has already been minimized, and any remaining impact will be mitigated and all construction will comply with Federal and state permit requirements. . . . [a]nd, a noise study will determine where noise barriers are necessary and cost-effective").

Plaintiffs argue that TVA did not previously clear the right-of-ways, so the 2012 project was not "routine maintenance." While the entirety of the right-of-ways may not have been cleared at the time the transmission lines were installed—and TVA does not assert that they were entirely cleared—TVA's historic practice has been to leave a buffer zone of trees along the outer edges of the easements where "low-growing" trees could be maintained [Doc. 50 at 1453–58]. TVA retained the discretion to allow or disallow trees in this zone, and at times cleared only a portion of the right-of-ways due to budget constraints [Doc. 41 at 587–88, 593, 605, 615, 625; Doc. 191-1].

Plaintiffs also argue that the administrative record makes no mention of the fifteen-foot rule, making TVA's review arbitrary and capricious. While this lack of mention may be true, it is of no consequence in the context of plaintiffs' NEPA claim. As explained in this opinion, TVA's review of the 2012 vegetation maintenance project considered every segment of each transmission line right-of-way that was subject to the 2012 vegetation maintenance project and evaluated the impacts of maintenance. Moreover, as the Court has determined, the 2012 vegetation maintenance project was consistent with right-of-way maintenance guidelines that had been in place for over fifteen years, which allowed "low-growing" trees to remain in the buffer zones of the right-of-ways at TVA's discretion [Doc. 50 ¶¶ 4, 5, 7, 9, 10].

Plaintiffs further argue that it was arbitrary and capricious for TVA to "segment" the review into the thirteen sectors. While the Court recognizes that there are circumstances where segmenting for purposes of NEPA is improper, *see, e.g., Thomas v.*

21

*Peterson*, 753 F.2d 754, 759–60 (9th Cir. 1985), it does not find that TVA improperly segmented its review here. TVA divides its transmission system into sectors for purposes of vegetation management because its transmission system is varied in terms of terrain, species mix, growth, and density [*See* Doc. 50]. And because the Court finds it was not arbitrary or capricious for TVA to determine that the 2012 vegetation management project fell within the CE for routine maintenance, the cases cited by plaintiffs are inapposite. *See Bullwinkel v. U.S. Dep't of Energy*, 899 F. Supp. 2d 712, 129 (W.D. Tenn. 2012) (noting the "[i]mpermissible segmentation involves a 'major federal action' where a small part of that action has been segmented in order to escape application of the NEPA process").

Again, under the "arbitrary or capricious" standard, a plaintiff who challenges an agency decision must show that the agency did not "consider[ ] the relevant factors and [that] there has been a clear error of judgment." *Marsh*, 490 U.S. at 378. The Court finds plaintiffs have not met this challenge with respect to the 2012 vegetation maintenance project. While plaintiffs assert that TVA should have addressed certain issues in its review—including that this was a major project that involved a significant amount of land, the impacts on wildlife, nesting and migratory birds, wetlands and ponds, soil erosion, the effects of herbicides, air quality, and alleged reduction in property values [*see*, *e.g.*, Doc. 170 at ¶ 145]—as discussed in the subsequent paragraphs, TVA's analysis as set forth in the administrative record addresses all of the issues raised by plaintiffs, and plaintiffs have not shown that those evaluations are incorrect or that TVA failed to address any significant environmental impacts.

22

Plaintiffs claim that the reviews were arbitrary and capricious because TVA employees determined that the project was not major in scope, would not have environmental effects that are controversial, and did not involve more than a minor amount of land, even though TVA planned on removing virtually all of the trees in each sector. The Court finds these determinations were not arbitrary or capricious because TVA employees with extensive experience in preparing CECs did not just "check the box" in answering the questions as plaintiffs suggest. Rather, it appears they conducted a hard look into the environmental impacts of the project, producing thousands of pages of materials in support of their determinations [Docs. 114–26]. More specifically, in making these determinations, the reviewers received a list of plots, which are diagrams used to identify transmission line segments and other information, for the proposed work area [*See* Doc. 48]. They entered the plots into TVA's System Applied Maintenance ("SAM") database to identify specific segments and structures for which right-of-way maintenance was proposed and to obtain plan and profile drawings for those segments and structures [*Id.*]. They then cross-referenced the list of line segments and structures with TVA's SAR database to identify areas of known environmental concern [*Id.*]. With this information, they prepared a spreadsheet, identifying known areas of environmental concern within and near the proposed work areas, and maps with overlays depicting lines, structures, and sensitive areas of environmental concern [*Id.*]. The spreadsheet also identifies, among other things, the environmental specialist responsible for issues relating to the identified areas of environmental concern and a brief description of limitations on work performed

23

in or near the area of environmental concern for each line segment [*Id.*]. For example, for certain lines, it is noted that trees can be cut down only between certain dates because the area is known as a summer roosting habitat for the Indiana Bat [*See, e.g.*, Doc. 122-2 at PageID 19182]. Also, the particular determinations that the project is not major in scope, does not involve more than a minor amount of land, and is not part of a larger project were based upon the consideration that maintenance of existing rights-of-way is recurring and routine, as such is conducted every year, limited to specific line segments and structures, and does not involve a changed use of the property.

Plaintiffs also assert that TVA did not address potential soil erosion [*See* Doc. 170 ¶¶ 69, 123, 145]. The review for each sector, however, addresses soil erosion and explains that it will not be a problem because right-of-way maintenance does not involve any soil disturbance such as road construction or excavation [*See, e.g.*, Doc. 114-2 at PageID 10908, 10916; Doc. 115-2 at PageID 11769, 11774; Doc. 116-2 at PageID 12981, 12986; Doc. 117-2 at PageID 14378, 14406; Doc. 118-2 at PageID 15284, 15302; Doc.119-2 at PageID 16156, 16160; Doc. 120-2 at PageID 16803, 16809; Doc. 121-2 at PageID 17809, 17814; Doc.122-2 at PageID 19140, 19145; Doc.123-2 at PageID 20340, 20380; Doc. 124-2 at PageID 21307, 21313; Doc. 125-2 at PageID 22256, 22262; Doc. 126-2 at PageID 23318, 23324].

Plaintiffs further claim that the impact on wildlife was not considered [*See* Doc. 170 ¶¶ 47, 78, 145]. The review for each sector, though, addresses why the right-of-way maintenance is not expected to impact endangered, threatened, or special status species of wildlife:

> Aquatic and Terrestrial species have a potential to be present in the Sector's ROWs. See the attached spreadsheet for the affected transmission lines and structures. These areas are depicted on attached applicable spreadsheets with specific guidelines for each code. During the pre-job briefing, the ROW Specialist will delineate and identify the areas to the contractor along with the ROW guidelines and expectations from TVA's BMP manual (Muncy, 1999). Because of implementation of ROW guidelines and BMP requirements, no impacts are expected to occur.

[*See*, *e.g.*, Doc. 114-2 at PageID 10907, 10914; Doc. 115-2 at PageID 11768, 11772; Doc. 116-2 at PageID 12980, 12984; Doc. 117-2 at PageID 14377, 14404; Doc. 118-2 at PageID 15283, 15300; Doc.119-2 at PageID 16155, 16158; Doc. 120-2 at PageID 16802, 16807; Doc. 121-2 at PageID 17808, 17812; Doc. 122-2 at PageID 19139, 19143; Doc.123-2 at PageID 20339, 20378; Doc. 124-2 at PageID 21306, 21311; Doc. 125-2 at PageID 22255, 22260; Doc. 126-2 at PageID 23317, 23322].

In addition, plaintiffs assert that the proposed right-of-way maintenance will create "visual contrast or visual discord, and it will hugely interfere with recreational or educational uses," and that TVA did not appropriately consider this effect [Doc. 170 ¶ 124]. These issues are addressed in the administrative record, however, as TVA determined that the right-of-way maintenance would not have these impacts [*See*, *e.g.*, Doc. 114-2 at PageID 10908; Doc. 115-2 at PageID 11769; Doc. 116-2 at PageID 12981;

25

Doc. 117-2 at PageID 14378; Doc. 118-2 at PageID 15284; Doc.119-2 at PageID 16156; Doc. 120-2 at PageID 16803; Doc. 121-2 at PageID 17809; Doc. 122-2 at PageID 19140; Doc.123-2 at PageID 20340; Doc. 124-2 at PageID 21307; Doc. 125-2 at PageID 22256; Doc. 126-2 at PageID 23318].   The record indeed confirms that TVA's right-of-way maintenance activities are confined to existing right-of-ways that were previously cleared and involve no changes in land use or relocation of any educational facilities or buildings. As shown by the comments in the reviews, the right-of-way specialist coordinates with applicable authorities for specific guidelines or protections necessary in managed lands such as parks [*See*, *e.g.*, Doc. 114-2 at PageID 10915, 10917; Doc. 115-2 at PageID 11774–75; Doc. 116-2 at PageID 12986–87; Doc. 117-2 at PageID 14405, 14407; Doc. 118-2 at PageID 15301, 15303; Doc.119-2 at PageID 16160–61; Doc. 120-2 at PageID 16809–10; Doc. 121-2 at PageID 17814–15; Doc. 122-2 at PageID 19145–46; Doc.123-2 at PageID 20379, 20381; Doc. 124-2 at PageID 21313–14; Doc. 125-2 at PageID 22261, 22263; Doc. 126-2 at PageID 23323, 23325].

Plaintiffs maintain that TVA did not address the "responsibility to replant and remediate" [Doc. 170 ¶ 145].  Remediation efforts, however, are discussed in TVA's BMP manual, which is incorporated into each of the sector reviews [*See*, *e.g.*, Doc. 114-2 at PageID 10914–15 & Doc. 114-4 at Page ID 11581–762; Doc. 115-2 at PageID 11772–74, & Doc. 115-3 at PageID 12793–974; Doc. 116-2 at PageID 12984–85 & Doc. 116-4 at PageID 14190–371; Doc. 117-2 at PageID 14404–05 & Doc. 117-4 at PageID 15096–277; Doc. 118-2 at PageID 15300–01 & Doc. 118-3 at PageID 15968–16149; Doc. 119-2 at

26

PageID 16158–60 & Doc. 119-3 at PageID 16615–796; Doc. 120-2 at PageID 16807–09 & Doc. 120-4 at PageID 17621–802; Doc. 121-2 at PageID 17812–14 & Doc. 121-3 at PageID 18952–19133; Doc. 122-2 at PageID 19143–44 & Doc. 122-3 at PageID 20152–333; Doc.123-2 at PageID 20378–79 & Doc. 123-4 at PageID 21119–21300; Doc. 124-2 at PageID 21311–13 & Doc. 124-4 at PageID 22068–22249; Doc. 125-2 at PageID 22260–61 & Doc. 125-4 at PageID 23130–311; Doc. 126-2 at PageID 23322–23 & Doc. 126-3 at PageID 23847–24028].

Further, plaintiffs claim herbicide use was not reviewed appropriately [Doc. 170 ¶¶ 59, 67, 70, 145]. But, the review of each sector explains why herbicides are not expected to impact drinking water or ground water:

> If the pesticide EPA-registered label identifies the herbicide as having a potential to contaminate groundwater, the product shall be applied restrictively in accordance with the use restrictions for geologic conditions and application rate identified on the label.

[*See*, *e.g.*, Doc. 114-2 at PageID 10915; Doc. 115-2 at PageID 11774; Doc. 116-2 at PageID 12986; Doc. 117-2 at PageID 14405; Doc. 118-2 at PageID 15301; Doc.119-2 at PageID 16160; Doc. 120-2 at PageID 16809; Doc. 121-2 at PageID 17814; Doc. 122-2 at PageID 19145; Doc.123-2 at PageID 20379; Doc. 124-2 at PageID 21313; Doc. 125-2 at PageID 22262; Doc. 126-2 at PageID 23324].

Finally, plaintiffs claim that TVA's right-of-way maintenance will adversely affect property values and that TVA did not consider this fact [Doc. 170 ¶ 132]. But NEPA and CEQ's regulations do not require that socioeconomic issues be considered here. NEPA is

27

concerned with potential changes to the physical environment caused by the federal action; it is not concerned with the emotional or economic impacts of that action. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772–74 (1983) (concluding that NEPA addresses the protection of the physical resources that support life, such as air, land and water, and requires a federal agency to consider only those effects which follow closely from changes in the physical environment). Although agencies may consider factors other than the physical environment in their environmental reviews, such consideration is necessary in the NEPA review process only where there is "a primary impact on the physical environment." *Breckinridge v. Rumsfeld*, 537 F.2d 864, 866 (6th Cir. 1976); *see also Goodman Grp., Inc. v. Dishroom*, 679 F.2d 182, 185 (9th Cir. 1982).

In sum, after considering the present record under the "narrow" standard of review, the Court cannot find that TVA's decision that implementation of the 2012 vegetation maintenance project falls within the CE for routine operation, maintenance, and minor upgrading of existing TVA facilities was arbitrary and capricious. Indeed, it appears to the Court that TVA took the requisite "hard look" at the environmental consequences of the project before taking action. *Cf. Lichterman v. Pickwick Pines Marina, Inc.*, No. 1:07-CV-245-SAA-JAD, 2007 WL 4287586 (N.D. Miss. Dec. 6, 2007) (finding likelihood of success on merits of NEPA claim because there was no evidence in the record that TVA "contemplated or evaluated" action of cutting trees).

28

## IV. Conclusion

For the reasons explained, the Court will **DENY as moot** Plaintiffs' Motion for Permission to File Supplemental Brief on TVA's Motion for Summary Judgment [Doc. 202] and **GRANT** Tennessee Valley Authority's Motion for Summary Judgment on Count II (the NEPA Count) of the Second Amended Complaint [Doc. 129]. Plaintiffs' NEPA claim will be **DISMISSED**, and the Clerk of Court will be **DIRECTED** to **CLOSE** this case.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE