UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| DONNA W. SHERWOOD, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 3:12-CV-156-TAV-DCP |
| | ) | |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on plaintiffs' and defendant Tennessee Valley Authority's ("TVA") cross motions for summary judgment [Docs. 557, 559]. These motions have been fully briefed [Docs. 558, 561, 562, 565, 566], and the matter is now ripe for the Court's review. For the reasons stated below, the Court will **GRANT** TVA's motion for summary judgment [Doc. 557] and **DENY** plaintiffs' motion for summary judgment [Doc. 559]. Accordingly, the Injunction [Doc. 427] is **DISSOLVED**.

## I. BACKGROUND

On March 7, 2012, less than a month before the initiation of this litigation, famed quarterback Peyton Manning stated in a press conference, announcing his departure from the Indianapolis Colts: "in life and in sports we all know that nothing lasts forever." Kevin Nogle, *Peyton Manning Press Conference Transcript*, THE PHINSIDER (Mar. 7, 2012, at 10:00 p.m. EST) https://www.thephinsider.com/2012/3/7/2853459/peyton-manning-press-conference-transcript-2012-free-agency-nfl [https://perma.cc/MZ77-MA6F]. When he made that statement, no doubt, Manning did not fathom that an environmental lawsuit,

filed a few short days later, would remain pending before a district court sitting approximately 1 mile from Neyland Stadium at the University of Tennessee, where Manning spent his college football career, nearly 15 years later. Otherwise, perhaps he would have provided a caveat to his statement about "lasting forever."

The Court presumes familiarity with this action based on the Court's previous opinions and orders, as well as the Sixth Circuit's opinions. Nevertheless, in light of the extensive litigation in this case, spanning nearly 15 years, the Court finds it appropriate to set forth relevant background information before delving into the parties' arguments.

"TVA was created by Congress in 1933, 16 U.S.C. § 831, *et seq*. (2010), and is a 'wholly-owned corporate agency and instrumentality of the United States[.]'" *Sherwood v. Tenn. Valley Auth.*, 590 F. App'x 451, 453 (6th Cir. Oct. 22, 2014) ("*Sherwood I*") (quoting *Hill v. United States Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995)); *see also Thacker v. Tenn. Valley Auth.*, 587 U.S. 218, 220 (2019); *Appalachian Voices v. Tenn. Valley Auth.*, No. 3:24-cv-411, slip op. at 2, 6–7 (E.D. Tenn. Aug. 31, 2026).[1] TVA provides electric power to consumers in seven states across the Southeast. *Sherwood I*, 590 F. App'x at 453; s*ee also Appalachian Voices*, slip op. at 6–7 (noting that TVA "operates the largest public power system in the nation, and is intended to provide low-cost

---

[1] The Court notes that the opinion in *Appalachian Voices* is presently under seal [*See* Case No. 3:24-cv-411, Sealed Doc. 67]. However, the Court notes that, at this juncture, the parties have submitted a joint proposed redacted version of the order [*See* Case No. 3:24-cv-411, Sealed Doc. 80]. The Court has reviewed those proposed redactions and ensured that this memorandum opinion does not reference any of the information the parties propose redacting from the order in that case.

reliable electricity at low rates" (citing *Sierra Club v. Tenn. Valley Auth.*, 753 F. Supp. 3d 606, 611–12 (6th Cir. 2024))). [*See also* Administrative Record ("AR") at 913 ("TVA's transmission system serves nearly ten million residents in a more than 82,000-square-mile area that spans portions of seven states")]. "In order to reliably deliver that power, TVA maintains the vegetation under and around its power line structures." *Sherwood I*, 590 F. App'x at 453. TVA has the authority to acquire real estate for the purpose of constructing power transmission lines along the Tennessee River and its tributaries, and, rather than purchasing property in fee simple, TVA acquired easements, securing rights to use the property or specific purposes. *Id.* TVA's easements are typically between 75 and 200 feet wide, and, built within those easements are approximately 15,900 miles of power transmission lines. *Id.*

"Historically, TVA has removed all trees directly under its power lines, but did not cut down all of the trees in what TVA called buffer or border zones, the edges of the easements TVA possesses." *Sherwood I*, 590 F. App'x at 453. TVA's power transmission lines are divided into multiple sectors, each of which is managed by a right-of-way specialist. *Id.* at 454. Although TVA has maintained the vegetation in its easements for more than 70 years, it has not removed all of the taller, mature trees within the right-of-way, but rather, right-of-way specialists have been afforded discretion in determining which trees to remove. *Id.* [*See also* AR at 919 (acknowledging that TVA employees in charge of individual sectors had discretion to determine which vegetation would be cleared under TVA's past vegetation management practices)]. TVA had also made exceptions when

landowners promised to control the height of trees that fell within the right-of-way. *Sherwood I*, 590 F. App'x at 434.

However, "[i]n August 2003, approximately 50 million people in the Midwest and Northeast portions of the United States suffered a power outage for up to two days" which was determined to have been caused by a tree coming into contact with power lines. *Id.* [*See also* AR at 919–20]. "This event set in motion a review of transmission line maintenance programs." *Sherwood I*, 590 F. App'x at 434. In 2007, the North American Electric Reliability Corporation ("NERC"), a government-certified industry organization setting reliability standards for the transmission of electricity, established rules relating to vegetation management around electric transmission lines. *Id.* TVA altered its vegetation management practices to comply with the new NERC rules. *Id.* at 455. And, although the new rules only applied to transmission lines carrying a specific voltage, TVA elected to apply the rules uniformly to all of its transmission line easements. *Id.* As part of this effort, in 2012, several of the plaintiffs received notices that TVA would be removing dozens of tall, mature trees from the easements over their properties. *Id.* at 453.

This litigation started in April of 2012, when plaintiffs sued TVA for claims of conversion, breach of easement, trespass, and private nuisance, based upon TVA's intent to implement a new policy to remove "any and all trees" that were or could grow to be more than 15 feet tall on its right-of-way around its power transmission line [Doc. 1 ¶¶ 1, 9–10 & pp. 6–9]. Approximately a month later, plaintiffs significantly amended their complaint, adding a claim that TVA violated the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321–4370m-12 [Doc. 8 ¶¶ 100–14]. Specifically, plaintiffs alleged that TVA violated NEPA by not preparing and publishing an environmental impact statement ("EIS") prior to implementing a new policy, referred to in this litigation as the "15-foot rule"[2] [Doc. 8 ¶ 105]. Plaintiffs thereafter filed a second amended complaint raising the following claims: (1) "Injunction Based on Common Law," based on claims of trespass, private nuisance, conversion of property, and a taking of property without compensation; (2) "Declaratory and Injunctive Relief Based on TVA'S Failure to Make the Environmental Impact Statement Required by the National Environmental Policy Law Prior to Implementing its 'New Policy'"; (3) "Administrative Procedure Act – Declaratory and Injunctive Relief Based on TVA's Failure to Engage in Notice and Comment Rulemaking Prior to Implementing its 'New Policy'"; and (4) "Administrative Procedure Act – Declaratory and Injunctive Relief Based on Arbitrary and Capricious Agency Action" [Doc. 62 ¶¶ 94–125].

On February 19, 2013, the Court granted TVA's motion to dismiss Counts 1, 3, and 4 of the second amended complaint for failure to state a claim upon which relief may be granted, leaving only plaintiffs' NEPA claim to proceed [Doc. 162]. The Court also

[2] The original complaint, first amended complaint, and second amended complaint do not use the term "15-foot rule," although they refer to a policy of removing trees that are, or could grow to be, taller than 15 feet [*See* Docs. 1, 8, 62]. The third amended complaint, defines the 15-foot rule involved TVA cutting, clearing, and/or removing any and all trees on its easement/rights of way that are 15 feet tall or taller, or might grow to be more than 15 feet tall [Doc. 170, p. 8].

granted plaintiffs leave to file a third amended complaint on limited grounds [*Id.*]. Plaintiffs filed their third amended complaint in March of 2013 [Doc. 170].

On July 23, 2013, the Court granted summary judgment in TVA's favor on plaintiff's NEPA claim [Doc. 212]. Specifically, the Court concluded that the 15-foot rule was not a "new policy," but rather, was consistent with TVA's right-of-way maintenance guidelines over the prior 15 years [*Id.* at 16, 21]. Thus, applying a narrow standard of review, the Court held that TVA's decision that implementation of the 2012 vegetation maintenance project fell within the categorical exclusion from NEPA's environmental impact statement requirement for routine operation, maintenance, and minor upgrading of existing TVA facilities was not arbitrary and capricious [*Id.* at 7, 28]. Moreover, the Court concluded that "it appears . . . TVA took the requisite 'hard look' at the environmental consequences of the project before taking action" [*Id.* at 28]. Plaintiffs appealed [Doc. 214].

On appeal, the Sixth Circuit reversed and remanded as to plaintiffs' NEPA claim [Doc. 228]. *Sherwood I*, 590 F. App'x 451. The Sixth Circuit concluded that the evidence before it indicated that, although consistent with TVA's rights in the easements, the 15-foot rule was inconsistent with TVA's historical policy of giving specialists discretion to remove trees and the exceptions that TVA had made in the past. *Sherwood I*, 590 F. App'x at 460. The Sixth Circuit stated that it could not tell from the administrative record whether TVA had taken a "hard look" at the environmental consequences of the alterations made to its vegetation maintenance policies. *Id.* Thus, the Sixth Circuit remanded plaintiffs'

NEPA claim, with instruction that TVA compile the administrative record for the decision made that was challenged by plaintiffs, so that the Court could evaluate the decision's propriety under NEPA. *Id.* at 462–63. The Sixth Circuit, however, affirmed the dismissal of the other counts in the second amended complaint. *Id.* at 463.

On remand, the Court ordered TVA to compile the administrative record for the decision challenged by plaintiffs and file that record with the Court [Doc. 230]. In lieu of filing the administrative record, TVA filed a motion to dismiss the case on the ground that plaintiffs' NEPA claim was moot because TVA had suspended the use of the 15-foot rule and reverted to the right-of-way maintenance practices used prior to the 15-foot rule [Doc. 232]. In support, TVA submitted the declaration of Jacinda B. Woodward, Senior Vice President of Transmission and Power Supply of TVA, which stated: "I have suspended use of the 15-foot rule and reverted to the right-of-way maintenance practices that were utilized prior to the introduction of the 15-foot rule. TVA is reviewing its practices for the clearing of trees in buffer zones of TVA rights-of-way, and will initiate a de novo NEPA review of any new buffer zone maintenance practices before adopting them" [Doc. 233-1, p. 1]. In a supplemental declaration, Ms. Woodward clarified: "TVA has reverted to the right-of-way maintenance practices applicable to the wire and buffer zones on TVA rights-of-way that were utilized prior to the introduction of the 15-foot rule" [Doc. 240-1, p. 1].

On August 24, 2015, the Court granted TVA's motion and dismissed the case as moot [Doc. 276]. The Court found that TVA had made a genuine assurance that it had ceased use of the 15-foot rule and that it would conduct a NEPA review prior to either

re-implementing the 15-foot rule or adopting some other vegetation management practice [*Id.* at 8–9]. The Court concluded that there was no longer a live case or controversy under Article III, because, in light of TVA's withdrawal of the 15-foot rule and assurances that it would conduct appropriate NEPA reviews in the future, the declaratory relief plaintiffs sought was no longer "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" [*Id.* at 10 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975))]. Alternatively, the Court concluded that the doctrine of prudential mootness applied, because the change in circumstances rendered the Court unable to afford plaintiffs any meaningful relief [*Id.* at 11]. Plaintiffs appealed [Doc. 286].

On that second appeal, the Sixth Circuit provided that even if TVA had formally abandoned the 15-foot rule, "evidence in the record suggests that [defendant] has not reverted back to the right-of-way practices it used before adopting the rule" [Doc. 356, p. 8]. *Sherwood v. Tenn. Valley Auth.*, 842 F.3d 400, 405 (6th Cir. 2016) ("*Sherwood II*"). The Sixth Circuit determined that some evidence in the record suggested that the 15-foot rule had some continuing effect and, therefore, that the case was not moot. *Id.* at 406. The Sixth Circuit found that TVA's "promise to perform NEPA review before changing its buffer-zone maintenance policies is not an adequate assurance that its challenged conduct will not recur." *Id*. The Sixth Circuit further determined that "the record shows more than a 'mere possibility' that defendant's challenged conduct will recur (or is continuing)." *Id.*

at 407 The Sixth Circuit then remanded the case, providing that this Court should require TVA to compile an administrative record of its decision to implement the 15-foot rule.[3] *Id*.

Upon the second remand, TVA filed its administrative record on February 13, 2017 [Docs. 370–376]. On March 10, 2017, TVA filed a Confession of Judgment in Plaintiffs' Favor [Doc. 377]. In that Confession of Judgment, TVA consented to entry of a judgment declaring that its implementation of the 15-foot rule violated NEPA [Doc. 377, p. 1]. TVA also informed the Court that it had published notice in the Federal Register that it was preparing a programmatic, system-wide EIS of its transmission line right-of-way vegetation maintenance practices [*Id*.].

Based on TVA's Confession of Judgment, this Court found that TVA's implementation of the 15-foot rule violated NEPA, as well as its implementing regulations, because it was a major federal action significantly affecting the quality of the human environment and was not properly studied under NEPA prior to its implementation [Doc. 425, p. 10]. Addressing the parties' dispute as to the appropriate standard for TVA's vegetation management practices in the forthcoming injunction order, the Court elected to adopt an "immediate hazard" standard, which the Court believed "encompasse[d] defendant's prior practices" [*Id.* at 16–17]. The Court also found a spending-reporting requirement appropriate "[p]articularly in light of defendant's previous representations that

---

[3] The Sixth Circuit concluded that "[t]he fact that TVA did not create in 2012 a separate administrative record for the challenged decisions does not mean the agency does not have anything for the district court to review." *Sherwood II*, 842 F.3d at 407. Rather, "[u]nder § 706 of the Administrative Procedure Act, 5 U.S.C. § 706, the administrative record for judicial review consists of all materials that were before the agency when it made the challenged decision." *Id.*

it had abandoned the 15-foot rule, when there was evidence that the rule was still having an on-the-ground effect" [*Id.* at 20]. Finally, the Court found it appropriate to retain jurisdiction over the injunction beyond TVA's representation that it had issued an EIS [*Id.* at 24]. The Court instructed that: "[o]nce defendant issues a final decision it believes complies with NEPA, the Court will require defendant to file a request for dissolution of the injunction. At that point, plaintiffs will have the opportunity to state their position regarding whether the motion should be dissolved" [*Id*. at 25]. The Court continued to state that it "would then determine whether there is a change in circumstances that justifies dissolving the injunction without reviewing the EIS" [*Id*.]. The Court concluded that this approach would ensure TVA's compliance with NEPA [*Id*.].

Accordingly, on July 31, 2017, the Court entered the Injunction Order, enjoining TVA from further implementing the transmission line right-of-way vegetation management practice known as the 15-foot rule until TVA had prepared and published an EIS pursuant to NEPA [Doc. 427, p. 1]. The Injunction Order dictated that TVA maintain buffer zones on the edges of its right-of-way as described in TVA's 1997 and 2008 Line Maintenance Manuals [*Id.*]. TVA was directed to leave the existing trees in the wire zone so long as they did not pose an immediate hazard to the transmission lines [*Id.* at 3]. The Injunction Order required that, where TVA had previously allowed a landowner to trim his or her own trees, TVA would continue to so allow with the exception of any trees that presented an immediate hazard to TVA's transmission lines [*Id.*].

On or about January 13, 2017, TVA issued a notice of intent to prepare an EIS addressing the management of vegetation on its transmission system [Administrative Record ("AR"), pp. 1–8]. That notice of intent was published in the Federal Register on January 23, 2017 [*Id.* at 9–11, 924]. The notice of intent initiated a 60-day scoping period, which concluded on April 1, 2017 [*Id.* at 15, 925]. In December 2017, TVA completed its Scoping Report for the Transmission System Vegetation Management Programmatic Environmental Impact Statement, which described the internal and public scoping for relevant issues relating to the vegetation management effort and documented the input submitted to TVA by the public and intergovernmental entities during the public scoping period [*Id.* at 15, 925; *see generally id.* at 12–109]. A total of 53 comments were received and those comments were considered by TVA in drafting a programmatic EIS [*Id.* at 925].

In August 2018, TVA completed a draft of its Transmission System Vegetation Management Programmatic Environmental Impact Statement ("PEIS") [*Id.* at 110–856]. The draft PEIS then underwent a 45-day public review, after the public was given notice of the draft PEIS [*Id.* at 925]. During this public comment period, TVA conducted several public meetings across its service area [*Id.* at 926, 2606–11].[4] TVA received 150 comment submissions from members of the public, organizations, and state and federal agencies [*Id.* at 926, 24166–77]. TVA revised the draft PEIS in response to some comments and

[4] The PEIS states that seven public meetings were held [AR at 926]; however, the administrative record only contains sign in sheets for six meetings, specifically, those held in Chattanooga, TN, Bowling Green, KY, Knoxville, TN, Huntsville, AL, Tupelo, MS, and Memphis, TN [*Id.* at 2506–11].

included the comments in appendices to the final PEIS [*Id.* at 926, 1197–1255, 1698–1852].

In August 2019, TVA completed its final PEIS [*Id.* at 867–1194]. In the PEIS, TVA considered four alternatives for its vegetation management along the transmission right-of-way, labeled Alternative A, Alternative B, Alternative C, and Alternative D [*Id.* at 875]. Alternative A was provided as the "no action" alternative [*Id.*]. Under Alternatives B, C, or D, an initial removal of woody vegetation would occur within the buffer zones of the entire right-of-way [*Id.*]. These three alternatives, however, provided different approaches to the maintenance of the vegetation in the rights-of-way after this initial removal of woody vegetation [*Id.*]. In the PEIS, TVA set forth that its preferred alternative was "Alternative C: Condition Based Control Strategy (End State: Meadow-Like)" [*Id.* at 875, 895]. The PEIS explains that: "[t]his alternative would entail the initial removal of vegetation to the full width of the existing [right-of-way] easement over the first eight years of the program. Removal would target trees and woody vegetation that either remained or have regrown within the transmission [right-of-way] since construction" [*Id.* at 895]. Thereafter, "[a]ll areas within the transmission [right-of-way] . . . would be managed as floor" [*Id.*]. Under Alternative C,

> Routine vegetation maintenance would include identification and removal of vegetation within the transmission [right-of-way] that is incompatible with TVA's desired end-state condition. Within lands primarily managed by TVA, floor work would continue on an established cycle. The resulting end-state, consisting of a mix of herbaceous and low-growing shrub species, is more compatible and is expected to provide improved habitat value that over time is also expected to minimize intensity of maintaining the floor.

[*Id.*].

On October 18, 2019, TVA published its record of decision in the Federal Register, stating that it had decided to adopt a "condition-based control strategy for vegetation management, coupled with an initial clearing of all woody vegetation in the right-of-way . . . buffer zones. The full extent of the right-of-way . . . would then be maintained to a meadow-like end-state" [*Id.* at 863–66].

On October 18, 2019, TVA moved to dissolve the Injunction Order on the ground that it had complied with NEPA by preparing the PEIS [Docs. 458, 459]. The Court granted the motion to dissolve the Injunction Order [Doc. 479].[5] The Court stated that TVA's confession of judgment and the subsequent Injunction Order were clearly based on the fact that TVA had not prepared and published an EIS at all, as required by NEPA [*Id.* at 12–13]. The Court noted that TVA had completed a "programmatic" EIS, and concluded that, given the large region TVA's proposed vegetation management program would cover and the varied environmental effects across different locations within that region, the use of a programmatic EIS, followed by site-specific reviews, was an acceptable course of action under NEPA [*Id.* at 14]. The Court stated, however, that, in light of TVA's representations that site-specific reviews would be required before TVA could begin implementing Alternative C in compliance with NEPA, the Court expected TVA to follow through with such site-specific reviews [*Id.*]. Nonetheless, the Court found it was not

[5] The Court entered its initial order granting the motion to dissolve the Injunction Order on November 25, 2020 [Doc. 473]. The Court entered an amended order on July 30, 2021, correcting technical errors in the original order [*See* Doc. 479, p. 1 n.1].

appropriate for the Court to judicially manage the process of implementation of Alternative C in various locations as site-specific reviews were prepared [*Id.*].

Next, the Court turned to plaintiffs' argument that the PEIS failed to take a "hard look" at the policy alternatives, as required by NEPA [*Id.* at 15]. The Court noted the following:

> Despite plaintiffs' numerous complaints about the alleged insufficiencies of the PEIS's environmental analysis, the 328-page PEIS addresses many of the issues that plaintiffs insisted, in their third amended complaint, should be addressed in the forthcoming EIS, such as a discussion of soil erosion effects of the new practice or policy [Doc. 170, p. 59; PEIS § 4.5.2.2.2, p. 158], a discussion of the impact that the new practice or policy will have on wildlife [Doc. 170, p. 59; PEIS §§ 4.3, 4.3, pp. 104–42], consideration of state and federal laws relating to the protection of migratory birds [Doc. 170, p. 59; PEIS § 4.2.1.1, pp. 104–05], an estimate of the costs of a new policy or practice [Doc. 170, p. 6; PEIS Table S-20, discussion of TVA's responsibility to replant and remediate [Doc. 170, p. 60; PEIS § 2.3, pp. 43–44], and a discussion of the impact of herbicide use to surface waters [Doc. 170, p. 60; PEIS § 4.4.3.2.3, p. 151].

[*Id.*]. The Court concluded:

> While the PEIS does not address *all* of the specific issues raised by plaintiffs, in the way that plaintiffs specifically requested in the third amended complaint, the Court is unaware of, and plaintiffs have not identified, any legal basis, within NEPA or its implementing regulations, that requires an agency to address every specific concern raised in by opposing parties in the course of preparing and publishing an EIS. The Court concludes that, while an agency is required to take a "hard look" at its proposed action, addressing each of these issues raised by plaintiffs is not necessary for TVA to take the required "hard look" at Alternative C. *See* 40 C.F.R. § 1502.2(a), (c) (stating that an EIS, prepared in compliance with NEPA, should "not be encyclopedic," but rather should "be analytic, concise, and no longer than necessary to comply with NEPA").

[*Id.* at 16 (emphasis in original)]. The Court further concluded that, after its Confession of Judgment, TVA conducted an "extensive review of the environmental impacts of various

alternatives" and "prepared and published a PEIS containing a detailed analysis of its decision to implement a new alternative" [*Id.*]. The Court determined that "[i]n doing so, TVA ha[d] satisfied the terms of the Court's [I]njunction [O]rder" [*Id.*]. Accordingly, the Court found that TVA had satisfied the terms of the Injunction Order such that dissolving the injunction was appropriate [*Id.* at 17].

The Court likewise found that, regardless of satisfaction of the Injunction Order, it was no longer equitable to continue to enforce the injunction because the new alternative selected by TVA after preparation of the PEIS was a significant change in factual circumstances, and the new plan was subject to a new judicial review under the Administrative Procedure Act ("APA") [*Id.*]. The Court noted that "had TVA merely created planning documents to support its 15-foot rule, the Court might have come to a different conclusion. However, in light of the adoption of the new policy, Alternative C, it was advisable to complete any applicable administrative appeal processes, followed by a new, comprehensive judicial review" [*Id.* at 18]. Plaintiffs appealed [Doc. 480].

On third appeal, the Sixth Circuit concluded that the injunction should not have been dissolved "because the district court has not yet determined, in light of the administrative record, whether TVA took a hard look at the environmental consequences of its action, and the agency's action has not been shown to be so different from the 15-foot rule as to warrant a whole new suit to obtain judicial review" [Doc. 484, p. 3]. *Sherwood v. Tenn. Valley Auth.*, 46 F.4th 439, 440 (6th Cir. 2022) ("*Sherwood III*").

Addressing first the Court's alternative holding that it was no longer equitable to enforce the Injunction Order in light of the new circumstances, the Sixth Circuit concluded that, from the face of the PEIS, both the 15-foot rule and Alternative C cause the same result that formed the basis for this action in the first place, that is, preventing plaintiffs from growing or maintaining any trees on their private property in the buffer zones. *Sherwood III*, 46 F.4th at 443. The Sixth Circuit stated that the "only notable difference between the 15-foot rule and Alternative C is that Alternative C allegedly permits landowners to keep some trees in the rights-of-way, but the EIS later contradicts itself in several ways, including by failing to include any trees at all in the list of approved plants under Alternative C." *Id.* The Sixth Circuit opined that "Alternative C is likely just a differently packaged version of the 15-foot rule." *Id.* The Sixth Circuit highlighted statements in the PEIS indicating that "compatible trees" may be allowed to remain in areas actively maintained by others, but emphasized that Appendix H, titled "List of Compatible Trees and Shrubs" contained approximately 50 species of vegetation, but not a single species of tree. *Id.* at 444. Accordingly, the Sixth Circuit concluded that the Court abused its discretion when it held that Alternative C was factually distinct enough from the 15-foot rule to make enforcement of the injunction no longer equitable. *Id.*

The Sixth Circuit also concluded that, in light of the fact that Alternative C and the 15-foot rule were "arguably indistinguishable," the Court abused its discretion by dissolving the injunction without compiling the administrative record and conducting a hard-look review of whether the PEIS complied with NEPA. *Id.* The Sixth Circuit stated

that "[t]he dispute between TVA and the plaintiffs on this point boils down to whether the hard-look review of Alternative C should occur in this litigation or in a separately filed litigation," and the Sixth Circuit concluded that "plaintiffs have the better argument." *Id.* at 445. Specifically, the Sixth Circuit found that because Alternative C "would likely have the same negative impact on plaintiffs that caused them to seek an injunction in the first place" the hard-look analysis of Alternative C should occur on remand, rather than in separate litigation. *Id.* The Sixth Circuit stated that "the district court should have interpreted the terms of the injunction to require the compilation of the administrative record and a hard-look review at Alternative C before dissolving the injunction based on TVA's compliance with NEPA." *Id.* The Sixth Circuit concluded that "[s]ince Alternative C arguably has the same impact on the plaintiffs as the 15-foot rule, the court should make an actual finding on whether TVA has complied with NEPA before dissolving the injunction. In doing so, the district court may address the various 'hard-look' arguments raised in pages 59-102 of the plaintiffs' brief."[6] *Id.*

[6] The issued raised in pages 59 to 102 of plaintiffs' appellate brief appear to largely have been reproduced as their motion for summary judgment [*Compare* Sixth Circuit ECF, Case No. 21-5927, Doc. 32, pp. 59–102 *with* E.D. Tenn. ECF, Case No. 3:12-cv-156, Doc. 559]. Accordingly, the Court's analysis directly addresses the arguments raised in plaintiffs' motion for summary judgment, but in doing so, the Court is inherently addressing the same arguments raised in pages 59 to 102 of plaintiffs' appellate brief, in compliance with the Sixth Circuit's directive.

Upon third remand, on August 15, 2023, the Court reinstated the Injunction Order and ordered TVA to compile the administrative record [Doc. 512]. On August 29, 2023, TVA filed the administrative record [*See* Doc. 516].[7]

## II. STANDARD OF REVIEW

"NEPA is our basic national charter for protection of the environment, and is designed to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." *Tenn. Env't Council v. Tenn. Valley Auth.*, 32 F. Supp. 3d 876, 882 (E.D. Tenn. 2014) (internal quotation marks and citations omitted). To that end, NEPA requires federal agencies to consider the significant environmental effects of a proposed action. *Sherwood I*, 590 F. App'x at 457 (citing *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 97 (1983)). More specifically, NEPA requires federal agencies to take a "hard look" at the environmental consequences of their projects before taking action. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989); 42 U.S.C. § 4332(2)(C); *Sherwood III*, 46 F.4th at 445.

A primary provision of NEPA is the requirement that all federal agencies prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Sw. Williamson Cnty. Ass'n Inc. v. Slater*, 243 F.3d

[7] Upon approval by the Court [*see* Doc. 512], TVA filed the administrative record on DVD disc.

270, 274 n.3 (6th Cir. 2001); *Sherwood I*, 590 F. App'x at 457 (citing *Sierra Club v. Slater*, 120 F.3d 623, 628 (6th Cir. 1997)); *Sherwood III*, 46 F.4th at 444 (citing 42 U.S.C. § 4332(C)); *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*, 883 F.3d 644, 648 (6th Cir. 2018); *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 414 (6th Cir. 2004). "An EIS must detail, among other things, 'the environmental impact of the proposed action,' 'any adverse environmental effects which cannot be avoided' in implementing the proposal, and any available alternatives." *Sherwood III*, 46 F.4th at 445 (quoting *Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016)); *see also Mineta*, 375 F.3d at 414 ("An EIS provides an extensive explanation of the environmental impacts of, and possible alternatives for, a proposed major federal action").

However, "'[i]t is . . . well-settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.'" *Sherwood I*, 590 F. App'x at 457 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)); *see also Sherwood III*, 46 F.4th at 444 ("NEPA itself does not mandate particular results . . . rather, NEPA imposes only procedural requirements on federal agencies . . ." (internal quotation marks omitted) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2006))); *Meister v. United States Dep't of Agric.*, 623 F.3d 363, 377 (6th Cir. 2010) (NEPA "serves procedural rather than substantive goals" (internal quotation marks omitted)); *Massachusetts v. United States Nuclear Regul. Comm'n*, 708 F.3d 63, 67 (1st Cir. 2013) (stating that NEPA "seeks to guarantee process, not specific outcomes"). In other words,

NEPA's mandate is essentially procedural. *Robertson*, 490 U.S. at 350; *see also Little Traverse Lake Prop. Owners Ass'n*, 883 F.3d at 648 (describing NEPA as setting forth "essentially procedural requirements to assess environmental impacts of major federal actions" (quoting *Mineta*, 375 F.3d at 414)).

"NEPA merely prohibits uninformed—rather than unwise—agency action." *Sherwood I*, 590 F. App'x at 457 (quoting *Robertson*, 490 U.S. at 351). Accordingly, "NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency as NEPA was not intended to resolve fundamental policy disputes." *Mayo v. Reynolds*, 875 F.3d 11, 15–16 (D.C. Cir. 2017). And because NEPA primarily imposes procedural requirements on agencies, a NEPA lawsuit is "inherently a challenge to the adequacy of the record." *Sherwood I*, 590 F. App'x at 458 (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009)).

Federal courts have jurisdiction to review NEPA claims only pursuant to the APA, 5 U.S.C. § 704. *Slater*, 120 F.3d at 630–31; *see also Ctr. for Biological Diversity v. United States Coast Guard*, No. 25-cv-9109, 2026 WL 2031775, at *2 (N.D. Cal. July 13, 2026) ("Because NEPA does not provide a private right of action, plaintiffs must challenge agency action under the APA"). "Judicial review of NEPA compliance is limited in scope." *Kentuckians for the Commonwealth v. United States Army Corps of Eng'rs*, 746 F.3d 698, 706 (6th Cir. 2014); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 n.2 (2025) ("When reviewing compliance with NEPA, courts are to play only a limited role.").

"While summary judgment is the mechanism to determine whether agency action is supported by law, the typical summary judgment rules do not apply in APA cases." *Appalachian Voices*, slip op. at 8 (citing *Tenn. Hosp. Ass'n v. Price*, No. 3:16-cv-3263, 2017 WL 2703540, at *4 (M.D. Tenn. June 21, 2017)). "Instead, the APA provides that 'the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'" *Id.* (quoting 5 U.S.C. § 706).

An agency's determination will be upheld so long as the determination was not arbitrary, capricious, or an abuse of discretion. *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995); *see also Kentuckians for the Commonwealth*, 746 F.3d at 706 ("Judicial review ensures that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary and capricious" (internal quotation marks and alterations omitted)); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 412 (1976); *Marsh*, 490 U.S. at 376; *Slater*, 120 F.3d at 632 (also indicating that an agency's determination may be set aside if it is "otherwise not in accordance with the law"); *Tenn. Clean Water Network v. Kempthorne*, No. 3:05-cv-214, 2007 WL 220414, at *4 (E.D. Tenn. July 27, 2007). "A decision is arbitrary and capricious if the agency has '(1) relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the produce of agency expertise.'" *Sherwood I*, 590 F. App'x at 459

(quoting *Northwoods Wilderness Recovery, Inc. v. United States Dep't of Agric. Forest Serv.*, 192 F. App'x 369, 374 (6th Cir. 2006)); *see also Kentuckians for the Commonwealth*, 746 F.3d at 706.

In other words, an agency's decision must be "reasonable under the circumstances" when viewed "in light of the mandatory requirements and the standard set by NEPA." *Kelley*, 42 F.3d at 1519. "When it is possible to offer a reasoned explanation based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989).

In engaging in its review, a court cannot "substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Kelley*, 42 F.3d at 1518; *see also Sherwood I*, 590 F. App'x at 458; *Meister*, 623 F.3d at 377 (stating that, in deciding whether an agency has acted arbitrarily for NEPA purposes, a court will not substitute its own judgment for that of the agency, but will insist that the agency has in fact adequately studied the issue and taken a hard look at the environmental consequences of its decision). A court must, however, "determine whether the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Kelley*, 42 F.3d at 1518; *see also Sherwood I*, 590 F. App'x at 458; *Kentuckians for the Commonwealth*, 746 F.3d at 712 ("There is no substantive component to NEPA review; [a] court may only 'insist that the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision'" (quoting *Meister*, 523 F.3d at 377)). At bottom, this review is "a narrow

one." *Marsh*, 490 U.S. at 378. "'Because NEPA is a procedural and not a results-driven statute, even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs.'" *Kentuckians for the Commonwealth*, 745 F.3d at 706 (quoting *Ohio Valley Env't Coal.*, 556 F.3d 177, 191 (4th Cir. 2009)). "NEPA does not necessarily preclude agencies from taking actions that would affect . . . trees, because if the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Little Traverse Lake Prop. Owners Ass'n*, 883 F.3d at 653 n.2 (internal quotation marks and alterations omitted) (quoting *Robertson*, 490 U.S. at 350–51). Further, the deferential review under NEPA and the APA does not task courts with "flyspecking agencies' environmental analyses for any deficiency no matter how minor." *Appalachian Voices v. United States Army Corps of Eng'rs*, 134 F.4th 410, 422 (6th Cir. 2025) (internal quotation marks and alterations omitted) (quoting *El Puente v. United States Army Corps of Eng'rs*, 100 F.4th 236, 246 (D.C. Cir. 2024)).

Recently, the Supreme Court addressed the appropriate level of analysis courts should apply when faced with NEPA challenges. *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 179. The Court noted that federal courts had been addressing NEPA challenges since the 1970s, and "[o]ver time, some courts have assumed an aggressive role in policing agency compliance with NEPA" while "[o]ther courts have adopted a more restrained approach." *Id.* The Supreme Court thus found it appropriate to reiterate and clarify the

fundamental principles of judicial review in NEPA case, with the central principle of deference to the agency. *Id.*

In *Seven County Infrastructure Coalition*, the Supreme Court reiterated:

> NEPA imposes no substantive environmental obligations or restrictions. NEPA is a purely procedural statute that . . . simply requires an agency to prepare an EIS—in essence, a report. Importantly, NEPA does not require the agency to weigh environmental consequences in any particular way. Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws.

*Id.* at 173. In other words, "NEPA is a procedural cross-check, not a substantive roadblock" and the goal of NEPA "is to inform agency decision-making, not to paralyze it." *Id.* The Supreme Court emphasized that, when a party argues that an agency action was arbitrary and capricious due to a deficiency in an EIS "the reviewing court must account for the fact that NEPA is a *purely procedural statute*" and that "[u]nder NEPA, an agency's only obligation is to prepare an adequate report." *Id.* at 180 (emphasis in original). Accordingly, the reviewing court's only role "is to confirm that the agency has addressed environmental consequences and feasible alternatives to the relevant project." *Id.* (internal quotation marks omitted). Additionally, the Supreme Court stated that "[b]ecause an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained." *Id.*

The Supreme Court reiterated that "when determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency." *Id.* An

agency, the Supreme Court explained, "is better equipped to assess what facts are relevant to the agency's own decision than a court is . . . . So, the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Id.* at 181. Rather, "[s]o long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line." *Id.* at 182. The Supreme Court ultimately stated:

> [W]hen assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.

*Id.* at 182–83.

The Supreme Court concluded that "[a] 1970 legislative acorn has grown over the years into a judicial oak that has hindered infrastructure development under the guise of just a little more process. A course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." *Id.* at 184 (internal quotation marks omitted). The Supreme Court emphasized that "courts not only must defer to the agency's reasonable choices regarding the scope and contents of the EIS, but also must keep in mind that review of the agency's EIS is not the same thing as review of the agency's final decision concerning the project." *Id.* The Supreme Court further stated:

> The ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably

> explained. Review of an EIS is only one component of that analysis. Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.

*Id.* at 184–85. Ultimately, the Supreme Court highlighted that "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 185.

At least one federal appellate court has concluded that "[a]fter *Seven County*, the era of searching NEPA review is over—or at least it should be." *Sierra Club v. Fed. Energy Regul. Comm'n*, 153 F.4th 1295, 1311 (D.C. Cir. 2025).

## III. ANALYSIS

### A. Deference

As an initial matter, the Court addresses the deference owed to TVA's decisions regarding the PEIS and the selection of Alternative C. In its motion for summary judgment, TVA highlights the Supreme Court's *Seven County Infrastructure Coalition* decision and its reaffirmance that courts must afford substantial deference to agency NEPA actions [Doc. 558, pp. 12–14].

Plaintiffs respond, acknowledging that an agency's decision is generally entitled to deference, but raising two grounds that "might" affect the deference afforded to TVA in this case [Doc. 561, pp. 7–8]. First, plaintiffs contend that "[a]fter what TVA has put this Court and the Court of Appeals through in the case at bar, including numerous deceptions, 'lawyer gyrations' and evasion 'right up to the edge' of contempt of court as noted by the Court of Appeals, and with an altogether separate Motion for Contempt pending, the idea

of giving TVA the same deference as other agencies might require a certain amount of naivete" [*Id.* at 7].[8] Second, plaintiffs contend that TVA is "not an ordinary government agency but is instead a government-owned corporation . . . that combines both governmental and commercial functions" [*Id.* at 8]. Thus, plaintiffs contend that TVA is a "mixed entity" and "might not be afforded the full measure of deference that ordinary government agencies are afforded" [*Id.* (citing *Thacker v. Tenn. Valley Auth.*, 587 U.S. 218, 221 (2019))]. Moreover, TVA has represented that the removal of trees from the right-of-way is related to its reliability as a seller of electricity, which would appear to be a commercial, rather than a governmental function, and thus, the decision as to the removal of trees "might" not qualify for the same deference as that of an ordinary government agency [*Id.*].

TVA does not specifically respond to these arguments [*See* Doc. 565].

The Court notes that it is unclear whether plaintiffs truly seek to raise a claim that TVA is not entitled to deference either in support of their motion for summary judgment or in opposition to TVA's motion for summary judgment. Plaintiffs did not raise these

[8] In support of this argument, plaintiffs cite a transcript from argument before the Sixth Circuit on October 19, 2016 [Doc. 561, p. 7 (citing Doc. 382-1); Doc. 382]. In relevant part, at one point during TVA's argument, an unspecified member of the Sixth Circuit panel made a statement, apparently regarding production of the administrative record: "It shouldn't have to be hidden or subsumed and superseded and all of these—I don't know, with respect to lawyer gyrations, to keep us from seeing what the basis for the decision was" [Doc. 382-1, p. 32]. Additionally, in the course of that argument, an unspecified member of the Sixth Circuit panel suggested that "when the court of appeals tells the agency to compile an administrative record and they just don't do it, it's – its' not contempt maybe, but it's getting right up to the edge" [*Id.* at 27]. But, notably, no such conclusions about "lawyer gyrations" or "getting right up to the edge" of contempt were include in any of the Sixth Circuit's opinions.

arguments in their own motion, and indeed, raised them for the first time in their response to TVA's motion [*See* Doc. 561, pp. 7–8]. And the language of plaintiffs' argument, repeatedly stating that various factors "might" affect the deference owed to TVA's decisions is less than definitive [*See id.*]. Regardless, the Court finds that these arguments lack merit.

Turning to plaintiff's second argument, regarding TVA's status as a "mixed entity," the only support plaintiffs provide for this argument is a citation to the Supreme Court's *Thacker* decision [*See id.* at 8]. True, the Supreme Court recognized in *Thacker* that "TVA is something of a hybrid, combing traditionally governmental functions with typically commercial ones." 587 U.S. at 221. And the Supreme Court indicated that TVA's functions of producing and selling electricity, also at issue in this case, are "commonplace commercial functions." *Id.* But nothing in *Thacker* addressed the appropriate deference to be given to TVA in challenges to agency actions under the APA. In fact, *Thacker* did not arise under the APA, but rather, involved the applicability of the "discretionary function" exception to the Federal Tort Claims Act's waiver of sovereign immunity to TVA, in light of the TVA Act's "sue-and-be-sued" clause. *Id.* at 220–21. Accordingly, *Thacker* provides no support for any suggestion that TVA should be entitled to less deference in this review under the APA. Moreover, courts have regularly granted deference to TVA in reviewing actions under the APA, even post-*Thacker*. *See, e.g.*, *Sierra Club*, 753 F. Supp. 3d at 606; *Appalachian Voices*, slip op. at *8. And granting deference to TVA under these circumstances is the logical result. After all, absent its "hybrid status"

TVA would not be subject to the requirements of NEPA or the APA at all. *See* 42 U.S.C. § 4332 (setting forth NEPA requirements that apply to "all agencies of the Federal Government"); 5 U.S.C. § 704 (providing for judicial review of agency actions); 5 U.S.C. § 701 (defining "agency" for purposes of the APA as an "authority of the Government of the United States"). Accordingly, the Court finds no support for plaintiffs' suggestion that TVA should be granted less deference due to its "hybrid nature."

As to plaintiffs' first argument, that is, that TVA is somehow entitled to less deference based on plaintiffs' allegations of misconduct in the course of this litigation, the Court notes that plaintiffs cite no case law whatsoever supporting such claim. Given the dearth of legal support, the Court declines plaintiffs' invitation to essentially alter the scope of review in this case as a sanction.

**B. Scope of Administrative Record**

Next, the Court addresses the scope of the administrative record that should be considered in this review. Of relevance, the administrative record submitted by TVA contains a file dated November 10, 2022, titled "MEMORANDUM TO FILE: DETERMINATION OF NEPA ADEQUACY The Sixth Circuit Opinion in *Sherwood v. TVA* associated with the *Transmission System Vegetation Management Final Programmatic Environmental Impact Statement*" ("DNA") [AR at 24314]. The DNA states that it was prepared by a "NEPA Specialist" and an Attorney from TVA's Office of General Counsel [*Id.*]. The DNA states that it was prepared "to document the evaluation by the [TVA] [NEPA] Program to determine whether previous environmental analyses

conducted by TVA for the . . . PEIS . . . satisfies NEPA's requirements" [*Id.*]. The DNA specifically states that it is a record of determination of NEPA adequacy, in compliance with NEPA implementing regulations at 40 C.F.R. § 1502.9(d)[9] and TVA's NEPA procedures at 18 C.F.R. § 1318.101(d) [*Id.* at 24314–16, 24318].

The DNA highlights the Sixth Circuit's decision in *Sherwood III*, noting that the Sixth Circuit cited inconsistencies in the PEIS's statements regarding whether compatible vegetation was authorized on real property owned and maintained by third parties [*Id.* at 24315]. The DNA states that "[s]pecifically, the appellate court pointed to the compatible vegetation listed in Appendix H, entitled 'List of Compatible Trees and Shrubs,' and opined that the Appendix did not actually contain any trees" [*Id.*]. Regarding the comparison of Alternative C to the 15-foot rule, the DNA stated:

> Under Alternative C there would be greater coordination and interaction with local landowners to identify compatible vegetation that may be allowed on property maintained primarily by them (as opposed to property maintained by TVA). Vegetation compatible with the safe and reliable operation of the transmission system may be allowed to remain within the [right-of-way]. . .
>
> . . . .
>
> Although the Sixth Circuit's opinion does not raise significant new circumstances or information relevant to environmental concerns, it does identify a minor inconsistency in the application of Alternative C as compared to the 15-foot rule challenged in the *Sherwood* litigation. Although TVA agrees that the substantive outcomes of these two policies are very similar, under Alternative C, there are no height-based criteria used to

[9] Notably, Council on Environmental Quality ("CEQ") regulations previously governed the EIS and TVA's compliance with NEPA. *Appalachian Voices*, slip op. 22–23 n.4 (citing 40 C.F.R. §§ 1500.1-1500.8). However, the CEQ rescinded these regulations effective April 11, 2025. *Id.* (citing *Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10610-01 (Feb. 25, 2025)).

> determine what can and cannot remain on the [right-of-way]. And, based on conversations with ROW staff, Appendix H represents a list of vegetation that is pre-authorized to be planted in TVA's [rights-of-way] throughout the seven-state service area. Importantly, Appendix H represents a comprehensive list of species available for planting in the [right-of-way] but it is not an exclusive list; private property owners are invited to communicate with TVA staff to work together on appropriately planting species on their property within TVA's [right-of-way] that are compatible with TVA's [right-of-way] vegetation management requirements.
>
> . . .
>
> The 15-foot rule strictly implemented the removal of vegetation on the [right-of-way] above the height criteria, whereas Alternative C evaluates the existing and potential clearance between vegetation and the transmission line phases. . . . The end-state of Alternative C allows for compatible vegetation that may have otherwise been removed under the 15-foot rule.

[*Id.* at 24320].

Specifically addressing the lack of any reference to tree species in Appendix H, the DNA stated:

> The []PEIS includes an Appendix entitled "Compatible Trees and Shrubs (Appendix H)" that serves as a pre-approved list of available vegetation that landowners can plant within TVA's [rights-of-way] without seeking approval from TVA. TVA's preferred alternative will allow landowners to plant compatible vegetation within the [right-of-way], whether that be trees or not. Appendix H serves as a pre-approved, but not exclusive, list of available trees and shrubs that landowners can plant within TVA's [rights-of-way]. TVA is encouraging each landowner with property within the [right-of-way] to engage with TVA representatives to determine whether vegetation on their property may cause any issue with the operation and maintenance of the TVA transmission lines. Although TVA's preferred alternative seeks to establish a meadow-like end-state, that does not mean that trees will be categorically excluded on property maintained by landowners. Thus, TVA will consider the compatibility of vegetation (including trees) not included in Appendix H on a case-by-case basis.
>
> The []PEIS evaluated the potential environmental effects of creating a meadow-like end-state throughout much of the transmission system to

> support an environmental outcome with proportional benefits to the costs of cutting down mature trees and determined that the preferred alternative represented the best path forward in balancing all of the objectives of maintaining NERC standards of vegetation management on TVA's [rights-of-way]. Clarification that trees not included in Appendix H may be allowed to remain on the [right-of-way] does not change the outcome of this analysis because this determination will be made on a case-by-case basis.

[*Id.* at 24321].

Plaintiffs contend that the DNA should not be included in the administrative record, because it was not created until November 10, 2022, two years after the PEIS was completed and the Record of Decision published [Doc. 561, p. 20; *see also* Doc. 566, p. 11]. Plaintiffs argue that the administrative record is to be composed of materials that were before the agency at the time the decision was made [Doc. 561, p. 20]. And the Ninth Circuit has explicitly stated that it is inappropriate to consider documents that were prepared in response to litigation, years after the original decision was made [*Id.* at 20–21 (citing *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000))]. Plaintiffs contend that TVA created the DNA "as an evasive maneuver in response to the decision of the Court of Appeals in the third appeal," as is evident from its title, which specifically refers to "The Sixth Circuit Opinion in *Sherwood v. TVA*" [*Id.* at 22]. Plaintiffs also argue that the upshot of the DNA is that some anonymous right-of-way "staff" might, in unexplained circumstances, occasionally overrule or disregard the plain language of the EIS as written [*Id.*]. But these alleged representations of an unnamed staff member directly contradict the language of the PEIS, which was circulated [*Id.* at 23; *see also* Doc. 566, p. 12]]. Plaintiffs contend that this is a "textbook example" of unpermitted *post hoc* rationale

[Doc. 561, p. 23]. Plaintiffs thus argue that the Court must consider the words of the PEIS as published rather than any attempted *post hoc* clarification [*Id.* at 24].[10]

TVA replies that the DNA simply provides further clarification as to the site-specific review that will occur when Alternative C is implemented on land primarily maintained by others [Doc. 565, p. 6]. Moreover, TVA contends that preparation of this type of document is specifically provided for in the NEPA regulations in place at the time [*Id.* at 7]. TVA contends that the DNA was created pursuant to these regulations and with the goal of avoiding unnecessary duplication in the NEPA process [*Id.* at 7–8].

In reviewing a case under the APA, "courts confine their review to the administrative record, which includes all materials compiled by the agency that were before the agency at the time the decision was made." *Sierra Club*, 120 F.3d at 638 (internal quotation marks and alterations omitted). "'The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.'" *Little Traverse Lake Prop. Owners Ass'n*, 883 F.3d at 657 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985)). "'[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Id.* (quoting *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cnty.*, 286 F.3d 382, 387 (6th Cir. 2002) (citation and internal quotation marks omitted, alteration in original)).

---

[10] Plaintiffs also contend that the DNA's contention that Appendix H is a "comprehensive list" but not an "exclusive list" of compatible vegetation is "stupefying" and not a reasonable interpretation of the PEIS [Doc. 566, p. 11].

The Ninth Circuit previously explained that courts have recognized a limited role within NEPA's procedural framework for supplemental information reports ("SIR"). *Idaho Sporting Cong.*, 222 F.3d at 566. "Specifically, courts have upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental . . . EIS." *Id.* In that case, however, the Ninth Circuit determined that the agency was "not using SIRs wholly for the purpose of evaluating the significance of new information or changed circumstances[,] and, instead, the agency was "using SIRs to present information and analysis that it was required, but . . . failed to include in its original NEPA documents." *Id.* at 566–67. The Ninth Circuit concluded that "[i]t is inconsistent with NEPA for an agency to use an SIR, rather than a supplemental . . . EIS, to correct this type of lapse."[11] *Id.* at 567. The Ninth Circuit also found that the SIRs at issue in that specific case did not satisfy NEPA's timing requirements, as "the SIRs were prepared in response to litigation, years after the original decisions . . . were made." *Id.* at 568. Finally, the court distinguished the case before it from its prior holding in *Half Moon Bay Fishermans' Marketing Association v. Carlucci*, 857 F.2d 505 (9th Cir. 1988), stating that, in *Half Moon Bay*, unlike in the instant case, the relevant information was before the agency prior to making its decision. *Id.* at 568.

[11] Notably, the Ninth Circuit based this conclusion at least partly on the existence of the now-rescinded CEQ regulations regarding supplementation, which the Ninth Circuit concluded would be "superfluous" if an agency could correct deficiencies in an EIS through SIRs. *Idaho Sporting Cong.*, 222 F.3d at 568 (citing 40 C.F.R. § 1502.9(c)(4)).

TVA specifically points to the previously-applicable CEQ regulation [Doc. 565, p. 7], labeled "Supplemental environmental impact statements[,]" which stated: "Agencies: (1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action is incomplete or ongoing, and: (i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) There are substantial new circumstances or information about the significance of adverse effects that bear on the analysis." 40 C.F.R. § 1502.9(d)(1) (2024). [Doc. 565, p. 7]. TVA also points to the previously-applicable[12] version of TVA's own federal regulations [Doc. 565, p. 7], which stated:

> The NEPA compliance staff shall determine whether the action is already covered under an existing NEPA review, including a programmatic or generic review. Before such an action proceeds, the NEPA compliance staff shall evaluate and adequately document whether the new action is essentially similar to the previously analyzed action, the alternatives previously analyzed are adequate for the new action, there are significant new circumstances or information relevant to environmental concerns that would substantially change the analysis of the existing NEPA review, and there are effects that would result from the new action that were not addressed in the previous analysis.

18 C.F.R. § 1318.101(d) (2025).

In essence, it appears that TVA argues that the DNA was an appropriate document to conclude that the information about the contents of Appendix H highlighted by the Sixth Circuit in *Sherwood III*, that is, that Appendix H does not contain any trees, did *not* require a supplemental EIS under the then-applicable CEQ regulations, 40 C.F.R. § 1502.09(d)(1).

[12] TVA significantly amended this regulation effective January 21, 2026. *Implementation of the National Environmental Policy Act*, 91 Fed. Reg. 2470-01 (Jan. 21, 2026).

But, even if true that the DNA was an appropriate manner to document that conclusion, it does not necessarily follow that the DNA is an appropriate part of the administrative record for purposes of determining whether the PEIS complied with NEPA. And nothing in the previously-applicable CEQ regulations TVA cites addresses records memorializing a finding that no supplemental EIS is necessary. *See* 40 C.F.R. § 1502.09(d) (2024).

Likewise, the TVA-specific regulation in effect at the time the DNA was created also does not address the creation of a document memorializing a determination that no "significant new circumstances or information relevant to environmental concerns . . . would substantially change the analysis of the existing NEPA review"; rather, the regulation simply required "NEPA compliance staff" make such a determination. 18 C.F.R. § 1318.101(d) (2025). And, again, this regulation does not answer whether a DNA documenting such determination would be appropriately included in the administrative record before the court when determining whether the PEIS created by TVA complies with NEPA.

The ultimate inquiry in determining whether the DNA should be part of the administrative record in this case is whether it contains information that was before TVA when it created the PEIS and selected Alternative C. *See Sierra Club*, 120 F.3d at 638; *Idaho Sporting Cong.*, 222 F.3d at 567–68. On the record before the Court, it is unclear whether the information in the DNA—specifically, that Appendix H is not an exclusive list of vegetation permitted in TVA's rights-of-way under Alternative C, and that TVA would work with individual landowners to identify compatible vegetation—was before TVA at

the time that the PEIS was created. Plaintiffs contend that this information in the DNA "directly contradict[s]" the PEIS [Doc. 561, p. 23; Doc. 566, p. 12]. The Court would not go as far as to say that the information in the DNA is *contradictory* to the PEIS. But the PEIS's language on this topic is ambiguous and, at times, inconsistent with itself.

For example, the PEIS states that, "[u]nder Alternative C there would be greater coordination and interaction with local landowners to identify compatible vegetation. TVA would work with local property owners to evaluate the compatibility of vegetation within or near the transmission [right-of-way]. Vegetation compatible with the safe and reliable operation of the transmission system may be allowed to remain within the [right-of-way]" [AR at 895; *see also id.* at 985, 1159]. This statement, repeated several times in the PEIS, appears consistent with the information contained in the DNA about collaboration with landowners regarding compatible vegetation. On the other hand, the PEIS also states that, under Alternative C "TVA would have the option to allow compatible trees to remain in areas actively maintained by others" and notes that "[c]ompatible species of trees and shrubs are listed in Appendix H" [*Id.* at 983]. But, of course, as the Sixth Circuit concluded in *Sherwood III*, Appendix H does not include any trees, but rather, only contains a list of "flowers, bushes, and small shrubs[.]" *See Sherwood III*, 46 F.4th at 444.

Moreover, the title of Appendix H itself creates some ambiguity. The title page for Appendix H is labeled "Appendix H – List of Compatible Trees and Shrubs" [AR at 2138], but Table H-1, contained in that appendix, is labeled "*Comprehensive* List of Trees and

Shrubs that are Compatible Within TVA ROWs" [*Id.* at 2140–43 (emphasis added)].[13] And the term "comprehensive" is typically understood to mean "covering completely or broadly." *Comprehensive*, MERRIAM-WEBSTER, http://merriam-webster.com/dictionary/ comprehensive (last visited Sept. 24, 2026). The contention in the DNA that vegetation beyond that contained in Appendix H would be permitted under Alternative C certainly seems inconsistent with the labeling of that table as a "comprehensive" list.

Given this ambiguity in the PEIS, the Court cannot determine whether the DNA merely documents information that was already before TVA at the time it created the PEIS and selected Alternative C, or whether the clarification in the DNA is new information designed in response to the Sixth Circuit's decision in *Sherwood III*. On this record, then, the Court cannot determine that the DNA should appropriately be included in the administrative record. The Court therefore declines to consider the DNA as part of the administrative record in its review of whether the PEIS complies with NEPA.

### C. Purpose & Need

Under the previously applicable[14] NEPA implementing regulations, an EIS was required to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." *Coal. for*

---

[13] The Court's review of the PEIS has uncovered no other references to Appendix H being a "comprehensive" list of compatible vegetation, beyond the title of the table in Appendix H itself.

[14] As noted *supra*, the CEQ regulations that previously governed the EIS and TVA's compliance with NEPA were rescinded effective April 11, 2025. *Appalachian Voices*, slip op. 22–23 n.4 (citing *Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10610-01 (Feb. 25, 2025)).

*Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 487 (6th Cir. 2014) (citing 40 C.F.R. § 1502.13). "Because only alternatives that accomplish the purpose of the proposed action required detailed consideration, how the agency defines the purpose of the proposed action sets the counters for its exploration of available alternatives." *Sierra Club v. Tenn. Valley Auth.*, 753 F. Supp. 3d 606, 624 (M.D. Tenn. 2024). "'Agencies enjoy considerable discretion in defining the purpose and needs for their proposed actions, provided that they are reasonable.'" *Coal. for Advancement of Reg'l Transp.*, 576 F. App'x at 487 (quoting *Webster v. United States Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012)); *see also Sierra Club*, 753 F. Supp. 3d at 624–25, *Tenn. Env't Council*, 32 F. Supp. 3d at 888, *Appalachian Voices*, slip op. at 10–11. However, "[a]n agency must not define the parameters of a project so narrow as to limit its action to one conceivable alternative and obviate the choice in the []EIS to a 'foreordained formality.'" *Karst Env't Educ. & Protection, Inc. v. Fed. Highway Admin.*, No. 1:10-cv-154, 2011 WL 5301589, at *13 (W.D. Ky. Nov. 2, 2011) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)); *see also Appalachian Voices*, slip op. at 10–11. In other words, "while agencies may not define a project so narrowly that it forecloses reasonable consideration of alternatives, agencies enjoy considerable discretion in defining the purposes and needs for their proposed actions, provided that they are reasonable[.]" *Little Traverse Lake Prop. Owners Ass'n*, 883 F.3d at 656 (internal citations, quotation marks, and alterations omitted); *see also Tenn. Env't Council*, 32 F. Supp. 3d at 888 (stating that an agency's purpose and need statement is

"evaluated under a reasonableness standard." (citing *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998))).

Plaintiffs argue that TVA's claim that Alternative C will make the electrical system safer and more reliable is untrue and reflects a lack of reasoned decision-making [Doc. 559, p. 46]. Plaintiffs contend that the transmission lines with the buffer zones intact has been deemed safe and reliable by TVA for 76 years before TVA implemented the 15-foot rule [*Id.*]. The PEIS claims Alternative C will somehow make the transmission lines safer and more reliable [*Id.*]. Plaintiffs argue that this is another example of bending over backwards to justify a predetermined result because, according to TVA's website, the system is already 99.999% reliable and has been for the last 25 years in a row [*Id.*]. Plaintiffs contend that the PEIS does not explain how Alternative C could somehow make the system any more reliable [*Id.*].

TVA responds that the PEIS appropriately considered safety and reliability of the transmission system as part of the action's purpose and need [Doc. 562, p. 16].[15] TVA contends that an agency need not wait until a problem arises to make a decision designed to avoid it, and plaintiffs point to nothing in NEPA or the relevant case law requiring what

[15] In its own motion for summary judgment, TVA highlights that Chapter 1 of the PEIS defines the purpose and need for the proposed action, that is, the general need for a robust and effective vegetation management program as a result of the interconnected nature of TVA's transmission system with other utilities' systems, and the damage that can ensue if just one of TVA's transmission lines experiences an outage based on contact with vegetation [Doc. 558, p. 20]. TVA contends that the PEIS explains that the need for the proposed action is enhancing public safety, maintaining safe, efficient, and reliable operation of the transmission system in a cost-effective and environmentally sound manner, and complying with all current and future NERC reliability standards [*Id.*]. TVA asserts that the PEIS's purpose and need definition is eminently reasonable [*Id.*]

they suggest [*Id.* at 17]. Further, the concepts of reliability and safety are part of TVA's purpose and need for the proposed action, not the environmental effects that are subject to the hard look requirement articulated in NEPA case law [*Id.*]. TVA argues that plaintiffs' cherry-picking of incomplete phrases from the PEIS does not demonstrate that TVA's complete purpose-and-need statement is unreasonable [*Id.* at 18]. Rather, this argument is simply a repackaging of plaintiffs' overall disagreement with the substance of TVA's decision [*Id.*].

Plaintiffs reply that their argument in this regard is simply that, with the system already 99.999% reliable, the PEIS did not offer any explanation as to how the remarkable expense of the 15-foot rule and/or Alternative C, the destruction of millions of trees, and the "ruination" of properties in 51% of the right-of-way could be justified to improve reliability by .001% [Doc. 566, p. 23].

Initially, some clarification is in order. Plaintiffs raise this argument in the section of their motion devoted to whether the PEIS takes the required "hard look" at the environmental consequences of Alternative C [*See* Doc. 559, pp. 1–2 (table of contents)]. But the "hard look" standard only requires an agency to take a "hard look" at the *environmental impacts* of its actions. *See Robertson*, 490 U.S. at 350. What plaintiffs complain of in this respect is not a potential environmental impact of TVA's proposed action, but rather, a dispute over the need for the action *at all*. Accordingly, the Court finds that this challenge should be reviewed for the reasonableness of TVA's stated purpose and need. *See Coal. for Advancement of Reg'l Transp.*, 576 F. App'x at 487.

In their motion, plaintiffs specifically point to a portion of the PEIS which states: "[T]o *ensure the safe and reliable operation of the transmission facilities* and to improve the efficiency and effectiveness of vegetation management, Alternatives B, C and D would include an initial removal of vegetation within the buffer areas . . . within the full extent of the [right-of-way]" [AR at 973 (emphasis added); *see also* Doc. 559, p. 46]. Plaintiffs argument boils down to an assertion that no action was necessary, because TVA's transmission system was already over 99% reliable.

But the PEIS provides ample explanation as to why TVA believed action was needed. First, TVA highlighted the interconnectedness of the electric network, and the fact that any "interruption, especially a sustained outage caused by vegetation, can have impacts larger than the area served by the specific provider where the outage occurs" [AR at 919]. TVA provided a specific example of this problem, describing how, in August 2003, a single tree contacted a transmission line in Ohio, which resulted in "a series of cascading events that triggered transmission line failures and blackouts from Ontario, Canada, to the northeastern United States" that affected 55 million people and resulted in an economic impact estimated at $6 billion [*Id.* at 919–20].

The PEIS also explains that, in response to the 2003 incident "Congress enacted the Energy Policy Act of 2005 . . . which authorized the Federal Energy Regulatory Commission (FERC) . . . to certify an 'Electric Reliability Organization' (ERO) to create mandatory and enforceable reliability standards" [*Id.* at 920]. FERC then "designated NERC as the ERO with the responsibility to develop and enforce standards to ensure the

reliability of the Bulk Power System" [*Id.*]. On June 8, 2007, "NERC began enforcing its Reliability Standard FAC-003 Transmission Vegetation Management Program" [*Id.*]. TVA's failure to address vegetation clearance, compliance, and monitoring requirements of this standard can result in NERC applying regulatory penalties, including mitigation and fines [*Id.*]. The PEIS states that "traditional methods of vegetation management have had to improve to meet the reliability standards required by NERC via Reliability Standard FAC-003" [*Id.*].

Further, the PEIS highlights that "[r]ecent wildfire events in the Western United States have placed additional scrutiny on [right-of-way] vegetation management programs, as these events demonstrate the devastating loss of life and property that can occur if [rights-of-way] are not properly maintained" [*Id.*].

Considering this information, TVA set out three purposes of the proposed action: (1) enhancing public safety; (2) improving the effectiveness of TVA's vegetation management program to ensure TVA can continue to provide safe and reliable electric power; and (3) compliance with current and future NERC Reliability Standards to maintain transmission lines in a safe and reliable operating condition, to minimize potential for costly fines for noncompliance [*Id.* at 920–21].

In light of the deference owed to an agency when setting forth its purpose and need for a proposed action, the Court cannot say that TVA's purpose and need statement in the PEIS is unreasonable. *See Little Traverse Lake Prop. Owners Ass'n*, 883 F.3d at 656. In the PEIS, TVA set forth several justifications for the proposed action, including safety

related concerns, reliability related concerns, and NERC compliance related concerns. Plaintiffs' argument essentially amounts to a disagreement with TVA's determination that action was necessary to improve reliability TVA's electric transmission system [*See* Doc. 559, p. 46]. But plaintiffs' mere disagreement does not indicate that TVA's determination that action was needed was unreasonable. Moreover, plaintiffs' arguments are exclusively geared toward TVA's stated purpose of increasing the reliability of its electric transmission system [*See id.*]. Plaintiffs provide no argument suggesting that TVA's remaining two purposes of increasing safety and ensuring current and future compliance with NERC standards are somehow unreasonable. Accordingly, even if the Court were to find that TVA's stated purpose of increasing reliability was unreasonable, the PEIS still provides reasonable purposes for the proposed agency action. The Court therefore finds no issue with TVA's purpose and need statement in the PEIS.

**D. Tiering**

Although plaintiffs do not appear to directly contest whether the PEIS in this case was appropriately completed at the programmatic level, and plaintiffs certainly do not devote any section of any of their briefs to this issue, they do contend that if the action in question, that is, removing all of the trees from the right-of-way, is a "broad guideline," addressed in a programmatic EIS, there is nothing left to be decided in any future "site specific" reviews [Doc. 561, p. 11; *see also* Doc. 566, pp. 23–24]. In their reply brief, plaintiffs contend that TVA attempts to avoid scrutiny by arguing that the PEIS need not include more detailed information, but TVA overlooks the fact that, under Alternative C,

there is nothing left for site-specific reviews to determine regarding removal of the trees, other than whether they will use herbicide, chain saws, or machetes, and the date and time of removal [Doc. 566, p. 24]. Accordingly, plaintiffs contend that the only time that the environmental effects of removing the trees might be reviewed is here and now [*Id.*].

"'Ordinarily, an agency can avoid some of the burdens of the NEPA process by 'tiering' to a prior document that has itself been the subject of NEPA review.'" *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, No. 6:24-cv-1641, 2026 WL 1346855, at *13 (D. Or. May 14, 2026) (quoting *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1118 (9th Cir. 2018)); *see also Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 832 (E.D. Tenn. 2019). "'Tiering . . . is expressly permitted by federal regulation . . . Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review.'" *Cascadia Wildlands*, 2026 WL 1346855, at *13 (quoting *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002)).[16] One way an agency can tier its impact statement is by scope, e.g., from a programmatic to a site-specific statement. *Oak Ridge Env't Peace All.*, 412 F. Supp. 3d at 832 (citing 40 C.F.R. § 1508.28(a)). In fact, the prior NEPA implementing regulations encouraged agencies to tier their EISs to eliminate repetitive discussions of the same issues and focus on the actual issues ripe for decision at each level of environmental review. *Id.*

[16] The "federal regulation" expressly permitting tiering referred to is one of the recently rescinded CEQ regulations, discussed *supra*. *See Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10610-01 (Feb. 25, 2025).

(citing 40 C.F.R. § 1502.20). "Thus, an agency may prepare an EIS that reflects the broad environmental consequences attendant upon a wide-ranging federal program. It may then prepare a later statement to address more particularized, site-specific considerations once the overall program has reached the second tier, or implementation stage of its development." *Id.* at 832–33 (internal quotation marks and citations omitted); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) ("An EIS for a programmatic plan . . . must provide sufficient detail to foster informed decision-making, but site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development") (internal quotation marks omitted). But "NEPA requires a full evaluation of site-specific impacts *only when* a critical decision has been made to act on site development—*i.e.*, when the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to project at a particular site." *Friends of Yosemite Valley*, 348 F.3d at 801 (internal quotation marks omitted) (emphasis in original).

The PEIS states that it "is prepared at the programmatic level to encompass [right-of-way] vegetation management across TVA's transmission system. The management of individual transmission line segments will tier from the PEIS as needed and provide more site-specific review and analysis" [AR at 869; *see also id.* at 871, 911, 921]. The PEIS states that it "establishes the process TVA considers when making decisions regarding vegetation management, identifies potential environmental impacts associated with vegetation management tools, and establishes mitigation measures that

minimize environmental impacts. Future site-specific assessments would integrate findings and conclusions of this analysis" [*Id.* at 921].

The Court sees no problem with TVA's election to prepare a programmatic EIS, followed by later site-specific EISs under the circumstances presented here. The vegetation management project at issue is certainly a "wide-ranging federal program," *see Oak Ridge Env't Peace All.*, 412 F. Supp. 3d at 832, as it involves the entirety of TVA's right-of-way in its seven-state geographic area, totaling approximately 238,000 acres within that right-of-way [AR at 871]. And TVA has confirmed that site-specific EISs will be required before Alternative C is implemented on any section of the right-of-way [*See* Doc. 479, p. 14 (citing Doc. 468, p. 7); AR at 869, 871, 911, 921]. Further, as the Court understands it, the PEIS sets out TVA's preferred alternative, Alternative C, and addresses the potential environmental impacts of that proposed action at a programmatic level. But, again, the Court understands that Alternative C will not, and indeed, cannot, be implemented, or, in other words, the woody vegetation from the right-of-way cannot be completely removed, until TVA conducts its site-specific EISs [*See* Doc. 479, pp. 10–14]. And nothing would preclude TVA from changing its decision as to the best course of action once it completes a site-specific EIS, if TVA determines, during the course of preparing such site-specific EIS, that the environmental impacts of proceeding with Alternative C in a particular area outweigh other considerations. Of course, that is a determination best left to TVA. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 181. Given this information, the Court finds no error in TVA's choice to conduct a programmatic EIS at this stage.

### E. Segmentation

As with tiering, Plaintiffs also do not include any sections in their briefs specifically alleging that the PEIS does not comply with NEPA due to improper segmentation. However, plaintiffs sprinkle arguments throughout their briefs that are best interpreted as falling in this category [*See* Doc. 559, p. 27 (referring to "segmenting"); Doc. 566, p. 24 (referring to "segmentation"); Doc. 566, pp. 32, 36 (referring to "segmentation")]. Most of these arguments are raised for the first time in plaintiffs' reply brief regarding its own motion for summary judgment [*See* Doc. 566]. And "[i]t is well-settled that a movant cannot raise new issues for the first time in a reply brief because consideration of such issues 'deprives the non-moving party of its opportunity to address the new arguments.'" *Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577 (E.D. Tenn. 2012) (quoting *Cooper v. Shelby Cnty.*, 2283-STA-cgc, 2010 WL 3211677, at *3 n.14 (W.D. Tenn. Aug. 10, 2010)). Nevertheless, to the extent plaintiffs raised claims of segmentation in their initial motion, the Court will address those arguments herein.

"'Impermissible segmentation' occurs when parts of an otherwise 'major' federal action have not been evaluated together in the same NEPA document—'segmented'—in order to avoid conducting the NEPA analysis that would be required if the segmented actions had been evaluated together." *Oak Ridge Env't Peace All.*, 412 F. Supp. 3d at 831–32 (citing *Hirt v. Richardson*, 127 F. Supp. 2d 833, 842 (W.D. Mich. 1999)); *see also Anglers of the Au Sable v. United States Forest Serv.*, 565 F. Supp. 2d 812, 831 (E.D. Mich. 2008). "[T]he rule against segmentation . . . prevents agencies from dividing one project

into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Kentucky Coal Ass'n*, 68 F. Supp. 3d at 697 (internal quotation marks and alterations omitted). The "hallmark" of improper segmentation "is the existence of two proposed actions where either one of the component actions has little or no independent utility[,]" such as if, in the construction of a highway, the agency builds small portions of the highway that are small enough to avoid being labeled as a "major" federal action individually. *Oak Ridge Env't Peace All.*, 412 F. Supp. 3d at 832; *see also Anglers of the Au Sable*, 565 F. Supp. 2d at 831. "Segmentation analysis functions 'to weed out projects which are pretextually segmented, and for which there is no independent reason to exist. When the segmentation project has no independent justification, no life of its own, or is simply illogical when viewed in isolation, the segmentation will be held invalid.'" *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139 (5th Cir. 1992) (quoting *Macht v. Skinner*, 715 F. Supp. 1131, 1135 (D.D.C. 1989)) (emphasis in original).

Plaintiffs contend that the PEIS referring to effects as "localized" is "a classic case of improper and impermissible 'segmenting' to disguise the environmental impact of a project" [Doc. 559, p. 27; *see also* Doc. 566, p. 36].[17]

[17] Plaintiffs also allege in their reply brief that the claim that more detailed information about herbicide application will be addressed in site-specific analyses "is a species of segmentation" [Doc. 566, p. 32]. For the reasons stated, *supra*, however, the Court finds that this argument is waived because it is raised for the first time in plaintiffs' reply brief. *See Malin*, 860 F. Supp. 2d at 577. Moreover, even if this argument was not waived, the Court has already determined that TVA's decision to proceed with a programmatic EIS and then tier site-specific EISs is appropriate under the circumstances in this case. Accordingly, the Court does not find that

The Court disagrees with this characterization. As discussed *supra*, a "classic case" of improper segmentation involves dividing a project into smaller projects to avoid the procedural requirements of NEPA. *See Oak Ridge Env't Peace All.*, 412 F. Supp. 3d at 831–32. In other words, improper segmentation typically involves the division of a larger project into smaller projects so that an agency does not have to complete an EIS for the lager project under NEPA, because the actions, individually, are not "major Federal actions." *See* 42 U.S.C. § 4332(C). As a result, the "hallmark" of segmentation is that at least one of the proposed actions has little or no independent utility. *See Oak Ridge Env't Peace All.*, 412 F. Supp. 3d at 832. None of this relates to the PEIS's categorization of effects as "localized." Here, there is a single "major Federal action," for which a programmatic EIS has now been completed. The Court is not convinced that the contents of that PEIS, and the agency's choices as to how to weigh the environmental impacts addressed, support a claim of segmentation.

### E. Predetermination

"[C]ourts have found that to meet the high standard of predetermination, a plaintiff must show an 'agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis—which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the

---

TVA's argument that further specifics about the types and amounts of herbicides to be used will be included in its site-specific EISs amounts to "segmentation."

agency's proposed action.'" *Tenn. Env't Council*, 32 F. Supp. 3d at 884 (emphasis in original) (quoting *Forest Guardians v. United States Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010)); *see also City of Crossgate v. United States Dep't of Veterans Affairs*, 526 F. Supp. 3d 239, 256 (W.D. Ky. 2021) ("'Arguments that a federal agency has predetermined the outcome of an [EIS] must meet a high standard'" (quoting *Karst Env't Educ. & Prot., Inc.*, 2011 WL 5301589, at *13)). Indeed, courts have described predetermination in the NEPA context as a "stringent standard" that a court "should not reach lightly." *City of Crossgate*, 526 F. Supp. 3d at 256 (quoting *Forest Guardians*, 611 F.3d at 714).

"NEPA does not require subjective impartiality. In fact, '[a]n agency can have a preferred alternative in mind when it conducts a NEPA analysis.'" *Tenn. Env't Council*, 32 F. Supp. at 884 (citing *Forest Guardians*, 611 F.3d at 712). Thus, the appropriate inquiry is "not whether an agency has focused on its preferred alternative, but instead whether it has gone too far in doing so, reaching the point where it actually has 'limited the choice of reasonable alternatives.'" *Id.* at 884–85 (quoting *Nat'l Aubudon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005)); *see also City of Crossgate*, 526 F. Supp. 3d at 257 (citing *Kentucky Coal Ass'n, Inc. v. Tenn. Valley Auth.*, 68 F. Supp. 3d 703, 718–19 (W.D. Ky. 2015)). "[B]ecause NEPA presumes that a federal agency is predisposed to favor a proposed action, a showing of such predisposition alone is insufficient to invalidate an agency's decision." *Burkholder v. Wykle*, 268 F. Supp. 2d 835, 844 (N.D. Ohio 2002) (citing *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000)). "'The

test of compliance . . . then, is one of good faith objectivity rather than subjective impartiality.'" *Forest Guardians*, 611 F.3d at 712 (quoting *Env't Def. Fund, Inc. v. Corps of Eng'rs of United States Army*, 470 F.2d 289, 296 (8th Cir. 1972)). "[P]redetermination is different in kind from mere 'subjective impartiality'—which does not undermine an agency's ability to engage in the requisite hard look at environmental consequences—*even though* subjective impartiality may under some circumstances involve something resembling predetermination and lead an agency down the road to predetermination." *Id.* at 714 (emphasis in original) (internal citation omitted). "This difference is highlighted by the stringent standard that must be met in order for us to conclude that an agency violated NEPA by predetermining the outcome of its environmental analysis—a conclusion that we would not and should not reach lightly." *Id.*

Further, an agency may "engage in design and engineering work and take minor steps toward a court of action that the agency initially prefers" before fully completing its NEPA review. *Tenn. Env't Council*, 32 F. Supp. 3d at 885; *see also Metcalf*, 214 F.3d at 1145 ("this case does not stand for the general proposition that an agency cannot begin preliminary consideration of an action without first preparing an" environmental analysis). And "[t]he Court will not hold 'that predetermination was present simply because the agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the possibility that a particular environmental outcome would be the result of its NEPA review of environmental effects.'" *Tenn. Env't Council*, 32 F. Supp. 3d at 885–86 (emphasis in original) (quoting *Forest Guardians*, 611 F.3d at 715).

In their motion for summary judgment, plaintiffs contend that Alternative C is the functional equivalent of the 15-foot rule [Doc. 559, p. 4]. Specifically, under both the 15-foot rule and Alternative C, the result is the removal of virtually all trees in the right-of-way [*Id.*]. Plaintiffs argue that when TVA selected Alternative C, it had already completed 45% of the project, through implementation of the 15-foot rule, at a cost of $59,742,589.70, which is an "enormous irreversible and irretrievable commitment of resources," effectively synonymous with predetermination [Do. 559, pp. 9–10]. Plaintiffs contend that TVA did not begin the EIS process until 2017, at which time the project had been in swing for six years [*Id.* at 13]. Plaintiffs argue that, by not conducting the required NEPA analysis at the appropriate time, TVA has "seriously impeded the degree to which its planning and decisions could reflect environmental values" [*Id.* at 13 (quoting *Metcalf*, 214 F.3d at 1142)].

TVA responds that information about the 15-foot rule is irrelevant to whether the PEIS complies with NEPA [Doc. 562, p. 3]. TVA argues that plaintiffs' 2012 challenge to the 15-foot rule ended on July 31, 2017, when the Court entered a final judgment, and the timeframe relevant to this phase of the litigation is January 2017 to October 2019, when TVA prepared and finalized its NEPA review [Doc. 562, p. 3; Doc. 558, pp. 4, 31]. Thus, TVA contends that plaintiffs are precluded from relying on facts that predate the 2017 "final judgment" [Doc. 562, p. 4; Doc. 558, p. 31]. Turning to plaintiffs' comparison of Alternative C and the 15-foot rule, TVA argues that it could have chosen the 15-foot rule and still complied with NEPA by preparing a sufficient EIS, and therefore, whether

Alternative C is the same or similar to the 15-foot rule is a non sequitur [Doc. 562, pp. 7–8; Doc. 588, p. 31].

TVA asserts that plaintiffs' predetermination argument fails because it relies solely on facts related to the 15-foot rule [Doc. 562, p. 10]. TVA contends that "predetermination" within the meaning of NEPA usually requires a binding contract committing an agency to some action prior to the completion of a NEPA review, but plaintiffs have offered no evidence that TVA was contractually obliged to select Alternative C [Doc. 562, pp. 11–12]. Instead, plaintiffs contend Alternative C was predetermined because TVA spent $59 million on the 15-foot rule and completed 45% of the buffer zone, but these facts are no longer relevant to the phase of this litigation [*Id.* at 12]. TVA argues that plaintiffs have not identified a single case with a similar fact pattern where a court has found predetermination [*Id.*]. Moreover, the upshot from *American Wild Horse Campaign v. Raby*, 144 F.4th 1178 (10th Cir. 2025), is that, even though the agency's plan resembled the plan under the invalidated consent decree, because the agency conducted a good-faith and NEPA-compliant EIS, it was not prohibited from implementing its plan [*Id.* at 13]. Likewise, TVA undertook the PEIS in accordance with NEPA and in good faith, fully considering the environmental effects of the alternatives—that Alternative C might resemble the 15-foot rule does not prohibit TVA from selecting it [*Id.*]. TVA also argues that the necessary outcome of plaintiffs' predetermination outcome completely contravenes NEPA's purpose [*Id.*]. Specifically, if plaintiffs' argument is accepted, the

effect would be that TVA would have to choose a different substantive alternative in order to comply with NEPA, but that is not what the law requires [*Id.*].

Plaintiffs reply that evidence about the similarity between Alternative C and the 15-foot rule is relevant because:

> TVA decided to remove all of the trees in its right-of-way in 2011, with the policy being called the "15-foot rule." Without bothering to prepare an EIS, TVA then put the policy into effect for six years, completing 45% of the project at a cost of $59,000,000+. Most would agree that this was an "irreversible and irretrievable commitment of (very substantial resources.) Then, after being enjoined, TVA unilaterally renamed the policy, dubbing it "Alternative C," and belatedly prepared an EIS, in which it selected Alternative C, leaving the unmistakable stench of predetermination

[Doc. 566, pp. 3–4]. Plaintiffs argue that their challenge to TVA's policy of removing all trees from the right-of-way, whether labeled the "15-foot rule" or "Alternative C" did not end in 2017, but continues today [*Id.* at 5]. And nothing in the Court's 2017 Injunction Order would preclude plaintiffs from presenting evidence that TVA had made an "irreversible and irretrievable commitment of resources" prior to completing the PEIS [*Id.* at 8]. Plaintiffs state that they do not challenge the wisdom of the selection of Alternative C, acknowledging that an agency can make whatever decision it chooses, but only after taking a "hard look" at the environmental consequences by means of a "reasonable and reasonably explained" EIS, that is, one whose result is not predetermined [*Id.* at 14–15, 18]. Plaintiffs also reply that TVA not only had multiple signed contracts, approximately $60 million worth of them, with an unknown number of contractors, but TVA had already spent the money and had already removed 45% of the trees, and these facts are not included in the PEIS [*Id.* at 15]. Plaintiffs contend that they have identified analogous cases where

predetermination was found, including *Metcalf*, *Forest Guardians*, and *Save the Yaak Committee v. Block*, 840 F.2d 714 (9th Cir. 1988) [*Id.* at 17]. Plaintiffs argue that the key fact in *American Wild Horse Campaign* was that petitioners did not suggest that any horses had been removed prior to the completion of the EIS, and therefore, plaintiffs do not believe this case is helpful to TVA's argument [*Id.* at 17–18].

TVA replies that the question of whether Alternative C is the "functional equivalent" of the 15-foot rule does not matter; what matters is whether environmental effects were adequately studied in the PEIS [Doc. 565, p. 1]. TVA contends that none of the cases plaintiffs cite, including *Sherwood III*, stand for the proposition that a litigant can file a lawsuit complaining that no NEPA review of a federal agency action has been performed, seek as relief a NEPA review of that action, and then effectively preclude an agency from implementing its preferred alternative after completing the sought-after NEPA review because activity predating that review makes the choice of the preferred alternative "predetermined" [*Id.* at 2]. TVA argues that plaintiffs effectively seek to morph their objection to a procedural deficiency into a lawsuit about the substantive outcome, i.e., the mode of vegetation management chosen by the EIS, but that is not permitted under NEPA [*Id.*]. TVA contends that *Metcalf* is inapposite because it turned on the existence of a binding contract committing the agencies to a specific course of action prior to determining its impact on the environment, but no such commitment exists in this case [Doc. 558, p. 32]. *Metcalf* does not stand for the proposition that an agency is precluded from taking an action because it previously violated NEPA [*Id.* at 33].

Plaintiffs respond that TVA twists the words of the *Metcalf* decision, which did not say that predetermination could only be found when the agency had "foreclosed or effectively foreclosed" any other option; in fact, the word "foreclosed" is not in the *Metcalf* decision [Doc. 561, pp. 25–26]. Instead, the *Metcalf* court specifically noted that the issue for decision was whether defendants prepared the environmental analysis too late in the decision-making process, i.e., after making an irreversible and irretrievable commitment of resources [*Id.* at 26]. Plaintiffs opine that the predetermination in *Metcalf* was "mild" compared to this case [*Id.* at 27]. The agency in *Metcalf* had a signed contract, but here, TVA had not only signed a contract, but $59 million worth of contracts, with an unknown number of contractors, had already spent the money, and had removed 45% of the trees [*Id.*]. In light of these facts, plaintiffs contend that they have met the "high standard" of showing predetermination [*Id.* at 28].

Preliminarily, TVA's argument in opposition to plaintiffs' allegation of predetermination boils down to contentions that (1) the relevant inquiry at this stage is only the events that occurred after entry of the Injunction Order, when TVA began the process of completing the PEIS; and (2) upon completing the PEIS, TVA was free to select the 15-foot rule. As to the latter point, the Court agrees that, because NEPA's requirements are purely procedural, once TVA complied with the procedural requirements, TVA was free to choose any alternative, as long as that decision was reasonably explained. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180. Accordingly, once TVA completed an EIS that complied with NEPA, it could have chosen to proceed with the 15-foot rule, assuming

that the EIS it created in this hypothetical scenario reasonably explained the selection of the 15-foot rule. However, TVA's argument in this regard attempts to divorce plaintiffs' argument regarding the similarities between the 15-foot rule and Alternative C from plaintiff's argument regarding TVA's commitment of resources in implementing the 15-foot rule prior to the Injunction Order. But the Court understands these arguments to be part and parcel of a larger argument—essentially, that because TVA spent 6 years implementing the 15-foot rule on 45% of the right-of-way, at a cost of nearly $60 million, the selection of an alternative so closely aligned with the 15-foot rule suggests that TVA was committed to proceeding with the 15-foot rule, or a substantially similar plan, regardless of the results of any environmental analysis completed. Accordingly, while the Court agrees that TVA would have been free to select the 15-foot rule after completing an EIS that complied with NEPA, that fact does not answer the question as to whether TVA's selection of Alternative C was predetermined in violation of NEPA's requirements.

Turning to TVA's argument that the only relevant facts before the Court are those from 2017 to present, the Court disagrees. The only legal support TVA provides for this proposition is cases addressing collateral estoppel and the law-of-the-case doctrine [Doc. 562, p. 4 (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 325–26 (1979) and *In re. Kenneth Allen Knight Trust*, 303 F.3d 671, 677 (6th Cir. 2002))]. But neither of these doctrines are applicable here. "The doctrine of collateral estoppel mandates that once an issue of ultimate fact, necessary to the previous judgment, has been litigated and subject to a valid and final judgment, the same issue cannot be litigated again between the same

parties in a future action." *United States v. Mask*, 101 F. Supp. 2d 673, 683 (W.D. Tenn. 2000). Similarly, "[t]he law-of-the-case doctrine 'provides that the courts should not reconsider a matter once resolved in a continuing proceeding.'" *GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 338 (6th Cir. 2016) (quoting *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015)). Plaintiffs' reliance on TVA's commitment of time and money to effectuating the 15-foot rule prior to beginning the required environmental analysis does not attempt to re-litigate any previously determined issue. The issue previously determined as to these facts was that TVA violated NEPA by implementing the 15-foot rule without first conducting *any* environmental review. The issue now before the Court is whether the extent of TVA's commitment of resources to implement the 15-foot rule prior to conducting an environmental review infected the result of that environmental review—in other words, the issue now is whether "the die was cast" as to the selection of Alternative C before TVA even prepared the PEIS.

Despite these flaws with TVA's argument, the Court, nonetheless, is not convinced that the selection of Alternative C was predetermined, as that term is defined for NEPA purposes. As discussed *supra*, a showing of predetermination under NEPA is a "high" and "stringent" standard, and the Court should not conclude that an agency's decision was predetermined lightly. *See Forest Guardians*, 611 F.3d at 714; *City of Crossgate*, 526 F. Supp. 3d at 256. And, as discussed *supra*, plaintiffs' claim of predetermination in this case is based on two factors: (1) TVA's commitment of time and money to implementing the 15-foot rule; and (2) the similarity of Alternative C to the 15-foot rule. For purposes

of this analysis, the Court accepts as true plaintiffs' contentions that (1) TVA spent 6 years implementing the 15-foot rule, clearing approximately 45% of the right-of-way at a cost of nearly $60 million and (2) Alternative C is substantially similar to the 15-foot rule. *See Sherwood III*, 46 F.4th at 444 (stating that "Alternative C is likely just a differently packaged version of the 15-foot rule").

Ultimately, plaintiffs' argument about TVA's prior commitment of resources equates to assuming that TVA has fallen victim to the sunk-cost fallacy[18] in its analysis. In other words, plaintiffs attribute to TVA the conclusion that, because it has spent 6 years and nearly $60 million dollars clearing the right-of-way under the 15-foot rule, and has already cleared approximately 45% of the right-of-way using the 15-foot rule, it therefore would have wasted those resources if it does not continue to clear the right-of-way in a manner consistent with the 15-foot rule. But, logically, this makes no sense. TVA used the time and financial resources to clear 45% of the right-of-way under the 15-foot rule, but those resources are not "wasted" if TVA elected to proceed with a different plan for its vegetation management in the remainder of the right-of-way after conducting its environmental analysis under NEPA. In other words, it is unclear how the amount of resources that TVA expended on clearing the first 45% of the right-of-way, before conducting its environmental analysis, would have any impact on its decision of how to

[18] Judge Jerry E. Smith noted that "the 'sunk cost fallacy,' [is] defined as 'continu[ing] a[n] endeavor as a result of previously invested resources (time, money or effort).'" *Perez v. Abbott*, 253 F. Supp. 3d 864, 975 (W.D. Tx. 2017) (Smith, J., dissenting) (quoting "Sunk cost fallacy," https://www.behavioraleconomics.com/mini-encyclopedia-of-be/sunk-cost-fallacy/).

manage the vegetation in the remaining portion of the right-of-way, beyond the obvious fact that TVA's goal in implementing the 15-foot rule in the first place, and its goal in creating a vegetation management plan in the PEIS, are one in the same.

Plaintiffs have not cited, and the Court is unaware of, any cases that have found predetermination under similar circumstances. The cases plaintiffs cite are readily distinguishable. First, plaintiffs contend that *Metcalf*, 214 F.3d at 1135, is comparable [Doc. 566, p. 17]. In *Metcalf*, the National Oceanic and Atmospheric Administration ("NOAA") entered into a formal written agreement with the Makah Indian Tribe ("Makah") providing that "after an adequate statement of need is prepared by the Makah, NOAA, through the U.S. Commissioner to the [International Whaling Commission ("IWC")], will make a formal proposal to the IWC for a quota of gray whales for subsistence and ceremonial use by the Makah tribe." 214 F.3d at 1139 (internal alterations omitted). Subsequently, NOAA and the National Marine Fisheries Service ("NMFS") issued a final Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI").[19] *Id.* at 1140. The Ninth Circuit concluded that the agencies prepared the EA after making an irreversible and irretrievable commitment of resources. *Id.* at 1143. Specifically, the court stated "the record makes clear that the Federal Defendants did not

[19] As background, under NEPA "[w]hen it is unclear whether a proposed action requires an EIS, the agency must first prepare a less-detailed [Environmental Assessment ("EA")]. If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a [Finding of No Significant Impact ("FONSI")] and forego the further step of preparing an EIS." *Forest Guardians*, 611 F.3d at 712 (internal quotation marks and citations omitted).

even consider the potential environmental effects of the proposed action until long after they had already committed in writing to support the Makah whaling proposal." *Id.* The court concluded that when NOAA signed the contract with the Makah, it had, at that point, made an irreversible and irretrievable commitment of resources. *Id.* The court explained "[h]ad NOAA/NMFS found after signing the Agreement that allowing the Makah to resume whaling would have a significant effect on the environment, the Federal Defendants would have been required to prepare an EIS, and they may not have been able to fulfill their written commitment to the Tribe. As such, NOAA would have been in breach of contract." *Id.* at 1144. Accordingly, the Ninth Circuit concluded that the EA did not comply with NEPA's timing requirements. *Id.*

Additionally, plaintiffs cite *Save the Yaak Committee*, 840 F.2d 714, as a similar case [Doc. 566, p. 17]. In that case, the United States Forest Service had begun reconstructing the Yaak River Road, a road that winds through the Yaak and Eureka Range Districts of the Kootenai National Forest in Montana, in five separate sections. *Save the Yaak Comm.*, 840 F.2d at 716. Construction began on the Porcupine Sullivan Creek section of the road in 1982, without preparation of an EA, and an EA for the construction of this section of the road was not prepared until two years later. *Id.* The Ninth Circuit concluded that the Forest Service's preparation of environmental documents was untimely under NEPA. *Id.* at 718. The Ninth Circuit noted that "contracts were awarded prior to the preparation of the EAs, and by the time the [Biological Assessment ("BA")] was prepared, construction had already begun." *Id.* The court concluded that "[t]hese events demonstrate

that the agency did not comply with NEPA's requirements concerning the timing of their environmental analysis, thereby seriously impeding the degree to which their planning and decisions could reflect environmental values." *Id.* at 718–19. The Ninth Circuit concluded that, in light of the EA's "substantive inadequacies" and "untimely preparation," it concluded that the Forest Service did not take the required "hard look" at the environmental consequences of the plan. *Id.* at 719.

In this case, however, there is no evidence that TVA had entered into a contract for *future* vegetation management activities that was likely to impact TVA's EIS process. Plaintiffs claim that this case is worse than *Metcalf* because TVA had "multiple[] signed contracts, actually $60,000,000 worth of them, with who knows how many contractors" [Doc. 566, p. 15]. But plaintiffs are clearly referencing TVA's contracts for the previously completed vegetation management activities under the 15-foot rule, not future vegetation management activities that were to be decided after completion of an EIS.[20]

The Court finds the discussion of predetermination in the recent *Appalachian Voices* case from this district enlightening. In that case, the district judge found that plaintiffs had shown predetermination based on TVA's signing of a contract, prior to completion of an

[20] The Court certainly understands plaintiffs' contention that the 15-foot rule was implemented over this portion of TVA's right-of-way in violation of NEPA, because no environmental analysis was conducted prior to its implementation. However, at this juncture, there is simply no relief that can be granted as to that prior conduct. *See One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 893 (8th Cir. 2004) ("A NEPA claim does not present a controversy when the proposed action has been completed and no effective relief is available"). And, for the reasons described *supra*, plaintiffs have not shown that this prior conduct somehow committed TVA to proceeding with the same course of action once it completed the PEIS.

environmental analysis, which contained no termination provision if TVA elected a different alternative, with the result being that TVA would have been in breach of contract if it did not select the alternative ultimately chosen. *Appalachian Voices*, slip op. at 27–30. However, the district judge found that plaintiffs had not shown predetermination based on TVA's signing of an option contract, because, while such was an investment of resources, it was not an investment that committed TVA to a particular course of action, as the resources could be used elsewhere. *Id.* at 31.

Both *Metcalf* and *Save the Yaak Committee* appear to have involved the relevant agencies entering into binding contracts related to the anticipated future project, that is, the determination that was to be made as a result of the environmental analysis under NEPA. *See Metcalf*, 214 F.3d at 1143–44; *Save the Yaak Comm.*, 840 F.2d at 718–19. These cases are akin to the predetermination found in *Appalachian Voices*. *See Appalachian Voices*, slip op. at 27–30. But here, the evidence of predetermination is even less than the "option contract" found to not establish predetermination in *Appalachian Voices*. *See id.* at 31. There, the option contract was at least forward-looking, relating to the project to be determined as a result of the environmental analysis. *Id.* But, again, here, there is no evidence of any contracts or agreements of any sort relating to the future vegetation management practices that could be said to have potentially impacted TVA's PEIS process. Accordingly, the Court does not find that *Metcalf* or *Save the Yaak Committee* support plaintiffs' assertion of predetermination in this case.

Plaintiffs also cite *Forest Guardians* as a similar case [Doc. 566, p. 17]. That case involved a challenge to the United States Fish and Wildlife Service's ("FWS") decision to reintroduce a nonessential experimental population[21] of endangered Northern Aplomado Falcons ("Falcons") into southern New Mexico. *Forest Guardians*, 611 F.3d at 695. In 2005, the FWS proposed a rule under § 10(j) of the Endangered Species Act that would reintroduce captive-bred Falcons into New Mexico and Arizona in an attempt to establish a viable resident population of Falcons. *Id.* at 697. Apparently, part of the FWS's plan in this regard was to release The Peregrine Fund's captive-bred Falcons, which had been propagated with the intention of re-establishing a wild population within the United States. *Id.* at 699. The FWS released its final § 10(j) rule in July 2006, which finalized its plan to release captive-bred Falcons in southern New Mexico as a nonessential experimental population. *Id.* at 700. The Peregrine Fund began releasing captive-bred Falcons in New Mexico that same year. *Id.* at 701.

Forest Guardians argued that the FWS had predetermined the result of its environmental analysis because The Peregrine Fund refused to allow the FWS to use its captive-bred Falcons unless the FWS agreed to promulgate a § 10(j) rule. *Id.* at 710. However, the Tenth Circuit concluded that, after reviewing the relevant record evidence, there was no indication that the FWS made an irreversible and irretrievable commitment to the release of captive-bred Falcons as a § 10(j) nonessential experimental population.

[21] The term "nonessential experimental population" is a term of art under Section 10(j) of the Endangered Species Act, which the plaintiffs also alleged the FWS violated. *See Forest Guardians*, 611 F.3d at 697–98; *see also* 16 U.S.C. § 1539(j)(2).

*Id.* at 718. Rather, the Tenth Circuit concluded that, at most, the evidence demonstrated that the FWS had a preferred alternative and that The Peregrine Fund shared that preference. *Id.* The Tenth Circuit rejected plaintiffs' argument that a grant agreement between the FWS and The Peregrine Fund was evidence of predetermination. *Id.* The court stated "[i]f Forest Guardians had been able to prove that the FWS and The Peregrine Fund had entered into a binding contract firmly committing the FWS to the 10(j) outcome before its NEPA analysis, we would be faced with a similar set of circumstances to those in *Metcalf* and very likely would have reached a different conclusion than we do here. However, we do not agree with Forest Guardians' argument that the grant agreement is such a contract." *Id.* Rather, the Tenth Circuit concluded that "[t]he grant agreement, which the two parties entered into before the NEPA analysis was completed, provide[d] that the grant could be expanded upon the promulgation of the 10(j) rule. If the rule were not promulgated, then the work by The Peregrine Fund would be limited to activities such as research, captive breeding, and '[c]ontact[ing] landowners in New Mexico with regard to the potential establishment of an experimental nonessential 10(j) population.'" *Id.* at 718–19 (citation omitted).

Frankly, the Court is confounded as to how this case could support plaintiffs' claim of predetermination, given that the Tenth Circuit rejected the plaintiff's claim of predetermination in that case. And, in fact, *Forest Guardians* appears to have more evidence that could have potentially supported a claim of predetermination than the instant case, as there was at least a forward-looking agreement between the FWS and The

Peregrine Fund regarding the action that was subject to the environmental analysis in that case. But, again, here, plaintiffs have presented no evidence of any agreement whatsoever regarding the future vegetation management practices that were the subject of the PEIS. The agreements plaintiffs point to simply relate to the past vegetation management practices that had already been completed prior to the Confession of Judgment, entry of the Injunction Order, and the start of the EIS process. Accordingly, the Court does not find that *Forest Guardians* provides support for plaintiffs' claim of predetermination.

The Court also notes that TVA cites *American Wild Horse Campaign*, 144 F.4th 1178, in support of its argument that predetermination is not present [Doc. 562, p. 13]. Plaintiffs dispute the relevance of *American Wild Horse Campaign* to TVA's position [Doc. 566, pp. 17–18]. In that case, the Bureau of Land Management ("BLM") amended its Regional Management Plan to change two Herd Management Areas to Herd Areas which reduced the wild horse population goal in certain areas. *Am. Wild Horse Campaign*, 144 F.4th at 1184. Previously the Grazing Association sued the BLM, resulting in a consent decree requiring BLM to remove all wild horses from private lands. *Id.* at 1187. Addressing predetermination argument with regard to the Amendments, the Tenth Circuit stated that while the Amendments may have been designed to meet the same goals as the prior consent decree, an agency is permitted to have a preferred alternative in mind when it conducts a NEPA review. *Id.* at 1191. And those preferred alternatives are only predetermined when an agency irreversibly and irretrievably commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain

outcome before the agency has completed the environmental analysis. *Id.* The Tenth Circuit explained that the plaintiffs did "not point to any actions suggesting BLM committed to removing horses prior to completing the EIS—they only argue that because the process was triggered by the Grazing Association's 2012 lawsuit and subsequent consent decree, 'the BLM tipped its hand before the process.'" *Id.* But the Tenth Circuit was not convinced that the BLM failed to undertake its environmental review in good faith, noting that the agency defined its goal broadly, and considered both a no-action alternative and alternatives that maintained the same number of horses on only public land, but concluded that these alternatives did not meet the agency's objective. *Id.* Ultimately, the Tenth Circuit concluded that plaintiffs had not shown that the BLM committed to any outcome before the NEPA process. *Id.* at 1191–92.

This case supports a conclusion that TVA's selection of Alternative C was not predetermined, as that term is used in the context of NEPA cases, simply because TVA may have preferred a certain alternative, and that alternative may resemble the previously-implemented 15-foot rule. Much like in *American Wild Horse Campaign*, plaintiffs argue that TVA was precommitted to Alternative C based on its prior implementation of a similar plan, which essentially amounts to an argument that TVA "tipped its hand before the process." *See Am. Wild Horse Campaign*, 144 F.4th at 1191. But, like the BLM in *American Wild Horse Campaign*, the Court finds that, in the PEIS, TVA defined its goal broadly and considered several alternatives, including a no-action alternative. *See id.* Accordingly, the Court finds that *American Wild Horse Campaign*

supports a conclusion that the results of the PEIS in this case were not predetermined for NEPA purposes.

Ultimately, the Court reiterates that a showing of predetermination under NEPA is a "high" and "stringent" standard, and the Court should not conclude that an agency's decision was predetermined lightly. *See Forest Guardians*, 611 F.3d at 714; *City of Crossgate*, 526 F. Supp. 3d at 256. Plaintiffs have not met that high standard in this case. For all the reasons discussed, the Court finds plaintiffs have not shown that TVA "irreversibly and irretrievably" committed itself to Alternative C before completion of the PEIS.[22] *See Tenn. Env't Council*, 32 F. Supp. 3d at 884.

**F. Hard Look**

The Court now turns to addressing whether TVA took a "hard look" at the environmental impacts of Alternative C in the PEIS. *See Marsh*, 490 U.S. at 374. In undertaking this inquiry, the Court is mindful that "the inquiry is 'whether the agency adequately studied the issue and took a hard look at the environmental consequences of its decision, not whether the agency correctly assessed the proposal's environmental impacts."

---

[22] The Court notes that, in its argument on predetermination, plaintiffs also argue that the PEIS did not acknowledge TVA's commitment of resources as required by 42 U.S.C. § 4332(C)(v), and therefore, the PEIS was *ipso facto* deficient [Doc. 559, p. 14]. TVA responds that the requirement to outline any irreversible and irretrievable commitment of resources is a forward-looking requirement [Doc. 562, p. 16]. The Court notes that the PEIS does contain a section labeled "Irreversible and Irretrievable Commitment of Resources," [AR at 1164–65] but it appears that plaintiffs' contention of error is that the section does not include any discussion of the resources used during the prior implementation of the 15-foot rule. However, because the Court has concluded, for the reasons explained *supra*, that TVA's prior implementation of the 15-foot rule did not constitute an "irreversible and irretrievable" commitment of resources, at least as relates to the future vegetation management practices at issue during the PEIS process, the Court finds no error in the PEIS's failure to include those past practices in this section.

*Appalachian Voices*, slip op. at 17–18 (internal quotation marks and alterations omitted) (quoting *Klein*, 753 F.3d at 581). "Congress, in enacting NEPA . . . did not require agencies to elevate environmental concerns over other appropriate considerations." *Id.* at 20 (quoting *Baltimore Gas & Elec. Co.*, 462 U.S. at 97); *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 173 (stating that, under NEPA, "an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws"). Accordingly, "NEPA does not necessarily preclude agencies from taking actions that would affect . . . trees, because if the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Little Traverse Lake Prop. Owners Ass'n*, 883 F.3d at 653 n.2 (internal quotation marks and alterations omitted) (quoting *Robertson*, 490 U.S. at 350–51).

**1. Study Area**

Plaintiffs argue that TVA's conclusion that clear-cutting the right-of-way would not destabilize the general plant communities in the study area demonstrates that it was not genuinely engaged in reasoned decision-making [Doc. 559, p. 20]. Plaintiffs note that the PEIS states that initial removal of buffer zones would result in notable but not destabilizing effects on forest resources and associated wildlife, but the effects would be moderate because the removal of the existing buffer zones would not destabilize the general plant communities within the study area [*Id.* at 21]. But the study area is the entire seven-state

region; all TVA is saying is that the removal of the buffer zones within the right-of-way will not destabilize the general plant communities within the seven-state region [*Id.*]. Plaintiffs contend that this is not reasoned decision-making [*Id.* at 22].[23]

Plaintiffs specifically point to a portion of the PEIS which states:

> Because vegetation removal activities would be conducted within the buffer zone of the previously established [right-of-way], the overall effect of this alternative on vegetation is considered to be moderate as both the routine maintenance of vegetation and removal of the existing buffer zones *would not destabilize the general plant communities within the study area*.

[AR at 895 (emphasis added); *see also* AR at 871 (defining the "study area" as all areas where TVA maintains right-of-way or could acquire and build transmission line within the newly acquired right-of-way); Doc. 559, p. 21].

Plaintiffs' argument in this regard ultimately asks the Court to determine that the scope of TVA's review of the environmental impacts in the PEIS are insufficient because they compared the impacts of implementing Alternative C to the entire seven-state study area. But the Court reiterates that, in conducting its environmental review under NEPA, "an agency will invariably make a series of fact-dependent, context-specific and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182–83. And the Supreme Court has warned that courts "should not micromanage

---

[23] Plaintiffs point to the decision in *Center for Biological Diversity v. United States Forest Service*, 687 F. Supp. 3d 1053, 1075 (D. Mont. 2023) in support of their argument in this regard [Doc. 559, p. 23]. The Court finds it unnecessary to address that case in this section; however, the Court notes that it has fully addressed why it does not find that case persuasive *infra*.

those agency choices[.]" *Id.* The Court finds that the PEIS's discussion of environmental impacts within the context of the environmental resources in the study area, with the study area defined as TVA's entire seven-state service area, falls within a "broad zone of reasonableness." *See id.* Moreover, the Court notes that its review under NEPA and the APA does not consist of "flyspecking" TVA's environmental analysis for "any deficiency no matter how minor." *Appalachian Voices*, 134 F.4th at 422.

### 2. Specific Statements[24]

Plaintiffs argue that the PEIS's claim that clear-cutting the right-of-way results in "improved habitat value" is unbelievable and standing alone a conclusive indication that TVA was not genuinely engaged in reasoned decision-making [Doc. 559, pp. 16–17]. Plaintiffs contend that the absurdity of these claims amply demonstrates that TVA was not genuinely engaged in reasoned decision making, did not make a searching and careful inquiry, and did not actually take a hard look at the environmental effects of the action [*Id.* at 17].

Next, plaintiffs argue that TVA's "unbelievable" assertion that clear-cutting the right-of-way will be beneficial to many animals due to the creation of "standing dead

[24] In their motion, plaintiffs object to several specific statements in the PEIS [Doc. 559, pp. 16–20, 26–27]. TVA's response addresses these arguments collectively [Doc. 562, pp. 37–40], as does plaintiffs' reply [Doc. 566, pp. 36–37]. For consistency, the Court will address these arguments collectively under this section.

vegetation" is an example of sweeping negative evidence under the rug, using subterfuge, and bending over backwards to reach a predetermined result [*Id.* at 19]. Plaintiffs note that TVA does not provide any scientific evidence for this claim [*Id.*]. Plaintiffs opine that the idea that clear-cutting the right-of-way would somehow be beneficial for many animals is "nothing short of preposterous" [*Id.*].

Additionally, plaintiffs next take issue with the PEIS's statements that impacts on factors related to the human environment are generally localized and temporary, stating "[t]his is obviously an enormous lie" [*Id.* at 26]. Plaintiffs contend that simply calling something "localized" does not amount to a "hard look" at the environmental consequences [*Id.* at 27].

TVA responds that these arguments are the types of "flyspecks" that courts routinely reject as sufficient to demonstrate that an agency's NEPA review is not unreasonable [Doc. 562, p. 38]. Further, TVA argues that the APA does not allow a reviewing court to overturn an agency's decision because it disagrees with the agency's conclusion about environmental impacts [*Id.*].

**a. Improved Habitat Value**

In their motion for summary judgment, plaintiffs specifically point to Section 4.2.2.2.3 of the PEIS, which states:

> **4.2.2.2.3 Impacts to Wildlife from Herbicide Application Methods**
> Herbicide use is not only effective in controlling target plant species, but it typically has the benefits of improving plant diversity and density. Greater plant diversity can create suitable conditions for a wider variety of animal species. Meadow-like environments of native species are especially beneficial to pollinators. . . .

[AR at 1021; *see also* Doc. 559, pp. 16–17]. Plaintiffs also point to statements in the PEIS that state: "The resulting end-state [of Alternative C], consisting of a mix of herbaceous and low-growing shrub species, is more compatible and is *expected to provide improved habitat value* that over time is expected to minimize intensity of maintaining the floor" [AR 985, 1158 (emphasis added); *see also* Doc. 559, pp. 16–17].

True, the PEIS does not specifically cite any sources for the statements of expected "improved habitat value" [*See* AR at 1021, 985, 1158]. However, plaintiffs essentially ask the Court to substitute its own judgment for that of the agency here and conclude, without any specific evidence, that Alternative C will not result in any "improved habitat value." The Court cannot do so. *See Sherwood I*, 590 F. App'x at 458 (stating that a court may not substitute its own judgment for that of the agency). And the Court notes that the PEIS devotes several sections to further discussion of the potential environmental impacts on wildlife from implementing Alternative C [See AR at 1014–25 (§ 4.2 Wildlife); 1025–52(§ 4.3 Threatened and Endangered Species)]. Furthermore, even if the Court presumes, without deciding, that the PEIS's statement of "improved habitat value" is incorrect, the Court notes that its review under NEPA and the APA does not consist of "flyspecking" TVA's environmental analysis for "any deficiency no matter how minor." *Appalachian Voices*, 134 F.4th at 422. The Court finds that plaintiffs' cherry-picking of these isolated statements is precisely such "flyspecking."

**b. Standing Dead Vegetation**

Next, plaintiffs specifically point to a section of the EIS that states:

> Environmental advantages to the herbicide application method are its effectiveness at achieving control and improvements to plant diversity and density. Greater plant diversity can create suitable conditions for a wider variety of animal species. Meadow-like environments are especially beneficial to pollinators. *Standing dead vegetation is beneficial for many animals including woodpeckers, reptiles, songbirds, raptors, bats and some pollinating insects such as bumble bees.*

[AR at 1044 (emphasis added); *see also* Doc. 559, p. 19].

Again, the Court agrees that the PEIS does not provide a specific citation for the fact that standing dead vegetation is beneficial for the listed animals. But again, the Court cannot substitute its judgment for that of an agency, particularly when dealing with scientific and technical details which the agency is more suited to evaluate. *See Sherwood I*, 590 F. App'x at 458 (stating that a court may not substitute its own judgment for that of the agency); *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 181 (noting that an agency "is better equipped to assess what facts are relevant to the agency's own decision than a court is"). Moreover, one of the affidavits plaintiffs cites agrees that "a few dead trees here and there . . . might provide a home or food for woodpeckers" [Doc. 462, p. 3], although the affiant ultimately disagrees with the environmental benefit of the scope of TVA's proposed project [*See generally* Doc. 462]. But "NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency as NEPA was not intended to resolve fundamental policy disputes." *Mayo*, 875 F.3d at 15–16. And, again, plaintiffs' argument as to this single sentence from the 300+ page PEIS document (exclusive of the appendices), is the type of "flyspecking" that is not permitted in reviewing

the adequacy of an environmental review under NEPA. *See Appalachian Voices*, 134 F.4th at 422.

Plaintiffs also appear to at least insinuate that the PEIS is disingenuous in citing the environmental benefits of standing dead vegetation because, in the past, TVA has shredded the tree remnants into a mulch, rather than allow "standing dead vegetation" [Doc. 559, p. 20]. In support, plaintiffs point to an affidavit stating that the affiant viewed the area within TVA's right-of-way after the removal of trees which was "generally covered with a thick layer of mulch, or shredded tree remains, anywhere from 6-14 inches thick, or more, where trees had previously stood" [Doc. 272, p. 3], as well as pictures taken by the affiant of the shredded tree remains [Doc. 272-3]. But this information is irrelevant in several respects. First, the quotation about "standing dead vegetation" to which plaintiffs object relates to trees that are treated with herbicide, not trees that are manually cut down [*See* AR at 1044]. Second, at least in this respect, it is unclear how TVA's past vegetation management practices being inconsistent with its newly proposed vegetation management practices undercuts its environmental analysis of that new proposal. Finally, the PEIS states that "[i]n the application of herbicides, treated woody stems in wetlands *may* be left standing, to fall and decompose naturally, after herbicide is applied" [AR at 1079 (emphasis added)]. Even this statement does not indicate that *all* of the trees treated with herbicide would be left to remain standing. This is likely an appropriate consideration for the site-specific EISs that tier from the PEIS.

### c. Localized and Temporary Impacts

Finally, plaintiffs point to a section of the PEIS which states:

> Impacts on factors related to the human environment (land use, socioeconomics, air, noise, cultural resources, solid/hazardous waste, public and worker safety, etc.) *are generally considered to be localized and temporary*. TVA would not allow homeowners to maintain incompatible vegetation within and along the transmission [right-of-way]. This alternative also keeps incompatible vegetation away from transmission lines, reducing the likelihood of devasting, and possibly fatal, wildfires. Consequently, this alternative reduces the risk to homeowners' safety.

[AR at 895 (emphasis added); *see also id.* at 986; Doc. 599, p. 26].

Plaintiffs' argument in this regard clearly takes the "localized and temporary" statement out of context. Plaintiffs contend "[u]nder TVA's reasoning, cutting down every tree in the world would present no environmental problem because it would be 'temporary.' After all, in 100 years they will grow back" [Doc. 559, p. 26]. But the specific portion of the PEIS stating that effects would be "localized and temporary" is specifically addressing "impacts on factors related to the human environment (land use, socioeconomics, air, noise, cultural resources, solid/hazardous waste, public and worker safety, etc." [AR at 895]. In other words, the quotation plaintiffs pull from the PEIS relates only to the impacts on some of the identified resources discussed in the PEIS, and, specifically, appears to be referring to the impact on these resources from the vegetation management procedures themselves, i.e., the tree-cutting procedures. The PEIS does not state that all impacts of Alternative C are "localized and temporary." To the contrary, at other points the PEIS acknowledges that "the effects of Alternative C include both short-term and long-term impacts" [AR at 986; *see also id.* at 988 (mentioning "[p]otential short-term and long-term impacts to threatened

and endangered species/habitats as a result of vegetation management")]. Ultimately, the Court concludes that this type of "flyspecking" and cherry-picking quotations out of context does not indicate that TVA failed to take the required hard look at the environmental impacts of Alternative C.

### 3. Environmental Consequences for Properties Primarily Maintained by Landowners

Plaintiffs contend that the PEIS does not include any significant discussion of the environmental consequences of removing all trees from cropland, golf courses, orchards, yards, and other properties that are primarily maintained by the landowner [Doc. 559, p. 22]. Plaintiffs state that, in addition to habitat for wildlife, the trees in the right-of-way provide shade, comfort, and beauty for the property owner, and, in some cases, fruit and the enjoyment of maintaining an orchard [*Id.* at 23]. The PEIS claims, without citing any instances of problems caused by allowing landowners to maintain their own trees, and with no mention of the environmental consequences, that alternatives deferring TVA's rights of vegetation management to landowners are not workable [*Id.*]. But the PEIS provides no explanation as to why this would present a problem [*Id.*]. Plaintiffs note that the "Ferguson Memo," which explains TVA's historic policy prior to the 15-foot rule, is not even mentioned in the PEIS, and thus, there is no reasoned decision-making as to whether to continue with the commonsense approach that TVA had successfully followed since at least 1986 [*Id.* at 24]. Plaintiffs further complain that the PEIS does not make any effort to state the number of landowners whose property will be affected by Alternative C or to describe the trees on the property or the effects of removal of the trees [*Id.* at 25]. Plaintiffs

contend that, unless the impact on these landowners is given a candid acknowledgement, there can be no hard look at the environmental consequences of the proposed action [*Id.* at 25–26].[25]

TVA responds that it is not required to detail this sort of information in a programmatic review: tree removal required on property primarily managed by others will be considered in the site-specific NEPA review that tier from this PEIS and on a case-by-case basis [Doc. 562, p. 19]. TVA contends that it is clear plaintiffs' actual complaint is not about the evaluation of the environmental impacts of this aspect of Alternative C, but with its decision that landowners will not be allowed to trim trees [*Id.* at 19–20]. TVA contends that NEPA does not require agencies to take a hard look at past statements or positions, rather, they only have to review the environmental effects of the action alternatives proposed in the NEPA document that meet the action's purpose and need—that is what TVA did [*Id.* at 20]. TVA states that the PEIS explicitly considered an alternative where TVA would rely upon agreements with landowners to maintain vegetation but pointed out key flaws in that alternative [*Id.* at 20–21]. TVA argues that

[25] Plaintiffs also complain that the PEIS claims that the impact on the human environment would reduce risks to homeowner safety, but there is no evidence that any homeowner is in danger under the present policy [Doc. 559, p. 25]. The specific portion of the PEIS states that, under Alternative C, "TVA would not allow homeowners to maintain incompatible vegetation within and along the transmission [right-of-way]. Consequently, this alternative reduces the risk to homeowners' safety" [AR at 986]. But plaintiffs' argument in this regard harkens back to their objection to the PEIS's purpose and need statement, not whether TVA took a hard look at the environmental consequences of Alternative C. The Court has already determined that the PEIS's purpose and need statement was reasonable, and the Court finds nothing in this statement regarding reducing risks to homeowner safety that would alter that analysis.

plaintiffs have not established that the decision to eliminate landowner tree trimming from detailed consideration was unreasonable under the law [*Id.* at 21].

Plaintiffs reiterate that, given the lack of reference to the Ferguson Memo, it would appear that there is not a candid discussion of the no-action alternative, and therefore, no hard look at the environmental consequences of doing away with the prior policy [*Id.* at Doc. 566, pp. 25–26].

**a. Alternative Including Landowner Maintenance**

First, and foremost, plaintiffs object to the PEIS's decision to eliminate alternatives that involved landowner maintenance of trees, citing a portion of the PEIS which addresses "Management Alternatives Considered But Eliminated" [AR at 969], and states the following:

> **3.2.1.2 Landowner Maintenance of Trees on Lands Primarily Maintained by Others**
>
> As described in Section 1.1.4, TVA has vegetation management rights for the entirety of the transmission [right-of-way]. However, approximately 51 percent of the transmission [right-of-way] is used as cropland, golf courses, orchards or similar uses, which are primarily maintained by the landowner. While the floor of the [right-of-way] is often maintained by others in these areas, TVA is ultimately responsible for system reliability and conducts routine inspections and vegetation management of ditch banks, fence rows, towers, and other features if they are not maintained by the owner. Under this alternative, TVA would rely upon agreements with landowners to maintain vegetation. Maintenance of the floor in such settings (lawns, cultivated fields, pastures, etc.) would continue to be the responsibility of the landowner. In addition, landowners would be responsible to trim or control woody vegetation growing along fence rows, tower/pole footings, and other features and would be responsible to trim or remove trees that present a hazard to the reliability of the transmission system.

> This alternative is critically flawed as it would defer TVA's rights for vegetation maintenance to landowners, while the ultimate responsibility for the reliability of the transmission system always remains with TVA. In cases where landowners fail to conduct the required maintenance, the transmission [right-of-way] inevitably would have an increased frequency of incompatible vegetation and danger trees. What is more, it is not efficient nor cost-effective for TVA to track varying agreements with landowners across its vast transmission system. There also is a high-probability of error and/or oversight in tracking such agreements. These conditions would reduce system reliability and ultimately expose TVA to the potential for non-compliance with applicable NERC reliability standards. Therefore, because of the high potential for non-compliance, reduced system reliability and increased financial risk, TVA has eliminated this alternative from further consideration.

[*Id.* at 970–71; *see also* Doc. 559, p. 23].

Contrary to plaintiffs' assertion that the PEIS contains "no explanation as to why [allowing landowners to maintain their own trees] would supposedly present a problem" [Doc. 559, p. 23], the PEIS provides ample explanation of why that proposed alternative would present a problem. Specifically, the PEIS lists several reasons that this proposed alternative is "critically flawed" [AR at 971]. First, the PEIS notes that allowing landowners to manage the vegetation on their property "would defer TVA's rights for vegetation maintenance to landowners, while the ultimate responsibility of the transmission system always remains with TVA" [*Id.*]. The PEIS explains that allowing landowners to maintain their own vegetation could result in "increased frequency of incompatible vegetation and danger trees" where landowners fail to conduct the required maintenance [*Id.*]. Additionally, the PEIS states that it would not be efficient or cost-effective for TVA to have to track a variety of agreements with landowners across the

seven-state region the transmission system covers [*Id.*]. Further, the PEIS explains that tracking a number of varying agreements would result in a likelihood of errors or oversight [*Id.*]. The PEIS explains that allowing landowners to maintain their own vegetation therefore would "reduce system reliability" and potentially "expose TVA to the potential for non-compliance with applicable NERC reliability standards" [*Id.*]. And, notably, these explanations as to why a landowner-maintenance alternative was rejected by the PEIS directly ties to the purpose and need section of the PEIS, which explained that reliability and compliance with NERC standards were specific goals of the project [*See id.* at 919–20].

Ultimately, plaintiffs' argument in this regard amounts to disagreement with TVA's substantive conclusions. But, because NEPA's requirements are purely procedural, *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 173, "such substantive disagreements are not actionable" under NEPA. *Granat v. United States Dep't of Agric.*, 238 F. Supp. 3d 1242, 1254 (E.D. Cal. 2017). Indeed, as the District of Columbia Circuit has noted, "NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency as NEPA was not intended to resolve fundamental policy disputes." *Mayo*, 875 F.3d at 15–16. Keeping in mind the "highly deferential scheme the Supreme Court has set out in *Seven County*," *Ariz. Mining Reform Coal. v. United States Forest Serv.*, 172 F.4th 641, 662 (9th Cir. 2026), the Court finds that the PEIS's rejection of an alternative permitting landowners to maintain the vegetation on their own property was reasonable and reasonably explained, and therefore, does not constitute a failure to take a hard look at the environmental consequences of the proposed action.

#### b. Past Practices ("Ferguson Memo")

Next, plaintiffs assert that the PEIS does not mention TVA's past vegetation management practices, which were summarized by the "Ferguson Memo" [Doc. 559, pp. 23–24]. TVA responds that its past vegetation management practices are discussed and considered in the PEIS [Doc. 562, pp. 14–15].

This argument is meritless. The PEIS states that "[i]n determining policy and direction for managing vegetation along its transmission line [right-of-way], TVA examined its past and current vegetation management practices" [AR at 874]. Additionally, the PEIS contains the following section:

> **1.1.6 Past Vegetation Management Practices**
> Historically, although TVA performed vegetation management consistent with its 1997 and 2008 Line Maintenance Manuals, it did not engage in system-wide maintenance planning. Rather, TVA employees in charge of individual [right-of-way] sectors had discretion to determine which vegetation within the [right-of-way] in their sector would be cleared. Decisions were based on a variety of factors, including how great a threat the vegetation presented to the transmission lines, budget constraints, and agreements with landowners (TVA 2008). The industry-wide reliability standard enacted in 2007 (see Section 1.3.1) states that transmission systems, like the TVA system, must maintain adequate transmission line clearances as required by the National Electric Safety Code (NESC) in order to be able to survive single-failure events while continuing to serve customer needs with adequate voltage. As such, between 2011 and 2014, the floor work maintenance cycle on transmission [rights-of-way] associated with transmission lines carrying 230 kV or higher was shortened from a three-year cycle to a two-year cycle. In addition, floor vegetation maintenance work incorporated a greater percentage of herbicide use to expedite adequate clearance. Although the NERC reliability standards did not require removing trees from the transmission [right-of-way], the penalties assessed by NERC for allowing even one tree to encroach within a specified distance of a conductor can be up to $1 million for each day that the encroachment is deemed to exist, and NERC can also mandate costly mitigation plans. Therefore, in response to the financial risk of non-compliance, TVA

> increased the vegetation management budget to allow for reclaiming non-maintained areas within the width of the transmission [rights-of-way].

[*Id.* at 919]. While the "Ferguson Memo" may not be specifically mentioned in the PEIS, it is clear that the PEIS discussed and considered TVA's past vegetation management practices. Plaintiffs have provided no argument supporting a conclusion that failure to specifically mention the "Ferguson Memo" when the prior practices are nonetheless addressed in the PEIS somehow affects whether TVA took a "hard look" at the environmental impacts of Alternative C.

### 4. Forested Acreage

Plaintiffs argue that a hard look at the environmental consequences of Alternative C should include a reasonable estimate of the number of trees to be destroyed, a recognition that many of them are huge trees, more than 50 to 100 years old [Doc. 559, p. 27]. Plaintiffs contend that there are likely at least 15 million trees in the right-of-way [*Id.*]. However, rather than the number of trees, the PEIS estimates the number of acres of trees that would be removed [*Id.* at 28].

Plaintiffs contend that the PEIS states that only 9,094 acres of the total 238,196 acres of right-of-way, or 3%, would require removal of non-compatible woody vegetation [Doc. 561, p. 14; Doc. 559, p. 28]. However, slightly different figures are stated elsewhere in the PEIS, with Table 4-3 indicating there are 9,332 acres of forested land in the right-of-way with that being 3.9% of the right-of-way [Doc. 561, p. 15; Doc. 559, p. 28]. The PEIS does not explain this apparent discrepancy [*Id.*]. Additionally, footnote 1 notes that the figure of 9,332 acres and 3.9% are derived from "2017g" one of the endnote

references in the PEIS [*Id.*]. Plaintiffs state that, while that link is now disabled, it previously took the reader to a copy of the PEIS on TVA's website—in other words, it cited itself as the source for the acreage and percentage of forest land [Doc. 561, p. 16; Doc. 559, p. 29]. Plaintiffs thus contend there is nothing in the PEIS to indicate where the figures for forest land came from and whether 9,094 or 9,332 acres or 3% or 3.9% is the correct figure [*Id.*]. The remaining figures in Table 4-3 are taken from "Homer et al. 2015" a recognized public source [Doc. 561, p. 16]. Plaintiffs contend that the upshot is that TVA used figures from the recognized public source for the remainder of the table and juxtaposed its own unexplained number for "forest land" [Doc. 561, p. 16; Doc. 559, p. 29].

Further, plaintiffs contend that the administrative record indicates that the figure of 9,332 acres is only 13.5% of the National Land Cover Database ("NLCD") estimate, which appears to be the true figure [Doc. 561, p. 16; Doc. 559, p. 30]. Plaintiffs state that the reduced figure of 9,332 acres, or 13.5% of the actual acreage, is then brought forth from the forested wetlands page of the administrative record onto Table 4-3 of the PEIS as being the sum total of forest land within the right-of-way with no hint as to the oddity of its creation and no mention that it is only 13.5% of the true figure [Doc. 561, p. 16; Doc. 559, p. 31]. Accordingly, plaintiffs contend that the PEIS dramatically misrepresents the number of trees to be removed under Alternative C [Doc. 561, pp. 16–17; Doc. 559, p. 31]. If TVA had used the true NLCD data, the forested acreage would be 6 or 7 times the 3.9% stated in Table 4-3 [*Id.* at 17]. Plaintiffs also take issue with the PEIS's calculation of

forested acreage. Plaintiffs state that, although TVA uses data provided by the U.S. Geological Survey for all other purposes in its calculation, it conveniently altered this data when it came to the percentage of the right-of-way that was covered with trees [Doc. 559, p. 31]. The reduction to 13.5%, even if appropriate, should only be used for forested wetlands (a small fraction of the forested right-of-way, but TVA, in its haste to minimize the number of trees in the right-of-way, has used that reduction for the entire forested portion of the right-of-way, whether wetland or otherwise [*Id.* at 33]. Plaintiffs contend that calculation of the acreage affected by the PEIS is obviously critical to the analysis of agency action [*Id.*]. Plaintiffs note that in *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005), the court found an EIS to be insufficient when the Forest Service presented maps and calculations that did not adequately explain its claimed figures of the acreage of "hiding cover" in elk habitat [*Id.*]. Plaintiffs contend that the PEIS suffers the same shortcomings [*Id.* at 18].

Moreover, plaintiffs contend that the calculation of forested acreage appears to be based on the forested acreage as it appeared at the time of the PEIS, and thus, is based on the remnants of the buffer zones after 45% had already been removed through 6 years of implementation of the 15-foot rule [Doc. 559, p. 35]. Plaintiffs argue that, to constitute a hard look, TVA would have to look at the facts as they existed at the beginning of the project [*Id.*].

TVA argues that estimating the number of trees, rather than acreage, is not a practice that other agencies engage in when evaluating decisions involving vegetation management

[Doc. 562, p. 22]. TVA states that plaintiffs' argument boils down to the claim that the amount of forested acreage is dramatically misrepresented in the PEIS [*Id.*]. But the 3.9% and 3% numbers plaintiffs cite are not the same thing—the 3.9% refers to the percentage of forested land cover within the right-of-way and the 3% is the amount of initial woody vegetation that would need to be removed from the right-of-way's buffer zones under Alternatives B, C, and D [*Id.* at 23]. TVA states that the "vegetation" section of the PEIS discusses forested acreage, and that number is derived from TVA's Programmatic Biological Assessment for Evaluation of the Impacts of Tennessee Valley Authority's Routine Actions on Federally Listed Bats ("Bat BA") [*Id.*; *see also* AR at 18535–19150]. The other estimates are based on the NLCD, and information in the administrative record explains the reason for using these two sources [Doc. 562, p. 23]. Additionally, the "wetlands" section of the PEIS discusses forested acreage, but acreage of forested wetlands was adjusted based on an adjustment made to the NLCD data for land cover, which was also previously derived from forested land cover quantities from the Bat BA, and the rationale is fully explained in the PEIS [*Id.* at 24]. TVA contends that it is the agency, not the Court, that has the discretion to choose from among sources of evidence, and an agency may rely on its own experts [*Id.* at 25]. Moreover, TVA argues that, even if the Court finds some error in TVA's analysis, the error was harmless, as all of the PEIS's action alternatives involved an initial clearing of woody vegetation in the right-of-way's buffer zones [*Id.* at 26]. TVA states that plaintiffs do not argue that the inclusion of more acreage

of forested land cover or forested wetlands in the PEIS would have materially affected TVA's decision to remove the buffer under all three action alternatives [*Id.*].

Plaintiffs reply that the entire discussion of acreage, both in the PEIS, and TVA's brief, and with the odd references to the Bat BA, and then switching back and forth between 3% and 3.9%, is so confusing and not "reasonably explained" that no ordinary member of the public could hope to understand it, but it does appear the number of affected acres is dramatically underestimated [Doc. 566, p. 26]. Plaintiffs state that while TVA says that the estimate of 9,332 acres of forested land cover in the right-of-way is derived from the Bat BA, that figure is not contained in the Bat BA [*Id.*]. And neither the PEIS nor the appendices explain why the public data is supposedly outdated or how TVA or its contractor supposedly know this fact [*Id.* at 27]. Plaintiffs argue that TVA cannot cherry-pick the data and reject the key part as outdated without providing a reasonable explanation [*Id.*]. As to TVA's argument that the inclusion of more forested acreage would not have materially affected the decision, plaintiffs contend: (1) the question is not what decision TVA might have made, but rather, whether the PEIS takes a hard look at the environmental consequences, and (2) nothing would have materially affected TVA's decision, because it was predetermined[26] [*Id.* at 31–32].

TVA replies that, unlike *Native Ecosystems*, the PEIS's calculation of the forested acreage in TVA's own service territory is not governed by a preexisting forest management

[26] For the reasons explained *supra*, the Court has determined that TVA's selection of Alternative C was not "predetermined," at least as that term is used in the NEPA context.

plan mandating that it be estimated in a particular manner [Doc. 565, p. 4]. TVA contends that the PEIS and supporting documents in the administrative record explain why TVA chose to estimate the forested and forested wetland acreage in the manner that it did, including drawing from estimates in its previously prepared Bat BA [*Id.* at 4–5].

As an initial matter, the Court will address plaintiffs' complaint that the PEIS estimates the acreage of forested area within the right-of-way, rather than a specific number of trees. Plaintiffs cite no legal support for any claim that an agency must specifically estimate the number of trees, rather than forested acreage, in order to take a "hard look" at the environmental impacts of its proposed action on the forested area. Moreover, based on TVA's argument [Doc. 562, p. 22], as well as the sources cited by both parties and those included in the administrative record, it appears that the use of acreage, rather than number of trees, is likely more standard in the industry as the manner to quantify trees. Granting TVA the appropriate deference as to how to prepare its EIS, the Court finds no ground for concluding that the use of acreage as opposed to number of trees suggests TVA did not take a hard look at the environmental impact.

Additionally, the Court does not find that the use of forested acreage as it existed at the time of preparation of the PEIS constitutes failure to take a hard look at the environmental consequences of Alternative C. As the Court discussed *supra*, while the Court understands plaintiffs' contention that the 15-foot rule was implemented in violation of NEPA, at this juncture, there is simply no relief that can be granted as to that prior conduct. *See One Thousand Friends of Iowa*, 364 F.3d at 893 ("A NEPA claim does not

present a controversy when the proposed action has been completed and no effective relief is available"). Plaintiffs have cited no legal support for any argument that an agency should be required to consider the environmental impacts of a completed action, and, indeed, such a requirement would seem counter to the "action-forcing" purpose of NEPA. *See Robertson*, 490 U.S. at 350. And, in any event, even to the extent that TVA could be deemed to have erred in using the forested acreage as it stood at the time of preparation of the PEIS, rather than before implementation of the 15-foot rule, the Court finds that such was harmless error, as there is no reasonable likelihood that this omission impacted TVA's overall evaluation of the environmental impacts of Alternative C. *See Burkholder v. Peters*, 58 F. App'x 94, 98 (6th Cir. 2003) (recognizing a harmless-error rule in NEPA cases when "a mistake . . . has no bearing on the ultimate decision or causes no prejudice"); *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 184–85 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS").

Turning to plaintiffs' argument regarding the acreage calculations, plaintiffs point to several portions of the PEIS that state: "Only three percent of the total [right-of-way] (8,094 of the total 238,196 acres of [right-of-way]) would require initial vegetation removal" [AR at 895, *see also id.* at 985, 1010, 1158; Doc. 559, p. 28]. Plaintiffs then point to Table 4-3 of the PEIS, which is labeled "Land Cover Within the TVA Transmission Line Rights-of-Way" and lists the amount of "Forested Land" within the right-of-way as

9,332 acres which equates to 3.9% of the right-of-way [AR at 1002; *see also* Doc. 559, p. 28]. Plaintiffs also point to the footnote to Table 4-3, which states that the acres of forested lands within transmission right-of-way is derived from TVA 2017g, which, in the endnotes, is a citation to "Transmission System Vegetation Management Program" with a now disabled link to TVA's website [AR at 1002, 1187; s*ee also* Doc. 559, p. 28].

TVA explains the discrepancy between the 3% and 3.9% numbers [Doc. 562, p. 23], and that explanation is supported by the PEIS's language. The 8,094 acres, or 3% of the right-of-way, is the area that would require initial woody vegetation removal, according to the PEIS [AR at 895, 985, 1100, 1158]. On the other hand, the 9,332 acres, or 3.9% of the right-of-way, is the amount of the right-of-way that is forested [*Id.* at 1002]. Put another way, the PEIS's plain language indicates that approximately 9,332 acres of the right-of-way is forested, but only 8,094 acres of the right-of-way requires initial removal of woody vegetation. Accordingly, the Court finds nothing inconsistent about the use of these numbers in the PEIS.

More importantly, plaintiffs take issue with TVA's calculation of forested acreage in the right-of-way as 9,332 acres [Doc. 561, p. 16; Doc. 559, p. 30], and particularly, how that number was inserted into a table in which the remainder of the numbers are taken from a recognized source, namely "Homer et al. 2015," which appears to be a citation to the NLCD data [*See* AR at 1182]. Neither party provides a crystal-clear picture of how this number was calculated. Plaintiffs are correct that the citation the PEIS provides in Table 4-3 for the calculation of 9,332 acres of forested land is a link to TVA's own website,

which is no longer functional [*Id.* at 1002, 1187]. However, the PEIS appears to provide at least some explanation for the calculation of the 9,332 acres. Specifically, the PEIS states that the "NLCD[] data is based on a spatial resolution of 30-meter pixels, which makes it unsuitable for use on narrow transmission line corridors. As such, forest cover within the transmission [right-of-way] is consistent with the estimate developed for the programmatic BA for evaluation of the impacts on federally listed bats (TVA 2017e)" [*Id.* at 1000]. The PEIS also contains the following explanation, which appears to at least somewhat relate to the calculation of the forested land, although it refers to "forested wetland":

> For this section, the type and extent of wetlands within the study area and TVA transmission corridors have been derived from the [National Wetlands Inventory ("NWI")] database (USFWS 1977-2017). The use of national data sets such as NWI is appropriate and effective for a broad study area; however, the dataset is outdated and often doesn't reflect existing land uses or conditions. This is particularly problematic in non-agricultural lands and undeveloped lands . . . where use of NWI produces false overestimates of forested wetland areas by not eliminating the portion within the existing transmission corridor. Therefore, based on derived forested landcover quantities developed for TVA's ESA Section 7 Programmatic BA developed by TVA, the acreage of forested wetland within the transmission [right-of-way] presented by NWI has been modified to better represent the existing condition within the transmission [right-of-way]. *The difference in forested landcover between the BA and NLCD data was used as a guide to apply an equivalent adjustment to the NWI forested quantities*. The difference in forested wetland acreage was then applied to the total emergent acreage as this represents areas that have been cleared of the existing transmission corridors. Therefore, the acreage of forested wetland within the transmission [right-of-way] presented by NWI has been modified to better represent the existing conditions within the [right-of-way].

[*Id.* at 1072–73 (emphasis added)].

Notably, the administrative record contains calculations which include a table that appears to have been directly incorporated into the PEIS as Table 4-3, at issue here [*Compare* AR at 2723 *with* AR at 1002]. The table in that document is identical to Table 4-3, with the exception that the footnote explaining the calculation of "Forested Land" does not contain the citation to TVA's website, but rather, states "[f]orested lands within [right-of-way] derived from TVA 2017 [] Programmatic Biological Assessment for Evaluation of the Impacts of TVA's Routine Actions on Federally Listed Bats" [AR at 2723]. A chart on that same page states the following:

| **ROW Area (acres)** | |
|---|---|
| 32575.46 | from GIS |
| 65022.76 | from GIS |
| 59128.98 | from Bat BA (TVA 2017) |
| 554.27 | from GIS, summarize as |
| 2137.27 | from GIS |
| 586.90 | from GIS |
| Derive by subtraction | |

[*Id.*].

Additionally, another chart in the administrative record states the following:

| | | |
|---|---|---|
| NLCD total forest | 69341 | Source: Homer et al 2015 |
| BA total forest | 9332 | Programmatic Bat BA |
| New forested land cover = 13.5% of the NLCD estimate | | |
| NWI forested wetland | 4641 | |
| 13.5% of NWI forested | 626.5 acres | |

[*Id.* at 2911]. But the Court has not located the numbers "9332" or "59128.98" in the Bat BA contained in the administrative record [*See id.* at 18535–19150]. And, despite its contention the acreage of forested land cover is "derived" from the Bat BA, TVA has not

bothered to provide the Court with a specific citation within the 600+ page Bat BA for such calculations [*See* Doc. 562, p. 23 (citing "AR Doc. 172")].

While the Court finds TVA's lack of transparency about how the forested acreage estimate of 9,332 acres was created to be troubling, the Court nonetheless concludes that any error in this regard is harmless. As discussed *supra*, the estimate of 9,332 acres is purportedly the total forested acreage in the right-of-way, while the 8,094 acres is the portion of the right-of-way that would require initial woody vegetation removal. Given this fact, it is unclear how a much larger estimate of forested acreage within the right-of-way would impact TVA's selection of Alternative C. In other words, even if the forested acreage within the right-of-way is, as plaintiffs suggest, 6 or 7 times larger than the 9,332 acres suggested by the PEIS, plaintiffs do not seem to raise any suggestion that the 8,094-acre estimate of the portion of the right-of-way to receive an initial woody vegetation clearing is improperly calculated. Therefore, it does not appear that any increase to the amount of forested acres overall within the right-of-way would be relevant, as those additional acres would not be impacted by the planned "clear-cutting." Accordingly, the Court finds no reason to believe that TVA's decision to select Alternative C would have been impacted by a higher estimate of the overall forested acreage within the right-of-way. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 184–85 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS").

### 5. Carbon Sequestration

Plaintiffs next contend that the PEIS does not take a hard look at the loss of carbon sequestration capacity that would result from Alternative C [Doc. 559, p. 35]. Plaintiffs contend that loss of carbon sequestration capacity is a well-known environmental problem resulting from cutting down large numbers of trees, and is therefore an important aspect of the EIS [*Id.* at 36]. Plaintiffs argue that the District Court for the District of Montana recognized that merely discussing carbon impacts and concluding that they will be minor does not equate to a "hard look" [*Id.* (citing *Ctr. for Biological Diversity*, 687 F. Supp. 3d 1053)]. Plaintiffs assert that the PEIS states that the loss of carbon sequestration capacity in the right-of-way is small compared to the carbon sequestration capacity of the entire seven-state region, but the trees in the right-of-way are obviously a small fraction of the trees in the seven-state region [*Id.* at 37]. Plaintiffs also complain that the PEIS references an increase in carbon sequestration from the conversion of farmland to forested land, which plaintiffs state is unknown to them and has not been established by the PEIS or reported in the media [*Id.* at 38]. Moreover, plaintiffs contend that the PEIS's estimate of 8,580 tons of lost carbon sequestration capacity, while dramatically understated, appears to be a one-year figure, and the actual loss will go on forever, which is not mentioned in the PEIS [*Id.* at 39].

TVA responds that plaintiffs have not shown that the PEIS's analysis of carbon sequestration loss was unreasonable [Doc. 562, p. 33]. TVA states that the PEIS explicitly acknowledges the existence of climate change and observes that vegetation management

releases carbon dioxide from cleared vegetation into the atmosphere, but that vegetation control activities such as re-growth of low-growing vegetation and permanent storage of carbon in any trees marketed as lumber serve to offset carbon dioxide emissions [*Id.*]. TVA states that the PEIS also acknowledges that releases of carbon dioxide from emissions coupled with reduced carbon sequestration due to tree removal are potential mechanisms of impact on climate change [*Id.*]. However, despite the detailed analysis, plaintiffs criticize the fact that the acreage to be removed from the buffer zones is compared to forest area of TVA's service territory as a whole in determining the effect of carbon sequestration [*Id.* at 34]. TVA contends that this criticism ultimately relates to the decision to prepare a programmatic level NEPA review [*Id.*]. Furthermore, TVA contends that *Center for Biological Diversity*'s analysis is undoubtedly representative of the aggressive role in policing agency compliance with NEPA that the Supreme Court criticized in *Seven County Infrastructure Coalition* [*Id.* at 36–37].

Plaintiffs reply that TVA's argument about regrowth of low-growing vegetation and permanent storage of carbon in trees marketed as lumber is a farcical assertion that allowing weeds to grow where trees once stood and then marketing the felled trees will somehow offset carbon dioxide emissions [Doc. 566, p. 35]. Plaintiffs contend that this is not a candid acknowledgement of the environmental effects of Alternative C [*Id.*]. Plaintiffs contend that their argument has nothing to do with the characterization of the EIS as programmatic, however, they simply argue that the fact that the area covered by the right-of-way is small compared to the reset of the seven-state region, does not mean that

the removal of millions of trees and consequent loss of carbon sequestration capacity is insignificant or would have no impact on climate change [*Id.*].

In their arguments, plaintiffs specifically point to a section of the PEIS which states:

> EPA's quantification tool was used to estimate the carbon sequestration that may be lost due to initial removal of forested buffers (EPA 2017d). Assuming that *8,094 acres of forested areas* (the land cover with the greatest potential carbon sink) are completely cleared from the transmission [right-of-way] and forest composition and age is typical for the region, TVA estimates that the conversion of these forested lands would result in the loss approximately 8,580 metric tons of carbon sequestered in one year. The loss of carbon sequestered or stored is very small relative to the carbon sequestered in forested areas of the study area. *Overall, forest sequestration in the study area has increased due to net increase in forest areas from conversion of farmland to forested areas*, improved forest management, as well as higher vegetation growth productivity rates and longer growing seasons. Within the study area, it is estimated that existing forested lands (26,976,751 acres) sequester approximately 28,595,356 metric tons of carbon per year. Therefore, no impact on climate change is anticipated.

[AR at 1156 (emphasis added); *see also* Doc. 559, pp. 37–38].

The PEIS also states that "[t]he amounts of [global] warming projected beyond the next few decades . . . is directly linked to the cumulative global emissions of greenhouse gases (e.g., $CO_2$ . . . )" [AR at 1127]. The PEIS also acknowledges that "clearing of vegetation releases $CO_2$ from cleared vegetation into the atmosphere. Vegetation control activities that offset $CO_2$ emissions include the re-growth of low-growing vegetation and the permanent storage of carbon in any trees marketed as lumber" [*Id.*]. The PEIS continues on to state that "[r]eleases of $CO_2$ from emissions coupled with reduced carbon sequestration due to tree removal are potential mechanisms of impact on climate change. However, as relates to climate change, these emissions are considered *de minimis* and

reductions in carbon sequestration by trees from individual method application are *negligible in the context of the regional setting*" [*Id.* (emphasis added)].

Plaintiffs' first argument regarding the PEIS's discussion of carbon sequestration is that the PEIS did not take a "hard look" at the effects of lost carbon sequestration when it compared the impact to the carbon sequestration capacity of the entire seven-state region. In support, plaintiffs point to the District of Montana's decision in *Center for Biological Diversity*. In that case, the District of Montana agreed with the plaintiffs' argument that the agency's analysis of carbon impact was insufficient, because, while the agency took steps to explain how the project could impact carbon emissions, "it did so only in general terms, which does not meet NEPA's 'hard look' standard." *Ctr. for Biological Diversity*, 687 F.Supp.3d at 1074–75. The District of Montana explained that:

> Because the Project will allegedly "affect only a tiny percentage of the forest carbon stocks of the Kootenai National Forest, and an infinitesimal amount of the total forest carbon stocks of the United States," . . . the [agency] concluded no further effects analysis of the Projects' impact on climate change was required. However, the [agency] did not explain how this determination was made using "the high quality and accurate scientific analysis that NEPA's implementing regulations demand of environmental information produced by agencies."

*Id.* at 1075 (citation omitted). That court noted that "[i]n *350 Montana v. Haaland*, the Ninth Circuit rejected the agency's claim that project climate impacts would be minor based on 'an opaque comparison to total global emissions.' 50 F.4th at 1269–70. That problem exists here as well." *Id.* Accordingly, the District of Montana concluded that the agency had not sufficiently considered the project's climate impacts. *Id.* In so concluding, the District of Montana stated that "under this logic, the [agency] could always skirt 'hard

look' analysis when doing a carbon impacts review by breaking up a project into small pieces and comparing them to huge carbon stocks such as those contained within the over two million acres of land in the Kootenai National Forest." *Id.*

While *Center for Biological Diversity* does appear to support plaintiffs' position, the Court notes that that case is not binding precedent, and, given that it was decided before the Supreme Court's decision in *Seven County Infrastructure Coalition*, the Court does not find it particularly persuasive. Notably, much of the District of Montana's analysis in that case was reversed by the Ninth Circuit, although the specific portions relevant here were not at issue on appeal, and the Ninth Circuit therefore did not address them. *See Ctr. for Biological Diversity v. United States Forest Serv.*, Nos. 23-2882, 23-2886, 23-3146, 2025 WL 586358 (9th Cir. 2025). Further, other courts have recently explicitly rejected *Center for Biological Diversity*'s analysis regarding carbon impacts. For example, a few months ago, the District of Oregon found *Center for Biological Diversity* "not persuasive[.]" *Cascadia Wildlands*, 2026 WL 1346844, at *14. Moreover, the District of Montana has even distinguished *Center for Biological Diversity*, noting that the decision in that case turned upon the fact that the agency's "cookie-cutter analysis depended on a verbatim reproduction of analysis from another forest." *All. for the Wild Rockies v. Rollins*, No. CV 24-10-M-DLC-KLD, 2025 WL 4066514, at *7 (D. Mont. Sept. 30, 2025). But, in the case before it in 2025, the District of Montana rejected plaintiffs' arguments of inadequacy, finding that plaintiffs had not shown that the analysis supporting the agency's conclusions were borrowed from elsewhere. *Id.*

And, most importantly, the Court concludes that the decision in *Center for Biological Diversity* does not appear to have afforded the agency the high level of deference appropriate in light of the Supreme Court's recent *Seven County Infrastructure Coalition* decision. As the Supreme Court stated, "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 181. And as "long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line." *Id.* at 182. Here, the PEIS addressed the impacts of Alternative C on carbon sequestration [*See* AR at 1127, 1156]. Plaintiffs' argument amounts to a challenge to the level of detail of that analysis. But the Court must defer to the agency in that respect.

Plaintiffs' second argument regarding carbon sequestration contests the PEIS's statement that forested land has increased due to a conversion of farmland to forested land, which plaintiffs challenge essentially on the ground that they are not aware of such conversion of farmland to forested land [Doc. 559, p. 38]. True, TVA provides no citation for this claim in the PEIS. But plaintiffs' contention that they are unaware of any such conversion of farmland to forested land, and that such has not been reported in the media, is hardly evidence that the statement is untrue. Regardless, even if the Court assumes that this single line from the PEIS's discussion of carbon sequestration is inaccurate, the Court reiterates that its review under NEPA and the APA does not consist of "flyspecking" TVA's environmental analysis for "any deficiency no matter how minor." *Appalachian*

*Voices*, 134 F.4th at 422. The Court does not find that the inclusion of this statement in the PEIS, even if inaccurate, indicates that TVA failed to take a hard look at the environmental consequences of Alternative C. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 184–85 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS"). This is particularly true given the statement elsewhere in the PEIS that "forest cover has increased dramatically in parts of the eastern United States in the past century . . . (Dyer 2006)" [AR at 1003], which is supported by evidence in the administrative record [*Id.* at 7326]. In light of this, it is unlikely that any error in statement as to the reason for the increase in forested land would have had any impact on TVA's analysis of the environmental impacts of Alternative C.

Finally, plaintiffs contend that the PEIS does not take a hard look at the environmental consequences of Alternative C because it provides only a one-year figure of the estimated lost carbon sequestration capacity, without recognizing that this loss will go on forever. True, the PEIS does not quantify the estimated lost carbon sequestration capacity on a year-by-year basis, but plaintiffs provide no legal support that the PEIS was required to do so. Indeed, where would such calculation of an indefinite loss end? Would TVA be required to estimate the carbon sequestration loss at 5 years? 50 years? 500 years? 5,000 years? At some point, the PEIS would become a mind-numbing list of mathematical calculations that no longer provided useful information consistent with the goals of NEPA.

And, ultimately, the PEIS, while not calculating specific numbers, did recognize the that the long-term loss of carbon sequestration capacity was an environmental result of Alternative C. The PEIS states that Alternative C would result in "[l]ong-term loss of carbon sequestration capacity due to loss of forested buffer" [AR at 893, 994], and indicates that the "[l]ong-term impacts of [Alternative C] are related to loss of forested land and associated wildlife habitat and carbon sequestration capacity" [*Id.* at 986]. Given these acknowledgements, and particularly given the deference owed to an agency in determining the scope of its environmental analysis, *see Seven Cnty. Infrastructure Coal.*, 605 U.S. at 192 ("courts should afford substantial deference to the agency as to the scope and contents of the EIS"), the Court finds that the PEIS's decision to limit the quantification of estimated lost carbon sequestration capacity to one year was reasonable.

**6. Herbicide**

Plaintiffs contend that, under Alternative C, the right-of-way is initially clear cut and then kept in a "meadow-like end state" by way of 90% use of herbicides, but the PEIS does not estimate the amount of herbicide to be used or what will happen to it [Doc. 559, p. 39]. Plaintiffs argue that any hard look at the environmental consequences of dumping unprecedented quantities of herbicide on the right-of-way would have to state the quantity of herbicide to be used and what will happen to it, as well as the consequences on fish, water biology, and drinking water [*Id.* at 39–40].

TVA responds that the details plaintiffs seek regarding the use of herbicide is not required at the programmatic EIS level [Doc. 562, p. 27]. The environmental effects of

using herbicide on right-of-way sectors will be studied during the site-specific EIS process [*Id.*]. TVA argues that just because the PEIS does not consider the effects of herbicide in the precise way plaintiffs think they should does not mean that TVA's analysis is not reasonable [*Id.* at 28].

Plaintiffs reply that mass quantities of herbicide that are placed on individual properties year after year have a cumulative effect if and when they end up in streams and rivers [Doc. 566, p. 32].

Ultimately, plaintiffs' arguments regarding the PEIS's discussion of herbicide and its impacts amount to a disagreement with the decision to conduct a programmatic level EIS at this stage, which the Court has already found to be reasonable for the reasons discussed *supra*. Logically, the amount and type of herbicides anticipated to be used in a specific area, and what will happen to the herbicide applied in that area, is most appropriate addressed in the site-specific EISs that will tier from the PEIS. And TVA has acknowledged as much, stating: "Planning steps . . . are used by TVA to determine which herbicides, if any, would be appropriate for site-specific use" [AR at 940]. The Court finds that the decision to address these issues in more detail in the future site-specific EISs is reasonable.

Moreover, the Court notes that the PEIS contains an extensive discussion of the impacts of herbicides on the environment as a result of implementing Alternative C. Table 2-4 provides a list of all herbicides currently used on TVA's right-of-way [AR at 939]. Table 2-5 also provides a list of all pre-emergent herbicides currently used for bare ground

areas on TVA's right-of-way, and Table 2-6 provides a list of all growth regulators currently used on TVA's right-of-way [*Id.*]. The PEIS also contains a description of the active ingredients of each herbicide used [*Id.* at 1115–18].

Further, the PEIS specifically addresses the disadvantages of herbicide use:

> Herbicides applied to the TVA transmission [right-of-way] have the potential to impact non-target vegetation, *water sources*, or *fish* and wildlife through inadvertent application, excess surface runoff, spray drift, and leaching through the soil profile. Restrictions on herbicide applications around waterbodies, agricultural areas, urban areas, public lands, and other sensitive areas limit use of these methods. Risks of non-target exposure with herbicide use are low when herbicides are used according to the label recommendations and applied by trained applicators.

[*Id.* at 944 (emphasis added)]. Moreover, the PEIS contains a section addressing the impact of herbicide application methods for many of the 20 identified resources TVA identified as potentially impacted by the alternatives considered [*Id.* at 927, 1012 (vegetation), 1021 (wildlife), 1043 (threatened and endangered species), 1061 (surface water), 1069 (aquatic ecology), 1078 (wetlands), 1091 (groundwater), 1098 (natural areas), 1101 (parks and recreation), 1100 (visual resources), 1114 (health and safety), 1118 (air quality), 1133 (noise)].

Additionally, as to plaintiffs' contention that the PEIS should address the impacts of herbicide use on fish, water biology, and drinking water, the PEIS contains the following sections directly addressing those resources:

> **4.4.3.2.3 Impacts to Surface Water from Herbicide Application Methods**
> . . .
>
> Runoff of herbicides could occur with any of the herbicide application techniques . . . ; however, it would be minimized with limited application . . . .
>
> Drift of herbicides could occur when spray or pellets are carried offsite by unforeseen weather or wind conditions into adjacent streams. Herbicide drift also would be minimized with limited application . . . . The aerial broadcast herbicide application method is done either by fixed-wing aircraft or by helicopter and has a greater potential to impact water quality as a result of herbicide transport to non-targeted receiving streams and waterbodies. This method currently is not used, and if it is used in the future, is expected to be infrequent to rare.
>
> Mechanical equipment is used in some cases for herbicide application. This equipment requires the use of fuels and lubricants; therefore, there is a potential for impacts to water quality from leaks and spills that can enter nearby surface waters. . . .
>
> Any pesticide/herbicide used as part of vegetation maintenance activities would comply with the General Permit for Application of Pesticides, which requires a pesticide discharge management plan if certain thresholds are met. In areas requiring chemical treatment, only EPA-registered herbicides would be used in accordance with label directions designed in part to restrict applications near receiving waters and to prevent unacceptable aquatic impacts. Proper implementation and application of these products would be expected to have no significant impacts to surface waters. No cumulative impacts are anticipated.

[AR at 1061].

> **4.5.2.2.3 Impacts to Aquatic Ecology from Herbicide Application Methods**
> Herbicide application has the potential to impact water quality via inadvertent application to stream channels, excess surface runoff, spray drift, and leaching through the soil profile (Annett et al. 2014; Tatum et al. 2017), however TVA employs SOPs (e.g., label-directed use) and BMPs specifically designed to eliminate these risks. For example, overspray has the highest potential to acutely affect aquatic organisms (Rolando et al. 2017). Algae, microorganisms, macroinvertebrates, amphibians, and fish are

affected by exposure to consistently elevated levels of herbicide (Warren et al. 2003; Warrington et al. 2017), but, in the environment, organism exposure would fluctuate due to varying physical and climatic conditions. Field measures for concentration and durations of exposure to herbicides are typically well below standard toxicity endpoints (Scarbrough et al. 2015; Rolando et al. 2017). For example, glyphosate-based herbicides have a low-runoff risk and rapidly dissipate when introduced to aquatic environments (Rolando et al. 2017). Acute and chronic toxicity of herbicides to aquatic organisms is dependent on herbicide type, concentration, exposure time, and varies by species; but, overall risks of aquatic ecosystem exposure to herbicides are low when used within legal label recommendations and applied by trained applicators.

Spot and localized herbicide applications have little chance of impacting aquatic systems when applied correctly. Spot application is intended to use the least amount of herbicide possible to treat individual plants. Similarly, localized herbicide application consists of treating individual or small groupings of plants via basal, low-volume foliar, granular, and bare-ground treatments to minimize any overspray or excess runoff. Heavy rains could carry herbicides (e.g., granular pellets) offsite and into adjacent streams; however, rain would also serve to dilute any excess herbicide and limit any acute or chronic effects (Scarbrough et al. 2015). Additionally, broadcast application methods using mechanized equipment also have the potential for ground-disturbing impacts (as described above). Inadvertent application to aquatic environments via overspray and drift are most likely with broadcast and aerial application methods. Drift is the airborne movement of herbicides through wind or evaporation to non-target areas. Because TVA uses BMPs . . . , prior planning, proper herbicide mixtures, and advanced technologies to reduce or eliminate drift during application . . . , herbicide toxicity to aquatic ecosystems is unlikely under TVA's standard procedures.

[*Id.* at 1069–70].

**4.9.2.2.3 Impacts to Groundwater from Herbicide Application Methods** Herbicide application techniques include a range of tools that vary in the volume and type of herbicide used and in the intensity of their application. Potential effects to groundwater quality are limited to indirect effects arising from the transport of herbicide constituents in stormwater or surface waters draining a given project site. For example, treatments in certain areas may result in potential herbicide drift or leaching that could be transported via surface waters. Specialized environments where groundwater resources are closely associated with surface water are particularly vulnerable to surface

> water-groundwater interactions (i.e., karst topography, or shallow aquifer zones). . . .

[*Id.* at 1091–92].

In light of this, and considering the deference owed to agency decisions, the court finds that the PEIS took the required hard look at the environmental impacts of herbicide use under Alternative C, at least at the programmatic level.

### 7. Wildlife

Plaintiffs further argue that the PEIS does not take a hard look at the consequences to wildlife[27] and does not reflect any consideration of Tennessee Code Annotated § 70-4-114 [Doc. 559, p. 40]. Plaintiffs state that, under Alternative C, clear-cutting is to continue straight through nesting season, but the PEIS does not include a candid acknowledgement of the effects of clear-cutting during nesting season, nor does it contain any recognition or quantification of the number of nests that would be destroyed or the number of baby birds and other animals that would be killed [*Id.*]. Plaintiffs contend that NEPA requires agencies to take nesting season into consideration when making environmental decisions, and this is typically included in an EIS [*Id.* at 41]. Further, plaintiffs argue that the PEIS does not take hard look at Tennessee Code Annotated § 70-4-114, which makes it unlawful to disturb, mutilate, or destroy the home, nest, or den of any protected wild animals or birds [*Id.* at 42].

---

[27] Plaintiffs' arguments regarding "wildlife" are largely limited to the impacts to birds during nesting season. The Court notes that the PEIS devotes an entire section to the impacts of Alternative C on wildlife generally, as well as another section to threatened and endangered species [*See* AR at 1014–52].

TVA responds that this sort of data gathering is not required in a programmatic review [Doc. 562, p. 29]. TVA also asserts that the claim that clear-cutting will continue straight through nesting season is flatly contradicted by the PEIS [*Id.*]. The PEIS acknowledges the applicability of the Endangered Species Act, an executive order, and state laws [*Id.*]. As required by the Endangered Species Act, TVA consulted with the FWS on the actions studied in the PEIS [*Id.*]. Moreover, the PEIS outlines numerous mitigation measures that will be implemented to reduce impacts to wildlife, including birds, during right-of-way management [*Id.*]. TVA further contends that plaintiffs' claim that TVA is required to take a hard look at Tennessee Code Annotated § 70-4-114 makes no sense—the hard look is at environmental effects and the agency decides what environmental effects are relevant to the analysis in the first instance [*Id.* at 29 n.15].

Plaintiffs reply that the absence of this significant information in the PEIS is another danger signal that TVA has not really taken a hard look at the environmental consequences [Doc. 566, p. 33]. Plaintiffs state that TVA provides only three examples of when the project would not continue straight through nesting season: (1) prohibiting chainsaw use near sites for colonial wading birds and ospreys during nesting season; (2) prohibiting clearing within 660 feet of known bald eagle nests during certain times, and (3) avoiding mowing during the height of nesting season to minimize impacts to ground nesting birds [*Id.* at 33–34].

#### a. Quantification of Nests Destroyed/Birds Killed

As has been discussed *supra*, the Court has determined that TVA's decision to proceed with a programmatic EIS at this stage was reasonable. To the extent that plaintiffs complain that the PEIS does not specifically provide an estimated number of birds nests that would be destroyed and baby birds or other animals that would be impacted, to the extent that such numbers would be necessary at all, or even possible to calculate, the Court finds that they would be more appropriately addressed in the site-specific EISs that will tier from the PEIS in this case.

#### b. Nesting Season

Contrary to plaintiffs' assertion, the PEIS does not indicate that "clear-cutting is to continue straight through nesting season" [*See* Doc. 559, p. 40]. Rather, the PEIS contains an extensive discussion of the potential impacts of Alternative C on nesting birds and potential mitigation efforts to offset those potential impacts. Discussing disadvantages of mechanical cutting and trimming the PEIS acknowledges that "[n]oise, exhaust and dust from machinery can disturb wildlife and may even be restricted in during [sic] certain times of year to protect sensitive species such as federally listed bat species and *ground nesting birds*" [AR at 938 (emphasis added)]. Additionally, the PEIS contains a section recognizing regulations regarding the protection of wildlife, including birds, which states:

> **4.2.1.1 Regulatory Framework**
>
> Several species of wildlife are protected under the ESA and related state laws as described further in Section 4.3 Threatened and Endangered Species. In addition to these laws, the regulatory framework for protecting birds that is relevant to TVA includes EO 13186 – Responsibilities of Federal Agencies

> to Protect Migratory Birds. EO 13186 addresses migratory birds occurring in the United States. EO 13186 focuses on federal agencies taking actions with the potential to have adverse impacts on populations of migratory birds. It provides broad guidelines on avian conservation responsibilities and requires agencies whose actions affect or could affect migratory bird populations to develop a memorandum of understanding (MOU) on migratory bird conservation with the USFWS. TVA is currently developing an MOU in coordination with the USFWS and is developing an Avian Protection Plan. In addition, there are state laws regulating the hunting, trapping, other capture, and possession of some species.

[*Id.* at 1014–15]. Moreover, the PEIS recognizes that "[a]pproximately 27 species of birds breeding in the TVA study area are considered to be of conservation concern (Table 4-8)" [AR at 1018]. Table 4-8 provides a list of "Migratory Birds of Conservation Concern within the TVA Study Area" [*Id.* at 1019].

The PEIS also explains how TVA's Office Level Sensitive Area Review ("O-SAR") database defines sensitive areas, and specifically notes that, with regard to terrestrial animals, the O-SAR database has a "Class BALDEAGLE, HERONOSPREY, HERONRY, and OSPREY" and "[v]egetation management of sensitive areas in this class places seasonal restrictions on mowing and herbicide application within 660 feet of previously documented *bald eagle nests* and outside appropriate buffers determined for *heronries and osprey nests* by state guidelines to be outlined in TVA's Avian Protection Plan" [*Id.* at 967 (emphasis added)]. And the PEIS identifies as "[s]pecial and unique habitats within the study area" to include "Heron, Osprey, and Bald Eagle Nests," and states the following:

> Transmission line structures (poles and towers) within established [rights-of-way] may be used by various herons, ospreys, and bald eagles. *Ospreys are known to establish nests on transmission line towers* within the study area. In contrast, while *bald eagles typically do not nest on transmission line towers, they may use structures for perching or may forage*

> within wetland, shorelines and associated habitats within the [right-of-way]. Based on a review of the TVA Regional Natural Heritage database, there are 247 O-SAR features associated with heron, osprey, and bald eagle nests that are potentially subject to vegetation control measures along the existing transmission line [rights-of-way] within the study area. As described in Section 3.2.2 Alternatives, TVA uses information from the O-SAR process to consider the site sensitivity of each project area in the development of a context sensitive approach to tools for vegetation management. This process guides decisions regarding vegetation maintenance activities in the vicinity of previously documented features.

[*Id.* at 1016–17 (emphasis added)].

Further, the PEIS contains a section on mitigation measures for impacts to wildlife, which states, in relevant part:

> Among the manual vegetation control methods, *chainsaw use would be prohibited near nest sites for colonial wading birds and ospreys during nesting season* (February 1 through July 15). *No clearing would be permitted within 660 feet of known bald eagle nests* from December 1 through July 1. In rare circumstances in which clearing needs to take place during these time frames, TVA would coordinate with U.S. Department of Agriculture (USDA) Wildlife Services to ensure any actions comply with the conditions specified under USDA's Take permit.
>
> As with manual methods, *mechanical clearing would be prohibited near nest sites for colonial wading birds and ospreys during nesting season* (February 1 through July 15). Mowing and brush-hogging would be permitted. *No vegetation clearing would be permitted within 660 feet of known bald eagle nests* from December 1 through July 1. To minimize impacts to ground nesting birds, when practicable, *mowing would be avoided during height of the breeding season* (May 1 to July 15) (Vickery et al. 2000) and would ideally occur before mid-March and after August. Heavy equipment may also be seasonally excluded from certain habitats that support unusual characteristics or sensitive species as determined by TVA biologists. . . .

[*Id.* at 1024–25 (emphasis added); *see also id.* at 1021 ("Chainsaw use would be prohibited near nest sites for colonial wading birds and ospreys during nesting season (February 1 to

July 15). No clearing would be permitted within 660 feet of known bald eagle nests from December 1 to July 1")].

Finally, the PEIS provides an extensive discussion of potential impacts of Alternative C on "Threatened, Endangered, and Protected Birds" [*Id.* at 1033–35]. The PEIS states that "TVA has determined that [right-of-way] vegetation maintenance activities addressed in this PEIS are not likely to adversely affect the federally listed piping plover, interior least tern, whooping crane, or wood stork" [*Id.* at 1033]. The PEIS then goes on to address the following protected bird species:

> **Piping plover and Interior Least Tern -** In the TVA study area, occupied habitats for piping plover and interior least tern have little chance of meaningfully intersecting [right-of-way] vegetation management activities. Both species utilize sandbars and similar habitats along major river systems. In the TVA study area, the interior least tern and piping plover are primarily found near the Mississippi River.
>
> The piping plover has been documented in both eastern and western Tennessee, though occurrences are rare. A 5-year study of shorebirds in the Tennessee Valley observed only three individual piping plovers between 2004 and 2009. This species is a very rare spring migrant and uncommon fall and summer migrant in Tennessee. The open shoreline habitats used by both piping plover and interior least tern do not require active vegetation management. The likelihood of vegetation management activities affecting interior least tern and piping plover is discountable.
>
> **Whooping crane -** Whooping cranes found in the TVA study area are transitory, nonbreeding, and are classified by the [FWS] as non-essential experimental populations. As such, they are not subject to Section 7 consultation except when individuals occur on National Wildlife Refuge (NWR) and National Park Service lands. About 6.7 miles of TVA [right-of-way] occurs on Wheeler NWR. Whooping crane has been documented from agricultural fields that intersect TVA [right-of-way] on the refuge. These lands are kept open by the management activities of others. The birds feed on planted crops while migrating and are only present for short periods of time. Given that areas utilized by cranes are maintained

agricultural fields, little if any tree clearing on [right-of-way] is needed in areas that could be occupied by the species; herbicide work would not occur in a season when birds would be present. Therefore, TVA has determined that the likelihood of TVA vegetation management intersecting occupied habitat for the whooping crane is negligible and any effects would be discountable.

**Wood Stork** - The U.S. breeding range of the wood stork is restricted to coastal areas of Georgia, Florida, North Carolina and South Carolina, hundreds of miles south of the TVA study area. Although breeding does not occur in the TVA region, seasonal migrants occur further to the north in Mississippi within the TVA study area. This species could use permanently inundated, open wetlands in [rights-of-way] for foraging and trees alongside of the [right-of-way] for roosting at night. Because of the extremely low likelihood of vagrant individuals being present during [right-of-way] vegetation management activities, any potential for direct, indirect, or cumulative impacts to wood storks is discountable.

**Red-cockaded Woodpecker** - TVA [right-of-way] vegetation management has the potential to intersect habitat for the red-cockaded woodpecker at several locations in Mississippi, including Bienville and Tombigbee National Forest (NF) and the Sam D. Hamilton Noxubee NWR. In 1993, TVA completed construction of about 13.8 miles of transmission line through Bienville NF. Design and construction of the line was coordinated with U.S. Forest Service and [FWS] to avoid impacting nesting colonies of red-cockaded woodpecker.

TVA also has about 10.3 miles of transmission line crossing Tombigbee NF and Sam D. Hamilton Noxubee NWR, portions of which are located adjacent to each other in Winston County, Mississippi. No extant colonies are known to occur in Tombigbee NF and local land managers at both Bienville NF and Sam D. Hamilton Noxubee NWR units have supplied TVA with the current location of red-cockaded woodpecker colonies. Based on data from 2018, Bienville NF is the only area in Mississippi where extant colonies are known to occur within two miles of the TVA transmission line [right-of-way].

TVA has used information on known red-cockaded woodpecker colony locations to establish 0.5-mile buffers around these locations in the O-SAR database. TVA would restrict [right-of-way] vegetation management, such that no activity would occur during the breeding season, between April–July. As part of the O-SAR desktop review process, TVA will request any new data from the local land managers to update O-SAR buffers before planned

> floor work in Tombigbee NF, Bienville NF, and Sam D. Hamilton Noxubee NWR. TVA would also contact local land managers before tree work to determine if the location of proposed work overlaps with colonies. TVA would initiate a stand-alone consultation with the [FWS] if nest trees are proposed for removal. TVA has determined that routine vegetation management activities are not likely to adversely affect (NLAA) red-cockaded woodpecker, and that non-routine activities with potential to affect this species would be subject to individual ESA Section 7 consultations.
>
> Bald eagles are considered federally delisted and monitored under the ESA, but they are still protected under the Bald and Golden Eagle Protection Act. This species is associated with large mature trees capable of supporting its massive nests. These are usually found near larger waterways where the eagles forage. Field surveys would be performed on all tree clearing projects and appropriate buffers would be established around active nests to prohibit disturbance from vegetation maintenance activities.

[*Id.* at 1033–35].

In light of all of this information, and considering the deference owed to the agency, the Court finds that the PEIS takes the requisite hard look at the potential environmental impacts of Alternative C on birds, including the impacts on nesting season.

**c. Tennessee Code Annotated § 70-4-114**

Plaintiffs also point to Tennessee Code Annotated § 70-4-114, which states:

> (a) It is unlawful to disturb, mutilate, or destroy the home, nest, or den of any *protected wild animals or birds*, to use spears or any like device in the hunting or taking of protected wild animals, to blind with lights, except as provided in § 70-4-113, or to use explosives, chemicals, mechanical devices, or smokers of any kind to drive protected wild animals out of their dens, holes, or houses.
>
> (b) A violation of this section is a Class C misdemeanor.

Tenn. Code Ann. § 70-4-114 (emphasis added). Plaintiffs contend the PEIS should have taken a "hard look" at this state law [Doc. 559, p. 42]. But there is no requirement that an

EIS take a "hard look" at applicable environmental laws—NEPA requires that agencies take a "hard look" at the *environmental impacts* of their proposed actions. *See Marsh*, 490 U.S. at 374. And, regardless, it appears that plaintiffs raise Tennessee Code Annotated § 70-4-114 in regard to the protection of the nests of protected birds. But for all of the reasons explained *supra*, the Court finds that the PEIS adequately considered the effects of Alternative C on protected birds, including the impacts during nesting season, and the potential mitigation measures that could be taken during nesting season.

**8. Mitigation Measures**

Plaintiffs next argue that the PEIS does not include a reasonably complete discussion of possible mitigation measures [Doc. 559, p. 42]. Plaintiffs contend that steps that can be taken to mitigate adverse environmental consequences is an important ingredient of an EIS [*Id.* at 43 (citing *Roberson*, 490 U.S. at 352)]. However, the PEIS makes no effort to discuss mediation of the anticipated soil erosion, except to blithely state that, in some cases, TVA would reseed the right-of-way area [*Id.* at 43–44]. Plaintiffs assert that TVA attempts to "gloss over' the problem by stating, without explanation, that the effects of erosion will be limited [*Id.* at 44]. But plaintiffs allege that these statements are not sufficiently specific [*Id.* at 45].

TVA responds that the details plaintiffs describe, such as estimating the amount of topsoil that will be used, planting trees versus reseeding, outlining when and where reseeding will take place, are the types of decisions that will be made when TVA implements site-specific vegetation management decisions [Doc. 562, p. 31]. TVA

contends that the PEIS's discussion of mitigation measures fully satisfies the level of detail required in a programmatic NEPA document [*Id.*]. Moreover, TVA argues that, by focusing only on soil erosion, plaintiffs criticize one aspect of a much broader consideration of mitigation [*Id.*]. The PEIS considers potential environmental effects for 20 resources and specifically discusses any mitigation measures that would be applicable to each one [*Id.*].

Plaintiffs reply that TVA should take steps to minimize erosion, but the statement in the PEIS that it may do so, in some undefined circumstances, is not a "candid acknowledgement" of the extent of the erosion the clear-cutting will cause, and therefore, is not a searching and careful inquiry [Doc. 566, p. 34].

"To be sure, one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 490 U.S. at 351. This requirement flows both from "the language of the Act and, more expressly, from CEQ's implementing regulations."[28] *Id.* The Supreme Court has noted that "omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA." *Id.* at 352. On the other hand, however, "it would be inconsistent with NEPA's reliance on procedural mechanisms . . . to demand the presence

[28] As discussed *supra*, those implementing regulations have since been rescinded. *See Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10610-01 (Feb. 25, 2025).

of a fully developed plan that will mitigate environmental harm before an agency can act." *Id.* at 353.

Notably, the PEIS contains sections devoted to mitigation measures as to many of 20 identified resources [AR at 1014 (vegetation); 1024 (wildlife), 1049 (threatened and endangered species), 1071 (aquatic ecology), 1080 (wetlands), 1099 (natural areas), 1102 (parks and recreation), 1107 (archaeological and historical resources), 1119 (health and safety)].

In alleging that the PEIS's discussion of mitigation measures is inadequate specifically as to the issue of soil erosion, plaintiffs point to a statement in the PEIS which states: "In some cases, TVA restores the transmission [right-of-way] through reseeding. Generally, these restorative measures are implemented to: 1. Minimize soil erosion . . . ." [AR at 953; *see also* Doc. 559, pp. 43–44]. Plaintiffs also point to a portion of the PEIS indicating that TVA expects "*[l]imited disturbance and erosion of soils* resulting from vegetation removal, traffic of maintenance equipment, and localized manual clearing activities" [AR at 876 (emphasis added); *see also* Doc. 559, pp. 43–45].

But the PEIS also includes the following regarding reseeding as a mitigation effort:

> **2.3.1.2 Advantages**
> Reseeding facilitates restoration to a compatible vegetative community in the transmission [right-of-way]. Both methods help *control erosion* and prevent the establishment of noxious and/or invasive weeds. Additionally, restoration improves and promotes wildlife habitat and mitigates visual impacts of clearing vegetation. Steep slopes or *erodible soils with little potential for natural revegetation are areas that could require restoration if disturbed*. . . .

[AR at 955 (emphasis added)]. The PEIS also states that "[r]eseeding disturbed areas would result in *decreased erosion*, less sedimentation, and improved water quality. Some methods would involve machinery that can disturb soil in the short-term but stabilize it when vegetation is established" [*Id.* at 1048 (emphasis added)].

Additionally, the PEIS appears to contemplate other mitigation measures that can offset potential erosion. Regarding debris management, the PEIS states that "[d]ebris left in place can *reduce the erosion potential* caused by runoff during heavy rain and may limit the runoff of fine sediments into streams" [*Id.* at 1046 (emphasis added)]. And the PEIS notes that "[w]etland restoration can help to stabilize disturbed soil" [*Id.* at 1080].

Further, the PEIS contains more specifics regarding mitigation efforts to offset erosion than plaintiffs would have the Court believe. Specifically, the PEIS lists mitigation efforts including "[e]rosion control techniques are implemented within 50 feet of identified wetland areas where soil disturbance is proposed" and "[d]isturbed and exposed soils are seeded upon completion of work (or within 14 days, whichever comes first)" [*Id.* at 1080–81]. Accordingly, the PEIS sets forth a general location and timeline for implementing mitigation measures regarding erosion.

The Court again emphasizes the Supreme Court's direction that "courts should afford substantial deference to the agency as to the scope and contents of the EIS." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 192. Affording TVA that deference as to the scope of the PEIS's consideration of mitigation measures related to soil erosion, the Court finds that TVA's analysis of that issue was reasonable, and TVA therefore took the required

"hard look" at the environmental effects (and potential mitigation measures) of soil erosion from implementing Alternative C.

**9. Appendix H and Compatible Trees**

Finally, plaintiffs argue that the PEIS is deceptive because, while it includes language indicating that "Compatible Trees [may be] Allowed," Appendix H to the PEIS, which is the "Comprehensive List of Compatible Trees and Shrubs," lists 46 bushes and shrubs but no trees [Doc. 559, pp. 6–7; Doc. 561, pp. 13, 18–19].

In response, TVA relies upon the DNA, which it prepared following the Sixth Circuit's decision in *Sherwood III*, and which "clarifies" that Appendix H represents a list of vegetation that is preauthorized to be planted in the right-of-way but is not an exclusive list [Doc. 562, p. 8].[29] TVA also argues that plaintiffs have not connected the alleged discrepancy regarding Appendix H to any deficiency in the analysis of the alternatives' potential environmental effects [Doc. 565, p. 3]

Plaintiffs reply that the idea that Appendix H is a "comprehensive list" but not an "exclusive list" is "stupefying" and not a reasonable interpretation of the PEIS [Doc. 566, p. 11]. Moreover, the idea that TVA will consider the compatibility of vegetation not included in Appendix H on a case-by-case basis is not found in the PEIS [*Id.* at 12].

As discussed *supra*, the Court finds that the PEIS is somewhat ambiguous as to whether any trees would be permitted in the right-of-way under Alternative C. The PEIS

[29] For the reasons explained *supra*, the Court has already determined that the DNA is not an appropriate part of the administrative record in this case. Accordingly, the Court will not consider the DNA in its analysis of this issue.

states that, "[u]nder Alternative C there would be greater coordination and interaction with local landowners to identify compatible vegetation. TVA would work with local property owners to evaluate the compatibility of vegetation within or near the transmission [right-of-way]. Vegetation compatible with the safe and reliable operation of the transmission system may be allowed to remain within the [right-of-way]" [AR at 895; *see also id.* at 985, 1159]. While this statement does not specifically mention trees, it does suggest that "compatible" vegetation would be allowed to remain in the right-of-way, after consultation with property owners to evaluate the compatibility of vegetation. The PEIS also states that, under Alternative C "TVA would have the option to allow *compatible trees* to remain in areas actively maintained by others" [*Id.* at 983 (emphasis added)]. But the PEIS also states that "[c]ompatible species of trees and shrubs are listed in Appendix H" [*Id.*]. And, as the Sixth Circuit concluded in *Sherwood III*, Appendix H does not include any trees, but rather, only contains a list of "flowers, bushes, and small shrubs[.]" *See Sherwood III*, 46 F.4th at 444. The title of Appendix H injects more ambiguity into the situation. The title page for Appendix H is labeled "Appendix H – List of Compatible Trees and Shrubs" [AR at 2138], but Table H-1, contained in that appendix, is labeled "*Comprehensive* List of Trees and Shrubs that are Compatible Within TVA ROWs" [*Id.* at 2140–43 (emphasis added)].[30]

[30] As noted *supra*, the Court's review of the PEIS has uncovered no other references to Appendix H being a "comprehensive" list of compatible vegetation, beyond the title of the table in Appendix H itself.

Despite this ambiguity, given the highly deferential standard under *Seven County Infrastructure Coalition*, 605 U.S. at 185, the Court does not find that the failure to include any tree species in Appendix H constitutes failure to take a hard look at the environmental impacts of Alternative C. The primary problem with the PEIS in this regard is that Appendix H contains the word "trees" in its title, while the list itself does not contain any trees, which appears inconsistent. But, had TVA omitted the word "trees" from the title of Appendix H, and labeled the list simply "compatible vegetation," the failure to include any trees in that list would certainly have been an appropriate exercise of agency discretion, and the Court would not be free to substitute its judgment for that of the agency. *See Kelley*, 42 F.3d at 1518.

Admittedly, why TVA choose to refer to "compatible trees" and prepare a list that contained no trees is not clear to the Court. Perhaps TVA meant to leave open the possibility of allowing trees in some areas, based upon the site-specific EISs that will tier from the PEIS. Perhaps the inclusion was mere oversight. Regardless, mindful that "an EIS is only one input into an agency's decision" and "the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained," *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180, the Court finds, for all the reasons it has discussed throughout this memorandum opinion, that TVA's selection of Alternative C was reasonable and reasonably explained, despite the ambiguity regarding Appendix H. Moreover, any error in the failure to include any trees in Appendix H, despite the labeling of such list as including "compatible trees," appears to be harmless, as the Court has no

evidence that TVA might have disproved the project if this ambiguity regarding Appendix H were corrected. *See id.* at 184–85 ("Even if an EIS falls short in some respects, that deficiency may not necessary require a court to vacate the agency's ultimate approval of a project, at least absent reason o believe that the agency might disapprove the project if it added more to the EIS").

## IV. CONCLUSION

The Supreme Court recently clarified, in no uncertain terms, "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 185. TVA's choices regarding the selection of Alternative C, as well as its choices regarding the scope of the PEIS, are due such deference. Plaintiffs' arguments essentially ask the Court to micromanage agency decisions about the scope and contents of the PEIS, which the Court may not do. *See id.* at 182–83 ("Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness"). Moreover, "[t]he ultimate question is not whether an EIS in and of itself is inadequate but whether the agency's final decision was reasonable and reasonably explained." *Id.* at 184. For all the reasons the Court has set forth in the course of this memorandum opinion, the Court finds that, despite any deficiencies in the PEIS, TVA's ultimate selection of Alternative C was reasonable and reasonably explained. As a result, TVA's selection of Alternative C was not arbitrary or capricious.

Accordingly, and for the reasons stated above, TVA's motion for summary judgment [Doc. 557] is **GRANTED** and plaintiffs' motion for summary judgment [Doc. 559] is **DENIED**. The Court's July 31, 2017, Injunction Order [Doc. 427] is **DISSOLVED**. An appropriate order will follow.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE